**In re THE WALT DISNEY COMPANY DERIVATIVE LITIGATION**

No. Civ.A. 15452.

Court of Chancery of Delaware.

Submitted April 28, 2005.

Decided Aug. 9, 2005.

Joseph A. Rosenthal, Norman M. Monhait and Carmella P. Keener of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Seth D. Rigrodsky, of Milberg Weiss Bershad & Schulman LLP, Wilmington, Delaware; Steven G. Schulman, Joshua H. Vinik, Jennifer K. Hirsh and John B. Rediker, of Milberg Weiss Bershad & Schulman LLP, New York, New York, for Plaintiffs, of counsel.

David C. McBride and Christian Douglas Wright, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Mark H. Epstein and Jason L. Haas, of Munger, Tolles & Olson LLP, Los Angeles, California, for Defendant Michael S. Ovitz, of counsel.

Andre G. Bouchard and Joel Friedlander, of Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware, for Nominal Defendant The Walt Disney Company.

Robert K. Payson, Stephen C. Norman and Kevin R. Shannon, of Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant Sanford M. Litvack.

Jesse A. Finkelstein, Gregory P. Williams, Anne C. Foster, Lisa A. Schmidt, Evan O. Williford and Michael R. Robinson, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Defendants Stephen F. Bollenbach, Reveta F. Bowers, Ignacio E. Lozano, Jr., George J. Mitchell, Thomas S. Murphy, Richard A. Nunis, Leo J. O'Donovan, S.J., Sidney Poitier, Irwin E. Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson and Gary L. Wilson.

A. Gilchrist Sparks, III and S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Stephen D. Alexander and Fred L. Wilks, formerly of Fried, Frank, Harris, Shriver & Jacobson LLP, Los Angeles, California, for Defendants Roy Disney and Stanley P. Gold, of counsel.

Lawrence C. Ashby and Richard D. Heins, of Ashby & Geddes, Wilmington, Delaware; Gary P. Naftalis, Michael S. Oberman, Paul F. Schoeman and Shoshana Menu, of Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendant Michael Eisner, of counsel.

*OPINION*

CHANDLER, J.

## TABLE OF CONTENTS

Introduction .................................................................. 697

I. FACTS ................................................................. 699
 A. Michael Ovitz Joins The Walt Disney Company .......................... 699
 1. Background........................................................ 699
 2. Ovitz First Contemplates Leaving CAA But His Negotiations With MCA Fail........................................................... 701
 3. Ovitz Seriously Considers Joining The Walt Disney Company .......... 702
 4. Ovitz's Contract With Disney Begins to Take Form ................... 703
 5. Crystal is Retained to Assist Russell and Watson in Evaluating the OEA 704
 6. Ovitz Accepts Eisner's Offer ...................................... 706
 7. Disney's Board of Directors Hires Michael Ovitz..................... 708
 8. The October 16, 1995 Compensation Committee Meeting.............. 710
 B. Ovitz's Performance as President of the Walt Disney Company............. 711
 1. Ovitz's Early Performance ......................................... 711
 2. A Mismatch of Cultures and Styles ................................. 713
 3. Approaching the Endgame.......................................... 714
 4. Specific Examples of Ovitz's Performance as President of The Walt Disney Company ............................................... 715
 5. Veracity and "Agenting"........................................... 719
 6. Gifts and Expenses ............................................... 722
 C. Ovitz's Termination................................................... 724
 1. The Beginning of the End .......................................... 724
 2. The September 30, 1996 Board Meeting ............................. 726
 3. Options for Ovitz's Termination.................................... 728
 4. The November 25, 1996 Board Meeting.............................. 730
 5. The Illusion Dispelled ............................................. 732
 6. Ovitz's Bonus and His Termination ................................. 733
 D. Expert Witnesses ..................................................... 740
 1. Professor Deborah DeMott ......................................... 740
 2. Professor John Donohue............................................ 741
 3. Professor Kevin Murphy ........................................... 742
 4. Larry R. Feldman ................................................. 743
 5. John C. Fox ...................................................... 744
 6. Frederick C. Dunbar............................................... 744

II. LEGAL STANDARDS.................................................... 745
 A. The Business Judgment Rule ........................................... 746
 B. Waste ............................................................... 748
 C. The Fiduciary Duty of Due Care ....................................... 749
 D. The Fiduciary Duty of Loyalty......................................... 750
 E. Section 102(b)(7) ..................................................... 751
 F. Acting in Good Faith ................................................. 753

III. ANALYSIS............................................................. 756
 A. Ovitz Did Not Breach His Duty of Loyalty ............................. 757
 B. Defendants Did Not Commit Waste .................................... 758
 C. The Old Board's Decision to Hire Ovitz and the Compensation Committee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith 760
 1. Eisner .......................................................... 760
 2. Russell.......................................................... 763
 3. Watson.......................................................... 765

4. Poitier and Lozano............................................... 765
5. The Remaining Members of the Old Board.......................... 771
D. Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith ........................................... 772
1. The New Board Was Not Under a Duty to Act ..................... 773
2. Litvack........................................................ 776
3. Eisner ........................................................ 777

IV. CONCLUSION ...................................................... 779

## INTRODUCTION

This is the Court's decision after trial in this long running dispute over an executive compensation and severance package. The stockholder plaintiffs have alleged that the director defendants breached their fiduciary duties in connection with the 1995 hiring and 1996 termination of Michael Ovitz as President of The Walt Disney Company. The trial consumed thirty-seven days (between October 20, 2004 and January 19, 2005) and generated 9,360 pages of transcript from twenty-four witnesses. The Court also reviewed thousands of pages of deposition transcripts and 1,033 trial exhibits that filled more than twenty-two 3½-inch binders. Extensive post-trial memoranda also were submitted and considered. After carefully considering all of the evidence and arguments, and for the reasons set forth in this Opinion, I conclude that the director defendants did not breach their fiduciary duties or commit waste. Therefore, I will enter judgment in favor of the defendants as to all claims in the amended complaint.

As I will explain in painful detail hereafter, there are many aspects of defendants' conduct that fell significantly short of the best practices of ideal corporate governance. Recognizing the protean nature of ideal corporate governance practices, particularly over an era that has included the Enron and WorldCom debacles, and the resulting legislative focus on corporate governance, it is perhaps worth pointing out that the actions (and the failures to act) of the Disney board that gave rise to this lawsuit took place ten years ago, and that applying 21st century notions of best practices in analyzing whether those decisions were actionable would be misplaced.

Unlike ideals of corporate governance, a fiduciary's duties do not change over time. How we understand those duties may evolve and become refined, but the duties themselves have not changed, except to the extent that fulfilling a fiduciary duty requires obedience to other positive law. This Court strongly encourages directors and officers to employ best practices, as those practices are understood at the time a corporate decision is taken. But Delaware law does not—indeed, the common law cannot—hold fiduciaries liable for a failure to comply with the aspirational ideal of best practices, any more than a common-law court deciding a medical malpractice dispute can impose a standard of liability based on ideal—rather than competent or standard—medical treatment practices, lest the average medical practitioner be found inevitably derelict.

Fiduciaries are held by the common law to a high standard in fulfilling their stewardship over the assets of others, a standard that (depending on the circumstances) may not be the same as that contemplated by ideal corporate governance. Yet therein lies perhaps the greatest strength of Delaware's corporation law. Fiduciaries who act faithfully and honestly on behalf of those whose interests they

represent are indeed granted wide latitude in their efforts to maximize shareholders' investment. Times may change, but fiduciary duties do not. Indeed, other institutions may develop, pronounce and urge adherence to ideals of corporate best practices. But the development of aspirational ideals, however worthy as goals for human behavior, should not work to distort the legal requirements by which human behavior is actually measured. Nor should the common law of fiduciary duties become a prisoner of narrow definitions or formulaic expressions. It is thus both the province and special duty of this Court to measure, in light of all the facts and circumstances of a particular case, whether an individual who has accepted a position of responsibility over the assets of another has been unremittingly faithful to his or her charge.

Because this matter, by its very nature, has become something of a public spectacle—commencing as it did with the spectacular hiring of one of the entertainment industry's best-known personalities to help run one of its iconic businesses, and ending with a spectacular failure of that union, with breathtaking amounts of severance pay the consequence—it is, I think, worth noting what the role of this Court must be in evaluating decision-makers' performance with respect to decisions gone awry, spectacularly or otherwise. It is easy, of course, to fault a decision that ends in a failure, once hindsight makes the result of that decision plain to see. But the essence of business is risk—the application of informed belief to contingencies whose outcomes can sometimes be predicted, but never known. The decision-makers entrusted by shareholders must act out of loyalty to those shareholders. They must in good faith act to make informed decisions on behalf of the shareholders, untainted by self-interest. Where they fail to do so, this Court stands ready to remedy breaches of fiduciary duty.

Even where decision-makers act as faithful servants, however, their ability and the wisdom of their judgments will vary. The redress for failures that arise from faithful management must come from the markets, through the action of shareholders and the free flow of capital, and not from this Court. Should the Court apportion liability based on the ultimate outcome of decisions taken in good faith by faithful directors or officers, those decision-makers would necessarily take decisions that minimize risk, not maximize value. The entire advantage of the risk-taking, innovative, wealth-creating engine that is the Delaware corporation would cease to exist, with disastrous results for shareholders and society alike. That is why, under our corporate law, corporate decision-makers are held strictly to their fiduciary duties, but within the boundaries of those duties are free to act as their judgment and abilities dictate, free of *post hoc* penalties from a reviewing court using perfect hindsight. Corporate decisions are made, risks are taken, the results become apparent, capital flows accordingly, and shareholder value is increased.

Because of these considerations, I have tried to outline carefully the relevant facts and law, in a detailed manner and with abundant citations to the voluminous record. I do this, in part, because of the possibility that the Opinion may serve as guidance for future officers and directors—not only of The Walt Disney Company, but of other Delaware corporations. And, in part, it is an effort to ensure meaningful appellate review. Ultimately, however, it is for others to judge whether my effort here offers reasonable guidance to corporate directors, in general, on the subject of executive compensation

and severance payments.[1] What follows is my judgment on whether each director of The Walt Disney Company fulfilled his or her obligation to act in good faith and with honesty of purpose under the unusual facts of this case.

## I. FACTS [2]

### A. Michael Ovitz Joins The Walt Disney Company

#### 1. Background

The story of Michael Ovitz's rise and fall at The Walt Disney Company ("Disney" or the "Company") begins with the unfortunate and untimely demise of Frank Wells. Before his death, Wells served as Disney's President and Chief Operating Officer, and both he and Michael Eisner, Disney's Chairman and CEO, enjoyed ten years of remarkable success at the Company's helm. In April 1994, a fatal helicopter crash ended Wells' tenure at Disney and forced the company to consider a decision it was not properly prepared or ready to make.[3]

Disney's short list of potential internal successors produced, for one reason or another, no viable candidates.[4] Instead, Eisner assumed Disney's presidency, and for a brief moment, the Company was able to stave off the need to replace Wells. Within three months, however, misfortune again struck the Company when Eisner was unexpectedly diagnosed with heart disease and underwent quadruple bypass surgery. The unfortunate timing of Eisner's illness and operation set off an "enormous amount of speculation" concerning Eisner's health and convinced Eisner of the need to "protect[ ] the company and get[ ] help." [5] Over the next year, Eisner and Disney's board of directors discussed the need to identify Eisner's successor. These events were the springboard from which Eisner intensified his longstanding desire to bring Michael Ovitz within the Disney fold.[6]

By the summer of 1995, Michael Ovitz and Michael Eisner had been friends for nearly twenty-five years. These men were very well acquainted, both socially and professionally. Over time, this relationship engendered numerous overtures, by which Eisner and Ovitz flirted with the idea of joining ranks and doing something

**1.** The subject of executive compensation itself has recently produced much thoughtful analysis and comment. *See, e.g.,* Lucian Bebchuk and Jesse Fried, PAY WITHOUT PERFORMANCE: THE UNFULFILLED PROMISE OF EXECUTIVE COMPENSATION (2004) (describing how management influence distorts the compensation process); Stephen M. Bainbridge, *Executive Compensation: Who Decides,* 83 TEX. L.REV. 1615 (2005) (reviewing and critiquing Bebchuk and Fried's *Pay Without Performance* ).

**2.** To be consistent with the parties' submissions, the trial transcript will be cited as "Tr. ####," and at relevant times will indicate the particular witness by including that witness' name in parentheses. Deposition testimony will be cited as "[Deponent] ####." Plaintiffs' trial exhibits will be cited as "PTE" and Defendants' trial exhibits will be cited as

"DTE." Finally, for the sake of clarity, the Court will refer to Roy Disney as such.

**3.** *See* Tr. 4148:11–4150:5.

**4.** Tr. 3997:24–3999:4; *see also* 6025:7–19.

**5.** *See* Tr. 4150:20–4152:8.

**6.** Eisner never called a board meeting for the specific purpose of discussing the possibility of hiring Ovitz, but at various times Eisner did contact board members on an individual basis. *See* Tr. 3665:1–3676:20 (Gold); 3997:6–3999:4 (Roy Disney); 4699:19–4700:24 (Eisner); 5913:23–5914:10 (Bowers); 7125:2–18 (Poitier); 7628:19–7629:2 (Lozano); 8142:2–8 (Stern); *see also* Bowers 183:13–185:6; 192:8–25; Lozano 54:13–56:14; Mitchell 17:23–19:14; Wilson 44:22–45:23; 48:14–49:2.

together.[7] As Eisner put it: "I had been trying to hire him forever.... I couldn't do business with him ... he was too tough, so I thought he would be better ... on our side." [8] But until Eisner had offered Ovitz Disney's presidency, Ovitz had never seriously considered any of Eisner's offers and, according to Ovitz, there was good reason.

Michael Ovitz's interest in the entertainment industry was kindled during his high school years and, from that time through college, Ovitz held different posts at Universal Studios and Twentieth Century Fox. After graduating college, Ovitz left the studios and gained employment in the mailroom of the William Morris Agency. At that time, William Morris was well regarded as the oldest and largest theatrical talent agency in the world.[9] Ovitz worked for William Morris for six years, and had worked his way up to become a talent agent within the agency's television department. Here, Ovitz began to question the company's direction and its approach to representing its clients. Despite several colleagues' attempts to address their discontent with management, their efforts were not well received and, eventually, these philosophical disagreements led to an impasse. Ovitz and four other William Morris agents left, and Creative Artist Agency ("CAA") was born.

CAA had a modest beginning and, from 1974 to 1979, the company's revenues were barely sufficient to meet its expenses.[10] During this period, most of CAA's business focused on the television industry, because CAA was self-financed and television revenues were more certain than revenues from feature films.[11] It was not until late 1979 that CAA branched off into the motion picture industry, and another four or five years later, the company moved into the music and consulting businesses. Ovitz attributes CAA's rise, in part, to a business model that he dubbed: "packaging." [12] As Ovitz explained, before CAA, it was Hollywood studios, distributors or networks that controlled the talent "either contractually or by virtue of the fact that they had all of the distribution capability." [13] CAA revolutionized this system by grouping various talents, whether they were actors, directors or writers. These "packaged" talents could then coordinate their efforts to best exploit their leverage and maximize the economics of any given deal.[14] The effect of Ovitz's business model was clear. By 1995, CAA had reshaped an entire industry and had grown from five men sitting around a card table to the premier Hollywood talent agency. When Ovitz joined Disney, he left behind 550 employees and an impressive

7. Tr. 1105:12–1106:13 (Ovitz) ("[O]ver the years, he had asked me, and we had talked many times about doing something together from the time he [Eisner] was with ABC, then at Paramount and then when he went to Disney.").

8. Eisner 111:3–112:2.

9. Tr. 1091:6–10.

10. CAA's beginnings were so modest that the wives of the five founding partners were needed on a rotating basis to answer the company's phones. Tr. 1093:1–5.

11. Tr. 1094:20–1095:16.

12. *Id.*

13. Tr. 1093:8–24.

14. During trial, Ovitz best explained the concept of packaging by way of example. After Warner Brothers had rejected the screenplay for the motion picture *Rain Man*, the screen writer, using CAA as a conduit, was able to pass his work on to Dustin Hoffman, who teamed up with Tom Cruise, another CAA client, and Barry Levinson, to produce a picture that went on to win 1989's Academy Award for Best Picture. Tr. 1094:2–19.

roster of about 1400 of Hollywood's top actors, directors, writers and musicians—a roster that earned CAA approximately $150 million in annual revenues. In turn, this success translated into an annual income of $20 million for Ovitz and, for his part, he was regarded as one of the most powerful figures in Hollywood.

### 2. Ovitz First Contemplates Leaving CAA But His Negotiations With MCA Fail

In the spring of 1995, CAA was retained to facilitate negotiations between the Seagram Company and Matsushita where Seagram was to purchase eighty percent of Matsushita's holdings in Music Corporation of America ("MCA," now known as Universal Studios). During those negotiations, Edgar Bronfman Jr., Seagram's Chairman and CEO, who had known Michael Ovitz for a number of years, began to discuss with Ovitz the possibility of leaving CAA and joining MCA.

Bronfman's deal contemplated MCA purchasing CAA's consulting business from Ovitz, Ron Meyer and Bill Haber (the three remaining CAA founders and its only shareholders) in exchange for MCA stock. Ovitz, Meyer, and Haber would then sell their remaining CAA interest to a third party and use the proceeds to purchase more MCA stock.[15] If the deal were consummated, Ovitz would take MCA's reins as Chairman and CEO and would be paid handsomely for the job, including options for an additional 3.5 percent of MCA, $1.5 million in Seagram shares, and a sev-en-year contract (with a three-year renewal option) that paid a seven-figure salary with performance-based cash bonuses that could reach three to five times the base salary.[16]

By June 1995, it was apparent that Ovitz's deal with MCA would never materialize. Ovitz attributed this failure to his rising skepticism over his ability to improve "a company that had been flat for five [or more] years" in a culture unlikely "to support the effort of expansion, capital expenses, and changing overhead" that Ovitz perceived was needed.[17] Fueling Ovitz's skepticism was his perception that sudden changes to the terms of the CAA/MCA deal were not coming from Bronfman, but, in fact, were instigated at the behest of Bronfman's father and uncle, who were controlling shareholders in the Seagram Company. In the end, Ovitz remained unconvinced that Bronfman could deliver the things that he was promising to deliver.[18]

With the MCA deal falling apart, Ovitz returned to CAA and business continued as usual until Ovitz discovered that his close friend and number two at CAA, Ron Meyer, was leaving for MCA. This revelation devastated Ovitz, who had no idea Meyer was interested in leaving CAA, let alone leaving without Ovitz. Suddenly, the prospect of Ovitz remaining with the company he and Meyer built no longer seemed palatable, and Ovitz became receptive to the idea of joining Disney.

---

15. If the fair market value of CAA's non-consulting business was less than $50 million, Ovitz, Meyer and Haber would be required to invest their personal assets to bring their collective investment in MCA up to $50 million. In return, MCA would provide Ovitz, personally, with ninety percent of the quantity of MCA restricted stock needed to bring the three CAA shareholders' collective stake in MCA equity up to six and a half percent. PTE 793.

16. *Id.*

17. Tr. 1280:14–1281:22.

18. *Id.*

### 3. Ovitz Seriously Considers Joining The Walt Disney Company

Michael Eisner had been following Ovitz's talks with MCA closely and believed that now was the time to either talk to Ovitz seriously about joining Disney or face the possibility of having Ovitz at the helm of a major Disney competitor.[19] Thus, the informal overtures that had spanned the last two decades intensified and Eisner was "on a hunt"[20] to bring Ovitz to Disney.

Eisner's renewed efforts to recruit Ovitz received support from Sid Bass and Roy Disney (Roy Disney was also a director of the Company), two of the company's largest individual shareholders.[21] Hoping not to be outdone by MCA, Eisner and Irwin Russell (the chairman of Disney's compensation committee) reached out to Ovitz and attempted to convince him to join Disney. Both Eisner and Russell knew the basic terms and economics of MCA's offer and both knew that Disney would not match or exceed those terms.[22] For this reason, the initial talks with Ovitz were unproductive and ended in short order. Eisner could not compete with the rich terms MCA was offering and he settled on the notion that Disney would have "to live with [Ovitz going to] a competitor because [Disney] could not match [MCA's terms]."[23] Within a few weeks, however, the tides changed and Eisner learned that Meyer was leaving CAA to join MCA. For the first time, Eisner's desire to hire Ovitz was aligned with Ovitz's desire to leave CAA.

Eisner's efforts to hire Ovitz were in full swing by mid-July 1995. Russell, per Eisner's direction, assumed the lead role in negotiating the financial terms of the contract. These efforts took on significant import in the face of Disney's recent announcement of the acquisition of CapCities/ABC, a transaction that would double the size of Disney, place even greater demands on Eisner, and exacerbate the need for someone else to shoulder some of the load. Russell, in his negotiations with Bob Goldman, Ovitz's attorney, learned that Ovitz was making approximately $20 to $25 million a year from CAA and owned fifty-five percent of the company.[24] From the start, Ovitz made it clear that he would not give up his fifty-five percent interest in CAA without downside protection.[25]

---

**19.** See Tr. 4173:24–4175:12 (Eisner) ("I saw a parade of horribles in front of me, which were resolved in a fairly, averagely managed company coming back to America. I saw a company that spent money pretty freely, wanting maybe to get Michael Ovitz to come manage it. And I was getting a little nervous about the prospect of . . . having Michael Ovitz work for us be usurped by MCA, and not only have him not work for us but be a competitor.").

**20.** Id.

**21.** From the beginning, Bass made clear that he would support Ovitz's hiring but that he would not support Ovitz sharing equal power with Eisner. See PTE 778 at MDE 000053.

**22.** See, e.g., Tr. 4175:13–4177:3.

**23.** Id.

**24.** Plaintiffs have contended that the compensation committee had no informed discussions concerning Ovitz's earnings while with CAA and attribute this failure to Russell. See Pls.' Post Trial Open. Br. at 20; Tr. 2755:1–22. Russell did, however, have a basic understanding of what MCA was willing to pay Ovitz. See Tr. 2630:8–2631:10; see also DTE 76 at DD001991. Russell also testified that Goldman had represented to him that Ovitz was earning approximately $20 to $25 million a year from CAA and that he had no reason to question Goldman's veracity. Tr. 2755:1–22.

**25.** Ovitz repeated several times throughout his testimony that he had learned during his years of experience representing talent always to negotiate for upside participation and downside protection, and that when it came to negotiating for his own interests, he wanted no less. See, e.g., Tr. 1277:9–1278:5; 2175:2–2177:7.

While Russell and Goldman were in the preliminary stages of negotiating the financial terms of Ovitz's contract, Eisner and Ovitz continued their talks as well. From these talks, Ovitz gathered that it was his skills and experience that would be brought to bear on Disney's current weaknesses, which he identified as poor talent relationships and stagnant foreign growth.[26] Remaining cautious, Ovitz wanted assurances from Eisner that Ovitz's vision was shared and that Eisner was sincere in his desire to reinvent Disney. Apparently, Eisner was able to assuage Ovitz's concerns, because at some point during these negotiations, Ovitz came to the understanding that he and Eisner would run Disney as partners. Ovitz did recognize that Eisner was Chairman and would be his superior, but he believed that the two would work in unison in a relationship akin to the one that exists between senior and junior partners.[27] As it would turn out, Ovitz was mistaken, for Eisner had a radically different perception of their respective roles at Disney.

### 4. *Ovitz's Contract With Disney Begins to Take Form*

By the beginning of August 1995, the non-contentious terms of Ovitz's employment agreement (the "OEA") were $1 million in annual salary and a performance-based, discretionary bonus.[28] The remaining terms were not as easily agreed to and related primarily to stock options and Ovitz's insistence for downside protection.[29] Ovitz, using Eisner's contract as a yardstick, was asking for options on eight million shares of Disney's stock. Both Russell and Eisner, however, refused to offer eight million options and believed that no options should be offered within the first five years of Ovitz's contract.[30] This was a non-starter, since Ovitz would not leave CAA without downside protection and Disney had a policy against front-loading contracts with signing bonuses. Using both Eisner's and Wells' original employment contracts as a template, the parties reached a compromise.[31] Under the proposed OEA, Ovitz would receive a five-year contract with two tranches of options. The first tranche consisted of three million options vesting in equal parts in the third, fourth and fifth years, and if the value of those options at the end of the five years had not appreciated to $50 million, Disney would make up the difference. The second tranche consisted of two million options that would vest immediately if Disney and Ovitz opted to renew the contract.

The proposed OEA sought to protect both parties in the event that Ovitz's employment ended prematurely and provided that absent defined causes, neither party could terminate the agreement without

**26.** Tr. 1108:5–1113:5.

**27.** Tr. 1113:21–1115:4; 1116:7–1119:2.

**28.** *See* PTE 386 at DD001925; *see also* Tr. 2415:2–14.

**29.** After the MCA negotiations fell apart, and Ovitz decided to go to Disney, Ovitz, Meyer, and Haber transferred their interests in CAA to nine agents in exchange for seventy-five percent of revenues over the next four years on deals consummated before Ovitz left. *See* PTE 204. These payments were conditioned upon the new CAA first attaining certain financial benchmarks. *See id.* At the time this transfer occurred, no up-front cash was paid and it was uncertain whether new CAA would be profitable. *See, e.g.,* Tr. 1274:13–24. The record demonstrates that the compensation committee did not consider this arrangement when they determined Ovitz's level of compensation. *See* Tr. 2761:9–15 (Russell); 7206:22–7207:20 (Poitier); 7698:24–7699:2 (Lozano); 8096:1–10 (Watson).

**30.** *See* Tr. 2415:4–2421:13; 4203:22–4204:6.

**31.** *See* DTE 40 at DD001942; *see also* Tr. 2391:14–2392:18.

penalty. If Ovitz, for example, walked away, for any reason other than those permitted under the OEA, he would forfeit any benefits remaining under the OEA and could be enjoined from working for a competitor.[32] Likewise, if Disney fired Ovitz for any reason other than gross negligence or malfeasance, Ovitz would be entitled to a non-fault payment (Non–Fault Termination or "NFT"), which consisted of his remaining salary, $7.5 million a year for any unaccrued bonuses, the immediate vesting of his first tranche of options and a $10 million cash out payment for the second tranche of options.[33]

### 5. Crystal is Retained to Assist Russell and Watson in Evaluating the OEA

As the basic terms of the OEA were coming together, Russell authored and provided Eisner and Ovitz with a "Case Study" outlining the OEA parameters and Russell's commentary on what he believed was an extraordinary level of executive compensation.[34] Specifically, Russell noted that it was appropriate to provide Ovitz with "downside protection and upside opportunity" and to assist Ovitz with "the adjustment in life style resulting from the lower level of cash compensation from a public company in contrast to the availability of cash distributions and perquisites from a privately held enterprise." [35] According to Russell, Ovitz was an "exceptional corporate executive" [36] who was a "highly successful and unique entrepreneur." [37] Nevertheless, Russell cautioned that Ovitz's salary under the OEA was at the top level for any corporate officer and significantly above that of the CEO and that the number of stock options granted under the OEA was far beyond the standards applied within Disney and corporate America "and will raise very strong criticism." [38] Russell rounded out his analysis by recommending an additional study so that he and Eisner could answer questions should they arise. Russell did not provide this Case Study to any other member of Disney's board of directors.[39]

With the various financial terms of the OEA sufficiently concrete, Russell enlisted the aid of two people who could help with the final financial analysis: Raymond Watson, a current member of Disney's compensation committee and the past chairman of Disney's board of directors (and one of the men who designed the original pay structure behind Wells' and Eisner's compensation packages); [40] and Graef Crystal, an executive compensation consultant, who is particularly well known within the industry for lambasting the extrava-

---

32. See PTE 7 ¶ 9 at WD00209. But see Tr. 804:18–805:5 (Murphy) (opining that the OEA did not contain a mitigation or non-compete clause and that Ovitz "would be perfectly free to go accept additional alternative employment").

33. See PTE 33 at DD001768–69.

34. PTE 64 at DD001935.

35. Id.

36. Id.

37. Id.

38. Id. at DD001936.

39. Tr. 2765:2–5.

40. This was the first instance where a board member other than Russell or Eisner was brought into the Ovitz negotiation process. See, e.g., Tr. 7167:5–13 (Poitier) (testifying that before August 13, 1995 he did not discuss Ovitz's compensation package); 7658:4–21 (Lozano) (testifying that before the August 1995 press release, he did not speak to any board member, aside from Eisner, concerning Ovitz's employment); 2425:18–2427:15 (Russell) (testifying that it was his intention to inform Watson of the negotiations only after there was a good possibility of a deal).

gant compensation paid to America's top executives.[41] The three men were set to meet on August 10. Before the meeting, Crystal prepared, on a laptop computer, a comprehensive executive compensation database that would accept various inputs and run Black–Scholes [42] analyses to output a range of values for the options.[43] At the meeting, the three men worked with various assumptions and manipulated inputs in order to generate a series of values that could be attributed to the OEA.[44] In addition to Crystal's work, Watson had prepared several spreadsheets presenting similar assessments, but these spreadsheets did not use the Black–Scholes valuation method. At the end of the day, the men made their conclusions, discussed them, and agreed that Crystal would memorialize his findings and fax the report to Russell.

Two days later, Crystal faxed his memorandum to Russell. In the memo, Crystal concluded that the OEA would provide Ovitz with approximately $23.6 million per year for the first five years of the deal.[45] Crystal estimated that the contract was worth $23.9 million a year, over a seven-year period, if Disney and Ovitz exercised the two-year renewal option.[46] Crystal opined that those figures would approximate Ovitz's present compensation with CAA. That evening, Russell, Watson and Crystal phoned each other and further discussed Crystal's conclusions and the assumptions underlying those conclusions.[47] During those discussions some questions surfaced, and Russell asked Crystal to revise his memo to resolve the ambiguities Russell believed existed in the current draft. Instead of addressing the points Russell highlighted, Crystal faxed a new letter to Russell expressing Crystal's concern over the portion of the OEA that created the $50 million option appreciation guarantee.[48] Crystal contended that the current language of the OEA, if he was reading it correctly, would allow Ovitz to hold the first tranche of options, wait until his five-year term was up, collect the $50 million guarantee and then exercise in-the-money options for an additional windfall.[49] In light of this, Crystal was philosophically opposed to a pay package that would give Ovitz the best of both worlds—*i.e.*, low risk and high return.[50] Crystal's letter was never circulated to any board member oth-

---

**41.** Crystal, who had previously headed Towers Perrin's compensation practice, has consulted on behalf of Disney for many years and is actively engaged in both teaching and publishing in the field. *See* Tr. 2714:5–2715:5; 3243:2–3261:15.

**42.** The Black–Scholes' method is a formula for option valuation, widely used and accepted by industry figures and regulators, that determines option value based upon a complex calculation involving the exercise price and term of the options, the price of the underlying stock, its dividend history and volatility, and the risk-free interest rate. Tr. 764:20–765:13.

**43.** Tr. 3268:13–3269:11.

**44.** The various inputs accounted for different numbers of options, vesting periods, and potential proceeds of option exercises at various times and prices. *See, e.g., id.; see also* DTE 12; DTE 28; DTE 32; DTE 56.

**45.** PTE 365.

**46.** *Id.*

**47.** Plaintiffs have questioned whether this conversation actually occurred. *See* Pls.' Post Trial Opening Br. at 11. Based on the testimony adduced at trial the Court is satisfied that Crystal, Watson and Russell did indeed speak by phone to discuss their findings. *See* Tr. 2444:13–2445:4; 2452:10–16; *see also* DTE 120 at WD07502; PTE 215.

**48.** *See* PTE 59.

**49.** *Id.* at DD001391.

**50.** *Id.*

er than Eisner.[51] Rather, Russell addressed Crystal's concerns and clarified that the guarantee would not function in the manner Crystal believed [52] and, on August 18, Crystal augmented his August 12 memo and faxed Russell the revised copy. Again, Crystal opined that the OEA, during the first five years, was, as he originally estimated, worth $23.6 million, but as to the value of the OEA's renewal option, Crystal revised his estimation and believed that the two additional years would increase the value of the entire OEA to $24.1 million per year.[53] Up until this point, only three members of Disney's board of directors were in the know concerning the status of the negotiations with Ovitz or the particulars of the OEA—Eisner, Russell and Watson.

### 6. Ovitz Accepts Eisner's Offer

While Russell, Watson and Crystal were finalizing their analysis of the OEA, Eisner and Ovitz were coming to terms of their own. Eisner, having recently conferred with Russell concerning his ongoing research, gave Ovitz a take-it-or-leave-it offer: If Ovitz joined Disney as its new President, he would not assume the duties or title of COO.[54] After short deliberation, Ovitz accepted Eisner's terms, and that

evening he, Eisner and Sid Bass (and their families) celebrated Ovitz's decision.

As it would turn out, the celebratory mood was short lived. The next day, August 13, Eisner called a meeting at his home in Los Angeles to discuss his decision and, in addition to Ovitz and Russell, Sanford Litvack (Disney's General Counsel)[55] and Stephen Bollenbach (Disney's Chief Financial Officer) were invited to attend. At the meeting, Litvack and Bollenbach, who had just found out the day before that Eisner was negotiating with Ovitz,[56] were not happy with the decision. Their discontent "officially" stemmed from the perception that Ovitz would disrupt the cohesion that existed between Eisner, Litvack and Bollenbach,[57] and both Litvack and Bollenbach made it clear that they would not agree to report to Ovitz but would continue to report to Eisner.[58] At trial, the Court was left with the perception that Litvack harbored resentment that he was not selected to be Disney's President and that this fueled, to some extent, Litvack's resistance to Ovitz assuming the post he coveted.[59] Bollenbach's resistance was more curious. Indeed, Bollenbach had been hired before Ovitz and, at the time, his expectation was that he would report only to Eisner. Still, his testimony seemed disingenuous to the

---

**51.** See Tr. 2790:11–21; 7707:8–7708:3.

**52.** See PTE 214 at DD001385; see also Tr. 2458:3–2460:11.

**53.** See PTE 366.

**54.** While vacationing together, Eisner told Ovitz that Sid Bass was flying into Aspen for dinner and that "either we're going to have a deal by the time he lands … or we're not, … [and] the deal will be gone." Ovitz was then given until 6:00 p.m. that night to concede on a number of issues; the two largest concessions were: 1) the reduction in the number of options from a single grant of five million to two separate grants,—the first grant being three million options for the first five years,

and the second grant consisting of an additional two million options if the contract was renewed; and 2) Ovitz abandoning the idea of joining the Company as a Co–CEO. See Tr. 4196:10–4198:3.

**55.** Litvack was also Disney's Chief of Corporate Operations and Executive Vice President for Law and Human Resources.

**56.** See Tr. 6040:20–23; 6045:15–6047:11.

**57.** See id.

**58.** Tr. 5274:4–5276:2; 6048:1–6049:13.

**59.** See, e.g., Tr. 6027:13–6028:22.

Court when he pinned his resistance on the fact that he had been part of a cohesive trio (*i.e.*, Bollenbach, Litvack, and Eisner). After all, Bollenbach had been with the Company for a total of three months before he was informed of the negotiations with Ovitz.[60] Despite this mutiny, Eisner was able to assuage Ovitz's concern about his shrinking authority in the Company, and Ovitz, with his back against the wall, acceded to Litvack and Bollenbach's terms.

The next day, August 14, Ovitz and Eisner signed the letter agreement ("OLA") that outlined the basic terms of Ovitz's employment.[61] The OLA specified that Ovitz's hiring was subject to approval of Disney's compensation committee[62] and board of directors.[63] That same day, Russell contacted Sidney Poitier (for a second time) to inform him that Eisner and Ovitz reached an agreement.[64] At trial, Poitier failed to recount with any specificity his conversation with Russell. He made clear that he was never faxed Crystal's analysis or the draft of the OLA (which Litvack had prepared for Russell on August 12).[65]

Nevertheless, Poitier did testify that Russell had "mention[ed] the terms" of the OEA and that Russell promised to stay in touch with any developments.[66] Poitier believed that hiring Ovitz was a good idea because he knew Ovitz's reputation in the entertainment business and considered him an innovator who understood the movie business.[67] Poitier also expressed the opinion that Ovitz would adequately adapt to running a public company such as Disney.[68] Watson also contacted Ignacio "Nacho" Lozano by phone.[69] The record is unclear as to exactly when Lozano was called.[70] As with Poitier, relatively little of Lozano's phone conversation was recounted at trial, except to say that Lozano testified that he felt comfortable with Ovitz's ability to make the transition from a private company culture to that of a public company.[71] As for communications with the other board members, Eisner contacted each of them by phone to inform them of the impending deal. During these calls, Eisner described his friendship with Ovitz,

60. *See* Tr. 5271:22–5272:11.

61. *See* PTE 60.

62. The compensation committee was comprised of Russell, Watson, Ignacio Lozano and Sidney Poitier.

63. *See* PTE 60 at DD002932.

64. In his prior deposition, Poitier testified that the first contact concerning the Ovitz contract occurred at the compensation committee meeting on September 26, 1995. *See* Poitier 117:19–118:5. At trial, the witness revised his testimony to reflect that the first contact actually occurred via a phone call from Russell on Sunday August 13. Tr. 7125:19–7126:13; 7167:5–13. Russell testified that he had called Poitier twice. The first call occurred on August 13, and the second call was made the next day before the press release on August 14. *See* Tr. 2445:17–2446:20. I am satisfied that both calls did in fact occur and that at the time of the calls,

Poitier was on his yacht vacationing in Sardinia.

65. Tr. 7167:14–17.

66. Tr. 7126:10–13.

67. Tr. 7127:4–17.

68. Tr. 7129:13–18.

69. Tr. 7637:14–7638:3.

70. Lozano could not recall when the call occurred, but in an August 18, 1995 memo, Russell notes that "all the members of the Compensation Committee heartily endorse this pay package. Watson had a long discussion with Ignacio Lozano and I had two long conversations with Sidney Poitier in which all the details were reviewed and discussed before the deal was signed." PTE 215 at DD001636.

71. Tr. 7631:18–7632:1.

and Ovitz's background and qualifications.[72]

On the same day that Eisner and Ovitz signed the OLA, the news of Ovitz's hiring was made public via a press release. Public reaction was extremely positive. Disney was applauded for the decision, and Disney's stock price increased 4.4 percent in a single day—increasing Disney's market capitalization by more than $1 billion.[73]

### 7. *Disney's Board of Directors Hires Michael Ovitz*

Once the OLA was signed, Joseph Santaniello, who was an in-house attorney within Disney's legal department, took charge of embodying the terms Russell and Goldman had agreed upon and which were memorialized in the OLA.[74] To that end, Santaniello concluded that the $50 million guarantee presented negative tax implications for the Company, as it might not have been deductible.[75] Concluding that the provision must be eliminated, Russell initiated discussions on how to compensate Ovitz for this change—from this, an amalgamation of amendments to

certain terms of the OEA arose in order to replace the back-end guarantee.[76] Russell again worked with Watson and Crystal to consider the possible consequences of the proposed changes.[77] Russell and Crystal applied the Black–Scholes methodology to assess the value of the extended exercisability features of the options and Watson generated his own analysis to the same end.[78]

On September 26, 1995, the compensation committee met *for one hour* to consider (1) the proposed terms of the OEA, (2) the compensation packages for various Disney employees, (3) 121 stock option grants, (4) Iger's CapCities/ABC employment agreement and (5) Russell's compensation for negotiating the Ovitz deal.[79] The discussion concerning the OEA focused on a term sheet (the actual draft of the OEA was not distributed), from which Russell and Watson outlined the process they had followed back in August and described Crystal's analysis. Russell testified that the topics discussed were historical comparables such as Eisner's and Wells' option grants,[80] and the factors that

---

**72.** *See, e.g.,* Tr. 4215:12–4216:14 (Eisner); 3704:3–23 (Gold) (testifying that he received a call from Eisner and also spoke with Roy Disney); 5388:9–23 (Bollenbach); 5582:15–5583:8 (Mitchell); 5802:14–23 (Nunis); 7658:4–21 (Lozano); 8141:23–8143:3 (Stern); *see also* DTE 413 (Eisner's phone log).

**73.** *See* DTE 92; DTE 428 Ex. 4a.

**74.** Tr. 6055:16–6056:14.

**75.** Santaniello 48:23–49:19.

**76.** *See id.* at 50:7–19; *see also* PTE 348 (Russell's letter to Eisner suggesting the elimination of the $50 million guarantee and replacing it with: (1) the reduction in the option strike price from 115% to 100% of the Company's stock price on the day of the grant for the two million options that would become exercisable in the sixth and seventh year after commencement of employment; (2) Payment of $10 million in severance if the Company

chose not to renew Ovitz's contract; and (3) alteration of the renewal option to provide for a five year extension, $1.25 million per year in salary, the same bonus structure as the first five years of the contract, and the grant of three million additional options).

**77.** Tr. 2485:22–2486:16.

**78.** *See, e.g.,* Tr. 2489:7–21.

**79.** PTE 39.

**80.** Tr. 2521:8–2522:19. Although Russell used Wells' and Eisner's contracts as benchmarks for Ovitz's pay package, neither Poitier nor Lozano were able to recall any discussion concerning Crystal's observation that there were no comparables of non-CEO presidents of public companies that could justify Ovitz's pay package. *See* Tr. 7181:21–7182:1; 7701:4–10.

he, Watson and Crystal had considered in setting the size of the option grants and the termination provisions of the contract.[81] Watson testified that he provided the committee with the spreadsheet analysis he had performed back in August and discussed his findings.[82] Crystal, however, did not attend the meeting and his work product was not distributed to the Committee. At trial, Crystal testified that he was available via telephone to respond to questions if needed, but no one from the committee in fact called.[83] After Russell's and Watson's presentations, Litvack responded to various questions but the substance of those questions was not recounted in any detail at trial.[84] Poitier and Lozano testified that they believed they had received sufficient information from Russell's and Watson's presentations[85] to enable them to exercise their judgment in the best interest of the Company.[86] When the discussions concluded, the Committee unanimously voted to approve the terms of the OEA subject to "reasonable further negotiations within the framework of the terms and conditions"[87] described in the OEA.[88]

81. *See, e.g.,* Tr. 2522:11–2523:4. Although the term sheet did highlight the term "wrongful termination," no one on the committee recalled any discussion concerning the meaning of gross negligence or malfeasance. *See* Tr. 2903:8–16; 7198:14–20; 7701:23–7702:2; 7716:22–7717:3. Despite this omission, the terms gross negligence or malfeasance were not foreign to the board of directors, as the language was standard, and could be found, for example, in Eisner's, Wells', Katzenberg's and Roth's employment contracts. *See* Tr. 6081:1–9.

82. Tr. 7848:16–21. Poitier could not recall whether Watson had actually distributed copies of his spreadsheets, but he did recall that "figures and numbers" were passed around and discussed. *See* Tr. 7222:20–7223:8. Lozano also had no recollection at trial that these spreadsheets were actually distributed. Tr. 7702:3–6. I attribute this lack of recollection to the nine years that have passed between that meeting and the trial and do not attribute any lack of veracity to Watson's testimony because of it.

83. Tr. 3602:2–21.

84. Plaintiffs contend that since Litvack had no responsibility in the actual negotiations of the Ovitz contract, the question session, which followed Russell's and Watson's presentations, and was memorialized in the committee minutes, could not have been of any substance. *See* Pls.' Post Trial Opening Br. at 21. The Court does not agree with this contention. Litvack testified that he knew what the deal was. *See* Litvack 384:18–385:4. He could therefore speak intelligently to questions from the committee. Whatever personal animosity Litvack harbored for Ovitz, not actually negotiating the deal did not prevent him from answering the committee's questions with "substance."

85. Plaintiffs have demonstrated that at no point were the following matters discussed in the committee meeting: (1) the purchase of Ovitz's private jet for $187,000 over the appraised value; (2) the purchase of Ovitz's BMW at acquisition cost and not the depreciated market value; (3) the purchase of Ovitz's computers at replacement value instead of their lower book value; (4) any specific list of perquisites, despite Eisner already agreeing to provide Ovitz with numerous such benefits; and (5) that despite Ovitz's bonus being payable completely on a discretionary basis, Russell's memorandum to Ovitz indicating that the bonus would likely approximate $7.5 million annually. Although I have concluded that plaintiffs have established these facts, they are ultimately immaterial to my decision.

86. *See* Tr. 7136:23–7137:3; 7140:12–19; 7636:2–10; 7639:21–7640:3.

87. PTE 39 at WD01170.

88. At the behest of Watson, the committee discussed the time and energy Russell had placed into the negotiations and suggested that the committee recommend to the full board that Russell be compensated $250,000. The compensation committee voted to recommend this fee and the full board, while in executive session, approved it. See PTE 39 at WD01171; PTE 29 at WD01195–96. Russell abstained from voting on the issue.

An executive meeting of Disney's board immediately followed the compensation committee's meeting.[89] In executive session, the board was informed of the reporting structure that Eisner and Ovitz agreed to, but no discussion of the discontent Litvack or Bollenbach expressed at Eisner's home was recounted.[90] Eisner led the discussion regarding Ovitz, and Watson then explained his analysis and both he and Russell responded to questions by the board.[91] Upon resuming the regular session, the board deliberated further, then voted unanimously to elect Ovitz as President.[92]

### 8. The October 16, 1995 Compensation Committee Meeting

In accordance with the compensation committee's resolution roughly three weeks before,[93] the compensation committee convened again on October 16, 1995, in a special meeting to discuss several issues relating to stock options.[94] After a presentation by Litvack, during which he responded to questions from the members of the committee, the compensation committee unanimously approved amendments to The Walt Disney Company 1990 Stock Incentive Plan, thereafter titled The Walt Disney Company Amended and Restated 1990 Stock Incentive Plan (the "1990 Plan"), and also approved a new plan, known as The Walt Disney Company 1995 Stock Incentive Plan (the "1995 Plan").[95] Both plans were subject to further approval by the full board of directors and by shareholders.[96]

Following approval of these plans, Litvack reviewed the terms of the proposed OEA with the compensation committee,[97]

**89.** PTE 29 at WD01195–96.

**90.** Neither Litvack nor Bollenbach attended the executive session. *Id.*

**91.** Tr. 2537:11–2540:16 (Russell); 3733:1–3735:16 (Gold); 4014:7–4017:24 (Roy Disney); 4872:4–4879:4 (Eisner); 5585:12–5588:11 (Mitchell); 5919:7–5925:2 (Bowers); 7851–5–7853:9 (Watson); 8145:13–8146:8 (Stern).

**92.** PTE 29 at WD01196.

**93.** PTE 39 at WD01170 (mentioning that Ovitz's stock option grant would be delayed until further details were worked out between Ovitz and the Company), WD01186–88 (term sheet outlining vesting schedule, other special terms of Ovitz's options, and that Ovitz's options would be formally granted at a later date).

**94.** PTE 41 at WD00118; Tr. 2546:1–2547:24; 2971:3–2972:10; 7228:18–7229:1. Although not members of the compensation committee, Litvack, Schultz (Vice President–Corporate Compensation) and Santaniello attended this meeting. PTE 41 at WD00118; Tr. 6076:22–6077:2; Schultz 86:10–15; Santaniello 102:12–19. Poitier and Russell attended by telephone from the Company's New York office, but Lozano and Watson were present in person. PTE 41 at WD00118; *see also* PTE 372 (Russell's notes of the October 16, 1995 meeting).

**95.** PTE 41 at WD00119–21, WD00123–141; Tr. 6077:3–6078:17. *But see* Tr. 7732:12–17 (Lozano has no independent recollection of the October 16, 1995 meeting).

**96.** PTE 41 at WD00120; *see* PTE 30 (memo requesting the board's unanimous consent to the amendments to the 1990 Plan and adoption of the 1995 Plan and explaining the differences between the old 1990 Plan and the new Plans, including the potential for exercisability beyond twenty-four months following termination); PTE 265 (unanimous written consent of the Company's board of directors approving the amendments to the 1990 Plan and adoption of the 1995 Plan); DTE 142 (proxy statement dated November 13, 1995 requesting shareholder approval of the amendments to the 1990 Plan and adoption of the 1995 Plan); Tr. 2548:1–2549:9.

**97.** Discussion of the *bona fides* of the OEA was minimal because that discussion had occurred at the compensation committee meeting on September 26, 1995. *See* Tr. 2976:17–2977:3; 6648:9–6649:1.

after which the committee unanimously approved the terms of the OEA and the award of Ovitz's options pursuant to the 1990 Plan.[98] Ovitz's options were priced at market as of the date of the meeting.[99] As a final wrap-up before adjourning, the compensation committee passed a resolution "that all of the actions heretofore taken by the officers of the Corporation in connection with the foregoing resolutions [relating to the OEA] be, and they hereby are, confirmed and ratified." [100]

The amendment to the 1990 Plan (consistent with the provisions of the new 1995 Plan), together with the terms of the Stock Option Agreement,[101] provided that, in the event of an NFT, Ovitz's options would be exercisable until the later of September 30, 2002, or twenty-four months after termination, but in no event later than October 16, 2005 (ten years from the date of grant).[102]

## B. Ovitz's Performance as President of The Walt Disney Company

### 1. Ovitz's Early Performance

Ovitz's tenure as President of The Walt Disney Company officially began on October 1, 1995.[103] Eisner authored three documents shortly after Ovitz began work that shed light on his early performance on the job. The first is a letter written to Ovitz dated October 10, 1995.[104] Eisner lauded Ovitz's initial performance,[105] and also provided Ovitz with some written guidance with respect to Eisner's management philosophies.[106] Ovitz testified that this letter was a continuation of conversa-

---

**98.** PTE 41 at WD00121–22; Tr. 2979:7–10; 6078:21–6080:4; *see* PTE 43 (memo from Marsha Reed to Donna Scanlon confirming the grant of Ovitz's options and their key terms); PTE 44 (PTE 43 with marginalia); PTE 48 (Ovitz's Stock Option Agreement); PTE 339 (same). *But see* Tr. 7230:4–7231:10 (Poitier) (testifying that he does not independently recall Litvack's discussion of the OEA).

**99.** PTE 41 at WD00122; Tr. 2979:11–16; 2980:18–2981:4; 6083:7–24; *see* PTE 43; PTE 44; PTE 48; PTE 339.

**100.** PTE 41 at WD00122. A similar resolution was also part of the resolutions approving the amendments to the 1990 Plan and adoption of the 1995 Plan. *Id.* at WD00121.

**101.** PTE 48; PTE 339.

**102.** PTE 48 at DD002785; *see* PTE 41 at WD00142–43.

**103.** *See* PTE 3 at DD002012.

**104.** PTE 267 (Eisner faxed a copy of the letter to Watson on October 16, 1995); Tr. 4251:7–18.

**105.** Some examples of Eisner's compliments to Ovitz: "I have noticed how quickly and brilliantly you have taken to the company and the company to you...." PTE 267 at DD002287. "Your instincts were right in coming to The Walt Disney Company and mine were right in suggesting it." *Id.* "Our partnership is born in corporate heaven...." *Id.* at DD002290. "This is basically your first week on the job and I can already see how well it is all going to work." *Id.* at DD002291.

**106.** Eisner wrote that PTE 267 "is a practical letter." *Id.* at DD002288. Some examples of Eisner's teachings: "There is no need to tell you how unique this company is...." *Id.* at DD002287. "[W]e generally stay away from partnership and joint ventures.... We recognize that business control is creative control." *Id.* at DD002287–88. "We must concentrate on the operations. We must concentrate on continuing to lead creatively. We must throw out mediocrity." *Id.* at DD002288. Eisner told Ovitz that public company executives should "act like 'Caesar's wife'." *Id.* "I feel about acquisitions exactly as I feel about everything else. We don't need them.... Most companies create the fiction that they can run anything better than the management of a target company. Often that is not true." *Id.* at DD002289. Eisner also provided a list of ten questions to ask before making an acquisition. *Id.* at DD002290.

tions he had already had with Eisner, and that the letter was "incredibly helpful and very supportive," [107] especially in light of the fact that Ovitz was adjusting to working at a publicly-traded company.[108]

The second document is a letter Eisner wrote to the board of directors, the Bass family, and his wife on October 20, 1995.[109] In it, Eisner called Ovitz's hiring "a great coup for us and a saving grace for me. . . . Everybody is excited being with him, doing business with him. . . . He has already run a private company, and being a quick study, has quickly adapted to the public institution." [110] Eisner testified that the October 20 letter accurately reflected his views of Ovitz at the time it was written.[111] Eisner also used the October 20 letter to reiterate his views regarding the appropriateness of acquisitions for the Company.[112]

The third document is dated November 10, 1995, and is a memo addressed to Tony Schwartz, Eisner's biographer.[113] In it, Eisner says that Ovitz has had a difficult time accepting Bollenbach and Litvack as his equals, but that Ovitz was adjusting, realizing that he need not "prove to himself, to the group, to the world, that he is in charge." [114] Eisner also reaffirmed that "Michael Ovitz is the right choice. He will, in short order, be up to speed in the areas we have discussed endlessly—brand management, corporate direction, moral compass and all those difficult areas, especially for Disney, to define." [115] Eisner described the already-existing tension between Ovitz and Litvack as attributable to Litvack by saying, "Sandy Litvack may never settle in because of his basic annoyance with the style of Michael Ovitz, but he may. Time may make it work, if he will let it." [116]

As late as the end of 1995, Eisner's attitude with respect to Ovitz was positive.[117] Eisner wrote, "1996 is going to be a great year—We are going to be a great team—We every day are working better together—Time will be on our side—We will be strong, smart, and unstoppable!!!" [118] Eisner opined that Ovitz performed well during 1995,[119] notwithstand-

**107.** Ovitz 211:21–22.

**108.** *Id.* at 212:2–9.

**109.** PTE 313; Tr. 4263:5–18.

**110.** PTE 313 at MDE000041; *see also* Tr. 3746:13–3747:14 (Gold) (testifying that "very early on" in Ovitz's tenure, Eisner's communications to him about Ovitz "were relatively complimentary"); 3750:20–3751:10. *But see* Tr. 4018:9–4021:6 (Roy Disney) (testifying that Ovitz was known by October 1995 as being habitually late to meetings); 6088:12–6092:23 (Litvack) (testifying to an argument between himself and Ovitz in October 1995 regarding Disney characters appearing on the David Letterman Show and explaining how this was an example of how Litvack and Ovitz could not get along, but that the fault belonged to both of them).

**111.** Tr. 4265:7–4266:7.

**112.** PTE 313 at MDE000042–44.

**113.** PTE 316. Eisner testified that his statements contained in PTE 316 were "honest and candid" when they were written. Tr. 4273:13–19; 4274:15–20.

**114.** PTE 316 at MDE000035.

**115.** *Id.* at MDE000036. If these areas were difficult for Disney to define, it is understandable that Ovitz would have a difficult time making the necessary adjustments.

**116.** *Id.* at MDE000037.

**117.** PTE 331; Tr. 4277:8–4278:15.

**118.** PTE 331 at DD002275.

**119.** Tr. 4278:18–4279:2. Especially after seeing the project come to fruition, Eisner is thankful for Ovitz's advice during late 1995 to place the gate to Disney's California Adventure theme park directly across from the main gate to Disneyland. Tr. 4278:18–4279:23; *see*

ing the difficulties Ovitz was experiencing assimilating to Disney's culture.[120]

### 2. A Mismatch of Cultures and Styles

In 1996, however, the tenor of the comments surrounding Ovitz's performance and his transition to The Walt Disney Company changed.[121] In January 1996, a corporate retreat was held at Walt Disney World in Orlando, Florida.[122] At that retreat, Ovitz failed to integrate himself in the group of executives by declining to participate in group activities, insisting on a limousine when the other executives, including Eisner, were taking a bus, and making inappropriate demands of the park employees.[123] In short, Ovitz "was a little elitist for the egalitarian Walt Disney World cast members [employees]," [124] and a poor fit with his fellow executives.[125]

As 1996 wore on, it became apparent that the difficulties Ovitz was having at the Company were less and less likely to be resolved. By the summer of 1996, Eisner

---

Tr. 5302:19–5304:10 (Bollenbach) (testifying that he believed that notwithstanding Ovitz's difficulties, Ovitz could still be "valuable" and "a contributor to the company").

**120.** Tr. 4279:24–4280:6. These positive, but still realistic, evaluations of Ovitz's performance stand in contrast to statements that Bass claims Eisner made at a dinner in early November 1995. *See* Bass 88:15–90:16. In my discretion as fact-finder, I do not find Bass' statements on this subject credible, and I conclude instead that the contemporaneous documents authored by Eisner, together with his trial testimony in regards to them, are credible and probative. At his deposition, Bass said that only after having his recollection refreshed was he able to recall that his meeting in Aspen with Ovitz occurred in August 1995, Bass 40:18–23, and when asked the "approximate date" of Ovitz's hiring, Bass could only reply "Fall 95." Bass 76:3–5. Because the time at which Eisner made the statements attributed to him is of paramount importance, I do not credit Bass' deposition testimony for that reason, but not that reason alone. *See* Tr. 4274:21–4276:12 (Eisner) (testifying that Bass was mistaken with respect to when certain events occurred). Bass' testimony is also vague as to the problems attributed to Ovitz—that Eisner "was having no success in dealing with Ovitz," that Ovitz "didn't care about money," "never looked at economics," and had "continuous problems of veracity." Bass 88:25–89:8. Furthermore, Eisner may not have been completely truthful with Bass or may have exaggerated the extent of the problems with Ovitz due to the stresses of that day or any other reason. *See* Tr. 4372:13–16; 4373:11–17; 4431:6–4433:21. Had I had the opportunity to observe Bass at trial, I might have reached a different conclusion as to the weight of his testimony, but based upon the record presented to me and my personal determinations as to the credibility of the testimony presented at trial, I find Eisner's account of Ovitz's performance together with the contemporaneous documents credible, and Bass' deposition testimony not credible. As a totally separate matter, Bass' statements would be of little worth even if I were to credit them, because they are hearsay and, therefore, inadmissible against all defendants other than Eisner. D.R.E. 801.

**121.** *See* Tr. 6970:21–6971:11; 7141:2–22. *Compare* Tr. 2567:7–16, 3746:17–3747:14, 3750:20–3751:6, 4010:10–4011:1, 5591:20–5593:1, 5806:12–5808:7, 5925:3–5926:10, 6086:5–17 *and* 7640:9–12 *with* 2567:17–2568:2, 3751:11–3751:18, 4021:7–4022:9, 4280:7–13, 5291:24–5292:16, 5593:2–11, 5808:8–20, 5926:11–24, 7241:14–7243:20, 7552:2–16, 7640:13–22, 7854:24–7857:12 *and* 8146:9–8147:2 (comparing the directors' views of Ovitz in 1995 and 1996).

**122.** Tr. 4280:14–4282:22.

**123.** Tr. 4281:4–4282:1.

**124.** Tr. 4281:23–24; *see also* Tr. 4282:2–22.

**125.** Tr. 5291:24–5295:7; 5307:2–18; *see also* Tr. 3751:11–3754:16 (Gold) (testifying to a lunch meeting with Eisner on January 26, 1996, where Gold was "shocked" to hear of these problems with Ovitz); 3754:17–3755:7 (Gold) (testifying that he spoke to Roy Disney about this conversation, and Roy Disney was less surprised to hear of these difficulties than Gold because of his personal interactions with Ovitz).

had spoken with several directors about Ovitz's failure to adapt to the Company's culture.[126] In June 1996, Eisner, Ovitz, and Wilson were in France for a cycling trip during which "it became clear [to Wilson] that what [he] had been hearing was not just idle gossip," but that "there was a problem of Mr. Ovitz being accepted into the organization." [127]

### 3. Approaching the Endgame

By the fall of 1996, directors began discussing that the disconnect between Ovitz and the Company was likely irreparable, and that Ovitz would have to be terminated.[128] Additionally, the industry and popular press were beginning to publish an increasing number of articles describing dissension within The Walt Disney Company's executive suite.[129] One of the more prominent of these articles was an article published in Vanity Fair based on an interview given by Bollenbach,[130] which many of the directors discussed while present for the November 25, 1996 board meeting.[131]

### 4. Specific Examples of Ovitz's Performance as President of The Walt Disney Company

Throughout this litigation, plaintiffs have argued that Ovitz acted improperly while in office. The specific examples discussed below demonstrate that the record created at trial does not support those allegations.

Plaintiffs have alleged that even before Ovitz was formally elected as President and employed by Disney, that he exercised Presidential authority in connection with the construction or renovation of his office.[132] The record does provide support for the benign assertion that Ovitz performed some work for the Company before his hiring was official.[133] In addition to the

---

**126.** Tr. 2567:17–2571:18; 4021:7–4022:12; 4294:4–4295:20 (between January and May 1996, Eisner spoke with Gold, Bollenbach, Litvack, Watson, Wilson and Russell about the increasing difficulties with Ovitz); 4733:7–4734:2; 5593:2–11; 5810:8–12; 5851:10–5854:12; 6095:19–6099:17; 7855:20–7857:12; 8147:3–8148:24; PTE 67 (note from Eisner to Watson and Russell enclosing an email from Eisner to Bass on May 26, 1996, discussing a conversation they had a few weeks earlier); see also Tr. 4297:2–4304:5 (Eisner) (testifying that he was aware in May 1996 that Iger, Bollenbach and Litvack were having problems with Ovitz); 6099:18–6100:9 (Litvack) (testifying that he was also aware of the problems between Ovitz and Iger).

**127.** Tr. 6836:15–6838:9; 4734:3–4735:12.

**128.** See Tr. 4345:17–4346:4; 4354:3–4355:6; 4368:1–18; 7555:22–7556:2; 8153:10–8154:5.

**129.** PTE 8; PTE 21; PTE 22; PTE 166; PTE 171; PTE 300; PTE 304; PTE 321; PTE 507; PTE 508; PTE 509.

**130.** PTE 8.

**131.** Tr. 5930:2–13; see PTE 89 (fax from Gold to Roy Disney on November 6, 1996, attaching the text of the article); see also Tr. 5199:20–5200:23 (Eisner) (recalling having read the article); 6580:13–15 (Litvack) (testifying he is "sure" all the directors saw the article); 7574:10–14 (Tom Murphy read it). But see also Tr. 6757:14–21 (O'Donovan) (failing to recall reading the article); 7916:23–7917:3 (Watson) (recalling the article's existence, but not reading it).

**132.** Ovitz 183:21–187:5; PTE 476; DTE 110; see Tr. 1927:6–1940:24; PTE 24 at DD002451.

**133.** Ovitz 162:16–163:7; Tr. 5289:14–5291:23 (Bollenbach) (testifying that he thought it was a "very good practice" to provide information to an officer coming to a senior position at the company before that person officially begins work); 6074:22–6075:8 (Litvack testified that: "It was not unusual at all," for someone to begin work before their employment agreement was executed). See generally Tr. 2222:9–2223:8; PTE 545 (presentation regarding the CapCities/ABC acquisition that was forwarded to Ovitz before he arrived at the Company, but there is nothing in the

fact that the documents plaintiffs rely on evidence no effort by Ovitz to direct the office work or authorize expenditures for it,[134] the testimony of both Ovitz and Eisner was that Ovitz's involvement in the project was limited. Furthermore, Ovitz's authority over the project both before and after October 1, 1995, was minimal at best, yet at the same time consistent with the input that would be expected from an executive when a new office is built for him or her.[135]

In addition to allegations that Ovitz overstepped his authority with respect to his office, plaintiffs contend that Ovitz acted improperly in connection with discussions he had, either personally, or on behalf of the Company, with representatives from the National Football League ("NFL") with respect to bringing a team to the Los Angeles area.[136] First and foremost, contemporary documents indicate that Disney, under Eisner's direction, was considering bringing an NFL franchise to Los Angeles before Ovitz's hiring was even announced, much less completed.[137] Second, any work Ovitz may have done on behalf of the Company in regards to the NFL before his employment formally began is, in my mind, evidence of Ovitz's good faith efforts to benefit the Company and bring himself up to speed—not evidence of malfeasance or other ulterior motives.[138] Third, it is clear from the record that, as soon as Eisner instructed Ovitz to cease discussions with the NFL, Ovitz complied with Eisner's directive.[139] Again,

record to suggest that Ovitz received this document before mid-August 1995); PTE 622; PTE 742; DTE 190; DTE 192; DTE 193; DTE 224. Eisner also applauds Ovitz's attendance on a trip to Jackson Hole, Wyoming to meet the Company's Consumer Products division before his employment officially began. PTE 316 at MDE000037. Because Ovitz was performing work either on behalf of the Company, or in preparation for his tenure there, his request for reimbursement of expenses related to The Walt Disney Company during that period of time are therefore appropriate and reasonable. *See* DTE 59 at WD6601. The appropriate persons in both management and auditing approved those September 1995 expenses. *Id.*

134. PTE 476; DTE 110; *cf.* Tr. 1934:11–1935:24; PTE 475 (memo dated January 15, 1995 addressed to Ovitz with respect to millwork expenditures in Ovitz's office, though the context makes it clear that if January 15 is the correct date, that the memo must have intended to be dated January 15, 1996, as DTE 144, DTE 152 and DTE 153 all indicate that there were outstanding issues regarding the millwork in Ovitz's office from December 1995 until at least February 1996).

135. Tr. 4389:10–4391:11; 6075:12–6076:16; 6141:9–24; *see also* Tr. 1318:13–1326:1; 1927:6–1940:24; DTE 144; PTE 654. Furthermore, the work that may have occurred on Ovitz's office between mid-August 1995 and the formal commencement of his employment on October 1 of that year is consistent with what would be anticipated when a company prepares for a new employee before their expected arrival.

136. *See* Tr. 1128:5–1133:18.

137. DTE 188 (memo to Eisner dated August 14, 1995 summarizing the status of the Company's prior discussions with the NFL; Ovitz was copied on the memo).

138. *See* PTE 621; PTE 631; DTE 189; DTE 191 (duplicative of PTE 631); Tr. 5159:12–5166:18. There are no allegations, nor any factual support in the record, for the proposition (which plaintiffs have not put forward) that Ovitz received a salary from the Company for work performed before October 1, 1995.

139. Tr. 1133:19–1134:2; 5164:7–16. The deposition testimony cited by plaintiffs (Bass 76:9–77:25; Eisner 330:3–331:6), which they argue supports the contrary proposition that Ovitz continued pursuing a deal with the NFL after Eisner instructed him to cease such discussions, is too vague to contradict the trial testimony previously cited. *See also* Tr. 4283:19–21 (Eisner) (testifying that Ovitz "walked away from" deals that made no economic sense).

the record fails to support allegations of misconduct by Ovitz in this regard either before or after October 1, 1995.

Plaintiffs argue that Ovitz is responsible, at least in part, for Bollenbach's decision to leave the Company,[140] and the controversy surrounding the hiring of Jamie Tarses to ABC. Bollenbach's trial testimony, however, contradicts the assertion that he left because of Ovitz.[141] Instead, he left the Company to pursue a better opportunity with Hilton Hotels.[142]

In mid–1996, ABC hired Jamie Tarses.[143] It was reported in the press that Ovitz "orchestrated" Tarses' hiring even though she was under contract at NBC for roughly fifteen more months.[144] Eisner testified that Ovitz was not at fault for the perceived negative repercussions of Tarses' hiring, saying that he "was convinced that [Ovitz] was brought into something he did not instigate."[145] In fact, Tarses' hiring was championed by Iger and approved by Litvack.[146]

Another "failure" plaintiffs have attempted to pin on Ovitz, but which is in reality more attributable to Iger, revolves around the film *Kundun,* directed by Martin Scorsese.[147] The film was not well received by the Chinese government and, at least initially, may have caused the Company some setbacks in that rapidly expanding market.[148] Once again, however, the testimony was clear that Ovitz did not have authority to approve the movie; instead, that authority (and the concomitant responsibility) rested wholly with Roth and Eisner.[149]

Although the general consensus on Ovitz's tenure is largely negative, Ovitz did make some valuable contributions while President of the Company. As previously mentioned,[150] Ovitz made a key recommendation with respect to the location of the gate to Disney's California Adventure theme park, built on part of the Disneyland parking lot.[151] He was instrumental in recruiting Geraldine Laybourne, founder of the children's cable channel Nickelodeon, and overhauling ABC's Saturday morning lineup.[152] Ovitz was successful in bringing Tim Allen back to work after he

---

140. *See* PTE 8 at DD002123, DD002125.

141. Tr. 5308:10–5310:10. Bollenbach did, however, reaffirm at trial that certain portions of PTE 8 were accurate. *See* Tr. 5399:7–5401:4; 5412:18–5413:9; 5471:22–5472:6.

142. Tr. 5308:10–5310:10.

143. Ms. Tarses was a television executive and is sometimes referred to as Jamie McDermott. Tr. 1698:7–8; 1713:7–8.

144. PTE 85; PTE 303; *see* PTE 435.

145. Tr. 4385:3–4386:16; DTE 194; *see* Tr. 1700:5–22. *But see* Ovitz 450:14–451:3.

146. Iger 97:21–99:8; *see* Tr. 6136:23–6138:1. *But see* Bass 123:7–125:5 (Bass' opinion on the Tarses situation is that it was Ovitz's fault based upon statements made by Eisner that are inadmissible hearsay against all defendants but Eisner).

147. Tr. 1217:14–19; 4386:17–23.

148. Tr. 1218:19–1220:4; 6138:10–15.

149. Tr. 1217:20–1218:12; 4386:24–4389:3; 6138:2–15. Because Ovitz had no authority over the motion picture studio, Eisner's attempt to blame him for losses in that area was unwarranted. *See* PTE 755 at WD09868. Indeed, Eisner had recognized in his May 26, 1996, email to Bass that the cost overruns in the motion picture studio were due to Roth's decision to dramatically increase marketing costs on unsuccessful movies. PTE 67 at DD002980–81.

150. *See supra* note 119.

151. Tr. 1204:11–1208:2; 4278:18–4279:23.

152. Tr. 1233:8–1238:5.

walked off the set of Home Improvement due to a disagreement.[153] He also helped retain several animators that Katzenberg was trying to bring over to Dreamworks.[154] Ovitz also assisted Roth in handling relationships with "talent."[155] Ultimately, however, Ovitz's time as President was marked by more "woulda, coulda, shoulda" than actual success.

As an example, Jeffrey Katzenberg was formerly the head of Walt Disney Studios.[156] After his contract with Disney was not renewed, he founded Dreamworks and embroiled the Company in a very costly lawsuit.[157] Ovitz testified that after some discussions with Katzenberg, he could have settled that dispute before the lawsuit was filed for roughly $90 million, and although the actual amount of the settlement remains confidential, Ovitz believes that it was in excess of $250 million.[158] Ovitz, however, was not given authority to settle that suit on behalf of the Company.[159] The litigation, therefore, was filed and continued until the confidential settlement in 1999.[160]

Ovitz was assigned to oversee Disney Interactive, which created interactive video games.[161] Eisner testified that Disney Interactive was "doing very badly, actually," but he hoped that Ovitz might be able to turn it around.[162] Ovitz was unable to do so.[163] In the face of Eisner's critical view of Ovitz's performance with respect to Disney Interactive, Ovitz testified that he had several ideas for Disney Interactive which could have potentially helped Disney Interactive,[164] including a joint venture with Sony,[165] and a purchase of part of Yahoo!®,[166] all of which Eisner rejected. Ovitz also pursued, together with Roth, a deal intended to benefit Disney's motion picture studio with Beacon Communications, a company run by Armyan Bernstein, a writer and director. Again Eisner instructed Ovitz not to close the deal.[167]

Ovitz wanted the Company to purchase Putnam Publishing in order to acquire the rights to author Tom Clancy. He also wanted to place other prominent authors (and former clients) such as Michael Crichton and Stephen King under contract with Disney's publishing division.[168] Eisner rejected these efforts as ill conceived.[169]

**153.** Tr. 1249:7–1255:14; 5034:5–5038:13; *see also* Tr. 6539:6–6542:6.

**154.** Tr. 1229:16–1231:9.

**155.** Tr. 1208:3–1209:18; Roth 9:22–10:18. In the end, Ovitz and Roth had different and wholly incompatible perspectives on the use of talent. *See* Roth 34:9–38:15.

**156.** Tr. 1153:18–24; 4053:8–16.

**157.** Tr. 4690:1–6; *see also* Tr. 3824:1–3829:22.

**158.** Tr. 1153:18–1160:12.

**159.** Tr. 1159:18–1160:5.

**160.** Litvack testified that "[n]o one could settle the Jeffrey Katzenberg case for $90 million." Tr. 6132:22–23. *See supra* note 157.

**161.** Tr. 1164:7–1165:12; 5168:12–24.

**162.** Tr. 5168:20–5169:6; *see* PTE 744 at WD09336–37.

**163.** Tr. 5170:5–10.

**164.** *See* Tr. 1180:14–1181:8.

**165.** Tr. 1165:13–1171:18.

**166.** Tr. 1171:19–1179:17; *see also* Tr. 1179:18–1180:13.

**167.** Tr. 1210:23–1213:6; PTE 322; PTE 747; PTE 749.

**168.** Tr. 1160:18–1163:19.

**169.** Tr. 1163:21–1164:9; *see also* Tr. 4286:8–12.

A similar story emerges of Ovitz's leadership over Hollywood Records.[170] Ovitz wanted to place Janet Jackson under contract with Hollywood Recrods,[171] acquire EMI (a Hollywood Records competitor) or enter into a joint venture with Sony.[172] Once again, however, Eisner rejected all of these suggestions.[173] Eisner and others were also critical of what they perceived to be a lack of attention paid by Ovitz to Hollywood Records,[174] though Ovitz's files belie the assertion that Ovitz ignored his oversight of Hollywood Records.[175]

There are three competing theories as to why Ovitz was not successful. First, plaintiffs argue that Ovitz failed to follow Eisner's directives, especially in regard to acquisitions,[176] and that generally, Ovitz did very little. Second, Ovitz contends that Eisner's micromanaging prevented Ovitz from having the authority necessary to make the changes that Ovitz thought were appropriate.[177] In addition, Ovitz believes he was not given enough time for his efforts to bear fruit.[178] Third, the remaining defendants simply posit that Ovitz failed to transition from a private to public company, ·from the "sell side to the buy side," and otherwise did not adapt to the Company culture or fit in with other executives. In the end, however, it makes no difference why Ovitz was not as successful as his reputation would have led many to expect, so long as he was not grossly negligent or malfeasant.

Many of Ovitz's efforts failed to produce results, often because his efforts reflected an opposite philosophy than that held by Eisner, Iger, and Roth.[179] This does not mean that Ovitz intentionally failed to fol-

170. *See* Tr. 1134:7–1137:24. Hollywood Records, according to Litvack, was from its creation to that time, "a spectacular failure." Tr. 6146:23–6147:5; *see also* DTE 207; PTE 638.

171. Tr. 1138:1–1139:10.

172. Tr. 1139:18–1147:2.

173. Tr. 1139:11–17; 1147:3–9.

174. *See* PTE 24 at DD002452–53; PTE 626; PTE 780 at WD13842.

175. *See* PTE 606; PTE 622; PTE 629; PTE 768; DTE 190. Donohues' predictable opinion that "Ovitz could have been in a coma and still collecting these empty documents" is of no benefit to the Court and, indeed, documents such as PTE 606 and PTE 622 contain marginalia with Ovitz's handwriting, which would refute Donohue's opinion that there is no indication that the files were ever read by Ovitz. *See* Tr. 9282:15–9284:16. Furthermore, plaintiff's attempt to use Ovitz's statement on the Larry King Live show—that after a year on the job he knew "about one percent of what I need to know"—to demonstrate that Ovitz failed to apply himself on the job, is specious and wholly unpersuasive. PTE 323 at 7.

176. Plaintiffs' authority for this argument comes from the letter Eisner wrote to Ovitz dated October 10, 1995. PTE 267. Plaintiffs often quote the letter in this way:

"Acquisitions are something we should ... almost never do." *Id.* at DD002290. The sentence actually reads: "Acquisitions are something *we should look at* and almost never do." *Id.* (emphasis added). It is obvious that this letter, therefore, can provide no support for the proposition that Ovitz intentionally disobeyed an˙ order or directive from Eisner to not pursue acquisitions under any circumstances. As discussed above, the record does not bear out the assertion that Ovitz continued pursuing specific acquisitions after being instructed by Eisner to no longer pursue them.

177. Ironically, Ovitz testified that Eisner advised him not to take the job at MCA because Eisner believed that Ovitz would not have enough autonomy to turn the company around. Tr. 1275:14–1276:14.

178. *See, e.g.,* Tr. 1171:14–18.

179. *See* Roth 29:16–30:20.

low Eisner's directives or that he was insubordinate. To the contrary, it demonstrates that Ovitz was attempting to use his knowledge and experience, which (by virtue of his experience on the "sell side" as opposed to the "buy side" of the entertainment industry) was fundamentally different from Eisner's, Iger's, and Roth's, to benefit the Company.[180] But different does not mean wrong. Total agreement within an organization is often a far greater threat than diversity of opinion.[181] Unfortunately, the philosophical divide between Eisner and Ovitz was greater than both believed, and as two proud and stubborn individuals, neither of them was willing to consider the possibility that their point of view might be incorrect, leading to their inevitable falling out.[182]

#### 5. *Veracity and "Agenting"*

At trial, plaintiffs, together with their expert on these issues, Donohue, spent a great deal of effort attempting to persuade the Court that Ovitz was a habitual liar, and that his lack of veracity would constitute good cause to terminate him without paying the NFT.[183] Defendants respond that the purported veracity problems attributable to Ovitz do not involve material falsehoods, but instead were caused by

---

**180.** *See* Tr. 4284:9–4285:10.

**181.** I note that Judge Posner eloquently emphasized this point in his critique of the 9/11 Commission Report by saying that:

> Much more troublesome [than the public relations effort by the commission, especially the participation of victims' relatives] are the inclusion in the report of recommendations (rather than just investigative findings) *and the commissioners' misplaced, though successful, quest for unanimity.... And pressure for unanimity encourages just the kind of herd thinking now being blamed for that other recent intelligence failure—the belief that Saddam Hussein possessed weapons of mass destruction.*
>
> At least the commission was consistent. It believes in centralizing intelligence, and people who prefer centralized, pyramidal governance structures to diversity and competition deprecate dissent. *But insistence on unanimity ... deprives decision makers of a full range of alternatives. For all one knows, the price of unanimity was adopting recommendations that were the second choice of many of the commission's members or were consequences of horse trading.* The premium placed on unanimity undermines the commission's conclusion....

Richard A. Posner, *The 9/11 Report: A Dissent*, N.Y. Times, August 29, 2004 (emphasis added). Judge Posner's critique also warns against the dangers of judging past actions with the benefit of perfect hindsight, saying that, "The commission's statement that Clinton and Bush had been offered only a 'narrow and unimaginative menu of options for action' [in response to al Qaeda] is hindsight wisdom at its most fatuous," by outlining several of the available options. *Id.*

**182.** *See* Tr. 3811:3–3814:15.

**183.** As with many of their other allegations, plaintiffs heavily rely on PTE 20, PTE 24, PTE 67, PTE 79, and the hearsay statements of Bass. In attempting to bolster their position, plaintiffs point to part of Ovitz's trial testimony to argue that his "self-serving" testimony was contradicted by other witnesses. *See, e.g.*, Tr. 1220:14–1228:1. In that passage, Ovitz recalls meetings in New York with Bollenbach, Litvack and Iger, followed by a meeting with Eisner in Los Angeles. *Id.* Eisner's testimony indicates a lack of specific recollection of that meeting, but basic familiarity with the issues purportedly discussed there. Tr. 5081:8–5084:5. Bollenbach could not specifically recall the meeting either, but does remember at least one meeting in New York with Ovitz. Tr. 5488:10–5493:11. Litvack's testimony was unclear on whether he remembered the meeting to which Ovitz was referring, at one point saying "I am sure that we met with Mr. Eisner after these meetings, yes," with the very next words out of his mouth being, "I don't recall." Tr. 6555:5–6556:16. Needless to say, the contradiction is, at most, minimal and a natural consequence of the many years that have passed since these events transpired rather than evidence of a lack of honesty on the part of Ovitz.

Ovitz's tendency to "handle" or "agent" others.

Eisner testified that, with respect to Iger's statement that Iger did not trust Ovitz,[184] the lack of trust was related to Ovitz's failure to communicate with Iger, and that Ovitz "wasn't doing anything wrong."[185] Eisner also expressed that he personally did not trust Ovitz.[186] From both the tenor of the document (written shortly after the stress of his mother's death) and from Eisner's more emotionally detached trial testimony,[187] however, it is clear that Eisner was not referring to any material falsehoods, but instead to Ovitz's salesmanship[188] or, in other words, his "agenting."[189]

Litvack felt the same way, saying that he did not trust Ovitz's judgment and that he did not trust Ovitz generally because Ovitz would "handle" Litvack and "put his spin on things."[190] Litvack also said that the "worst that I could remember in terms of lies was—and I use the word 'lies'—was 'I was on the phone with someone important and couldn't be on time for the meeting.'"[191] Other executives and directors made similar comments that they could recall no material falsehoods told to them by Ovitz.[192]

In the absence of any concrete evidence that Ovitz told a material falsehood during his tenure at Disney, plaintiffs fall back on alleging that Ovitz's disclosures regarding his earn-out with, and past income from, CAA, were false or materially misleading.[193] As a neutral fact-finder, I find that

184. PTE 67 at DD002981; Tr. 4298:6–4302:7.

185. Tr. 4300:7–4301:22. This testimony demonstrates that there could be any number of reasons for which Iger would no longer trust Ovitz. Lack of veracity is but one.

186. Eisner wrote:
Michael [Ovitz] does not have the trust of anybody. I do not trust him. None of the people he works with feels comfortable with his directness and honesty. Like an athlete who has lost his way, Michael is pressing, is confused, [is] ineffective. His heart may be in the right place, but his ego never allows it to pump. His creative instincts may be in the right place, but his insecurity and existential drive never allows a real functioning process.... He would be a great salesman, but his corporate disingenuous nature undermines him. And his lack of interests in long-term outcomes affects his judgment on short-term deals. The biggest problem is that nobody trusts him, for he cannot tell the truth. He says whatever comes to mind, no matter what the reality. Because of all the above his executives, outside business associates, and the Press have turned against him.
PTE 79 at DD002624.

187. Tr. 4434:1–4439:22; *see also* Tr. 3763:11–23; 6386:24–6388:4.

188. Tr. 4438:10–4439:22.

189. Tr. 6373:18–6374:13. *But cf.* Bass 44:17–46:5; 102:24–103:5 (Bass' opinion that Ovitz was not honest was not based upon first hand experience and personal knowledge, but was based instead on the hearsay statements of Eisner and other unnamed declarants). Eisner's credible trial testimony on this subject significantly undermines the probative value of Bass' testimony, which again, the Court was not able to observe personally. *See, e.g.,* Tr. 4434:1–4439:22.

190. Tr. 6132:11–19; *see also* Tr. 6088:12–6092:23; 6374:18–6378:17.

191. Tr. 6135:1–4. Clearly, these statements, even if construed as lies, would not constitute gross negligence or malfeasance.

192. *See* Tr. 2621:15–2622:13 (Russell); 3755:8–3756:9 (Gold); 4012:14–4013:8 (Roy Disney); 5307:17–5308:9 (Bollenbach); 5809:3–7 (Nunis); 5940:20–23 (Bowers); 6724:7–15 (O'Donovan); 6847:10–16 (Wilson); 7148:8–12 (Poitier); 7552:23–7553:1 (T. Murphy); 7649:10–16 (Lozano); 7867:6–9 (Watson); 8161:6–7 (Stern); Roth 118:20–119:13.

193. At trial, when asked to give specific instances of lies by Ovitz, Donohue could only provide two concrete examples of Ovitz's lying, one with respect to a deal Ovitz apparently made to sell an airplane to one of his prior

the evidence simply does not support either of those assertions.[194] The allegedly false or misleading disclosure regarding Ovitz's earn-out rights is contained in the copy of the Company's "Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance" that Ovitz signed on October 24, 1995.[195]

Plaintiffs attack this disclosure on several grounds. First, they argue that Ovitz was entitled to a majority of some unknown list of booked commissions that allegedly changed over time. The disclosure by Ovitz makes clear that he owned a majority interest in his prior employer, which would lead any reasonable person to believe that he would receive a majority of the income from that entity.[196] The disclosure also clearly spells out that Ovitz would be entitled to receive commissions from contracts entered into on or before September 30, 1995.[197] Ovitz's testimony

---

business partners, *see* PTE 404 at 45 n. 48, and the other relating to breaking the purported mutual non-disparagement agreement that Ovitz agreed to when he left the Company. Tr. 655:24–658:12. Donohue's report indicates that even he did not consider the alleged deception with respect to the airplane grounds for a for-cause termination because it did not occur in the course of Ovitz's duties for Disney. PTE 404 at 45 n. 48. Any statements Ovitz may have made that violated a mutual non-disparagement agreement would similarly not constitute cause for termination because they occurred after his termination was publicly announced, and were not made in the course of his duties for the Company.

194. *See* PTE 200 (W–2 for 1995 representing Ovitz's income at CAA from January 1, 1995 to the end of September 1995 for almost $18 million). This W–2 is consistent with Ovitz's testimony. Tr. 1099:5–15.

195. PTE 314; PTE 127 (transmission of the signature page of the document by Adler to Santaniello). Ovitz's statement reads as follows:

> I beneficially own a majority interest in my prior employer ("Prior Employer"), a franchised talent agency. My ownership interest is held by an independent trustee. The talent agency business of the Prior Employer is being continued by Creative Artists Agency LLC ("CAA"), in which I have no direct or indirect ownership interest. The Prior Employer will continue to receive commissions from contracts entered into by its former talent agency clients on or before September 30, 1995 and will also lease certain real and personal property to CAA. Except for ownership interests of less than 5% in publicly traded companies, either I or my Prior Employer may be deemed to beneficially have ownership interests in the following entities that are engaged in the media, entertainment, communications or publishing businesses: Diamond Cable Communications PLC [ & ] Ziff–Davis Holdings Corp.

> PTE 314 at DD000292.

196. Oldco's (also known as CAA, Inc. or "Prior Employer") receipt of revenues from booked talent commissions were based upon Newco's (also known as CAA, LLC) financial success. *See* PTE 203 at MTO 1660; Tr. 1450:5–1452:5; 1533:2–1535:4. To alleviate any potential conflicts relating to this symbiotic relationship between Oldco and Newco, Disney created a process by which conflicts of interest between Ovitz and CAA were to be avoided through approval of transactions greater than $100,000 involving a CAA client by any two of (1) Eisner, (2) Litvack, or (3) Gerry Swider. PTE 148; PTE 374; Tr. 1298:11–1299:22; 1610:20–1613:2; 6457:15–6469:20; 6696:5–6697:1. Plaintiffs attempt to use PTE 581 to demonstrate that this process was not followed, but Litvack's memory of these deals is hazy, and with respect to many of the deals, Litvack testified that he believed the projects related to many of those deals were not completed. Tr. 6494:11–6508:7. Given the sparsity of this record, I cannot conclude first, that the conflict of interest avoidance procedure was not used, or second (and more importantly), that if the procedure was not used, such failure was attributable to Ovitz, or that Ovitz used his position as President to facilitate deals with CAA clients in order to advance his personal financial interests. *See* Tr. 8844:10–8851:19.

197. *See* PTE 202 at MTO 582, PTE 206 at MTO 611–12; PTE 208.

that it is common practice in the industry for some of these contracts to be oral is not contradicted.[198] Plaintiffs' assertion that the commissions list evolved over time is consistent with the parties' agreement, but there is no support in the record for the assertion that the *definition* of those commissions changed during any time relevant to this suit.[199]

Second, plaintiffs contend that Ovitz held a security interest in Newco that contradicts his disclosure that he had no direct or indirect ownership interest in Newco.[200] The form used to perfect the security interest is clear on its face that it relates to a debt instrument, hence Oldco is referred to as the "Secured Party" and Newco is referred to as the "Debtor." [201] As · plaintiffs' counsel no doubt understands, a security interest based upon a debt instrument is *not* an ownership interest. Upon considering the documentary evidence and testimony, I find that Ovitz's disclosures were neither false nor misleading.[202]

### 6. *Gifts and Expenses*

In moving from the talent agency he founded to a public company, Ovitz was faced with an array of new policies and rules relating to gifts and expenses. Eisner had asked Russell to speak to Ovitz about his expenses,[203] and on January 17, 1996, Russell and Ovitz met for breakfast to discuss the topic.[204] To follow up on their meeting, Ovitz sent a memo to Russell in January 1996 asking for help in handling his expenses.[205] According to Ovitz, Russell was "fantastic" in helping Ovitz's assistant meet and confer with a knowledgeable Disney employee so that Ovitz's expenses could be properly handled.[206]

The only evidence in the record that is admissible to prove that Ovitz did not comply with Disney's policies regarding expenses is (1) the statements by Eisner that Ovitz may not have been in compliance with those policies, and (2) the undisputed fact that Disney withheld $1 million from the cash payment of Ovitz's NFT, but ultimately returned all but roughly $140,000 of that amount.[207]

---

**198.** Ovitz 561:22–562:6; *see also* PTE 206 at MTO 610–11.

**199.** It appears that the definition of booked commissions may have been altered in 1999, long after Ovitz left Disney, making such change irrelevant to this case. PTE 209 at MTO 2161–63. This alteration may have been necessitated by Newco's arrearages in paying Oldco, arrearages which were substantial as of October 1997. PTE 205. Eventually, Newco and Oldco reached a settlement in full accord and satisfaction of their respective obligations. PTE 209.

**200.** *See* PTE 203 (creation of interest); PTE 254 (perfection of interest).

**201.** PTE 254.

**202.** Plaintiffs' allegations that Ovitz *again* lied in relation to the Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance when he left the Company, *see* PTE 70, must

also fail in light of my findings below that Ovitz was in compliance with the Company's policies regarding gifts.

**203.** *See* PTE 378; Tr. 3046:6–3049:17; 4393:1–4394:4.

**204.** Tr. 2560:3–2563:18.

**205.** PTE 318; Tr. 1315:8–1318:12.

**206.** Tr. 1317:11–1318:12.

**207.** At trial and in the post-trial briefing, plaintiffs have relied extensively on PTE 147, a draft report by Price Waterhouse which purportedly uncovers numerous examples of Ovitz' expense reimbursement requests not complying with Company policy. I have previously ruled that the report is hearsay, and therefore inadmissible when offered to prove the truth of the matters asserted in the report. *See In re The Walt Disney Co. Deriva-*

The record contains several examples of statements by Eisner where he believed that Ovitz's compliance with Company expense policies was questionable.[208] The trial testimony of Eisner, Russell, and especially Litvack (whom Eisner had assigned to oversee Ovitz's expenses), however, was credible and coherent in stating that Ovitz was in compliance with the Company's expense policies.[209]

With respect to the eventual holdback of $139,184 from Ovitz's severance,[210] only $70,212 was attributed to potential expense policy violations.[211] The remaining $68,972 related to the unamortized cost of capital improvements to Ovitz's home,[212] and Litvack clearly testified at trial that the Company had no contractual right to recoup those costs from Ovitz.[213]

The record provides no support for, and indeed often contradicts, two key assertions made by plaintiffs regarding the holdback. First, plaintiffs' assertions that the holdback itself is evidence that the defendants were on notice at the time of Ovitz's termination that grounds to terminate him for cause may have existed cannot stand in light of the testimony that many executives at the Company were at least six months behind in billing their expenses.[214] The holdback, then, was simply a way to avoid having to collect that money back from Ovitz after termination if there was insufficient justification for the billings.[215] Second, the $70,212 ultimately withheld from Ovitz is not *prima facie* evidence that Ovitz "stole" from Disney. As to both of these points, Litvack testified that insufficient justification and documentation was the reason for the final holdback—not a determination that Ovitz had "stolen" from or otherwise intentionally defrauded the Company.[216]

Plaintiffs have repeatedly criticized Ovitz's gift giving as self-serving and not in accordance with Company policies. Furthermore, they argue that he failed to properly report gifts that he received while serving as President of Disney.[217]

*tive Litig.*, 2005 WL 407220, at *1 (Del.Ch. Feb.4, 2005). Plaintiffs also cite to DTE 59, a collection of expense reports submitted by Ovitz in an effort to show that Ovitz requested reimbursement for non-Disney expenses. The documents in DTE 59 on their face do not demonstrate that the expenses were not related to Disney, and there is no testimony in the record to lead me to believe otherwise. In fact, each and every expense report in DTE 59 has been countersigned in the box for "Audit Approval," with the overwhelming majority (but not all) of the forms also having been countersigned in the box for "Management Approval." In the absence of further evidence, this can lead me to no other conclusion than that all of the expenses detailed in DTE 59 were properly reimbursable under appropriate Company guidelines, including those incurred in late December 1996. DTE 59 at WD04935, WD05159.

208. *See* PTE 24 at DD002451; PTE 378; Tr. 3049:18–3051:20.

209. *See* Tr. 2632:21–2633:23; 2892:4–14; 4578:9–4580:20; 6145:20–6146:6; 6171:8–6178:11; 6362:5–23; 6533:4–20; 6604:5–16; 6692:12–6693:12; *cf.* Tr. 2883:24–2885:21; 3041:2–22.

210. *See* PTE 385; PTE 403.

211. DTE 178.

212. *Id.*

213. Tr. 6174:17–6176:16.

214. Tr. 4579:4–4580:20; 4400:21–4402:4; 5044:16–5045:19; 6423:19–6424:19.

215. Tr. 4579:4–4580:20; 4400:21–4402:4; 5044:16–5045:19; 6423:19–6424:19.

216. Tr. 6174:8–6175:23; 6178:7–11; 6604:5–6605:23; *see also* Tr. 6273:9–6275:9; 6533:4–20; 6691:16–6692:24.

217. *See* PTE 24 at DD002451–52; PTE 148; PTE 374. Plaintiffs attempt to use DTE 61 to impugn Ovitz's handling of gifts. The docu-

Once more, the record fails to support these assertions. As with Ovitz's expenses, Eisner asked Russell to assist Ovitz in complying with Disney's policies with respect to gifts.[218] Litvack was also told of Eisner's concerns, and following an investigation, he found that Ovitz was in compliance with Disney's gift policies.[219] At trial, plaintiffs' counsel asked Litvack whether he was aware of several questionable gifts, but Litvack unambiguously testified that either he had approved those gifts, or that, had he been asked, he would have approved those gifts because they related to the business of the Company.[220] In sum, finding Litvack's and Eisner's trial testimony credible as cited above, I find that Ovitz was not in violation of The Walt Disney Company's policies relating to expenses or giving and receiving gifts.

## C. Ovitz's Termination

### 1. The Beginning of the End

Ovitz's relationship with Eisner, and with other Disney executives and directors, continued to deteriorate through September 1996. In mid-September, Lit-

vack, with Eisner's approval, spoke with, or more accurately cornered Ovitz. Litvack told Ovitz that he thought it was clear that Ovitz was not working out at Disney and that he should start looking for both a graceful way out of Disney and a new job.[221] After Litvack reported this conversation to Eisner, Eisner, hoping to make Ovitz realize that there was no future for him at Disney, sent Litvack back to Ovitz and asked Litvack to make it clear that Eisner no longer wanted Ovitz at Disney and that Ovitz should seriously consider other employment opportunities, including the opportunity at Sony.[222] It seems that Ovitz brought up the possibility of moving to Sony with Eisner during a flight in June 1996 to New Orleans.[223] Eisner believed that Ovitz meant it as a threat, but Eisner welcomed the idea of Ovitz leaving the Company. Litvack conveyed Eisner's sentiments, and Ovitz responded by telling Litvack that he was "going to have to pull me out of here ... I'm not leaving," and that if Eisner wanted him to leave Disney, Eisner could tell him so to his face.[224] At trial, Ovitz testified that he felt that "as far as [he] was concerned, [he] was chained to

ment on its face, however, supports the conclusion that Ovitz was complying with Company policies by demonstrating that three of those four gifts were retained by Ovitz in exchange for a charitable contribution, and that the fourth was used as a prize at a Company event. In my mind, the simple fact that two of the gifts were not received by Disney until January 7, 1997 is unremarkable and not probative in any way detrimental to Ovitz, especially in light of the holiday season during which Ovitz was terminated and that the gifts were submitted to Disney shortly after the new year began.

**218.** *See* PTE 17; PTE 378; DTE 151.

**219.** Tr. 6139:10–6141:8; 6146:7–9; *see* PTE 406 (all gifts reported by Ovitz were turned over to the appropriate department within the Company); DTE 61.

**220.** Tr. 6437:21–6445:22; 6518:11–6530:4; 6533:1–20; *see* Tr. 5023:4–5029:18; 5034:5–5038:13; 5039:9–5042:22; *see also* Tr. 2201:15–2210:21 (Ovitz) (describing the reasons for some of his gifts); *cf.* Tr. 3049:18–3066:16 (Russell unable to give useful testimony expounding upon PTE 378 and PTE 17 due to lack of recall).

**221.** Tr. 6101:2–6102:18; 6562:7–13.

**222.** Tr. 4354:19–4355:6; 4731:13–4732:16; 6102:21–6103:14.

**223.** Tr. 4319:10–23. Eisner testified that when Ovitz first brought the Sony option up that Eisner believed that it would provide him a graceful way out of the Ovitz problem. *See id.*

**224.** Ovitz 537:24–25; Tr. 1350:5–13552:9; 6103:15–6103:24.

that desk and that company. [That he] wasn't going to leave there a loser," that the guy that hired him or the full board would have to fire him, and that he hoped he could still make it work and make all these problems just disappear.[225]

Following up on the discussions between Litvack and Ovitz, Eisner and Ovitz had several meetings on or around September 21, 1996, during which they discussed Ovitz's future (or lack thereof) at Disney, and the possibility that Ovitz would seek employment at Sony.[226] Eisner believed that Sony would be both willing and excited to take Ovitz in "trade" from Disney because Ovitz had a very positive longstanding relationship with many of Sony's top executives. Eisner favored the Sony "trade" because, not only would it remove Ovitz and his personality from the halls of Disney, but it would also relieve Disney of having to pay Ovitz under the OEA and would hopefully bring a valuable return to Disney in the form of licensing rights for *The Young and the Restless.*[227]

The Sony discussions continued on October 8 when Ovitz wrote Eisner a note asking for formal permission to begin negotiations with Sony.[228] After stating that he was still shocked that Eisner wanted him out, Ovitz wrote that he had resolved to look at other employment possibilities, and he wanted to make sure that he did

not leave himself or Sony open to a lawsuit because his departure from Disney would leave Ovitz in breach of the OEA.[229] On October 9 Eisner responded by letter, telling Ovitz that neither he nor anyone else at Disney had any objections to Ovitz working out a deal and eventually going to work for Sony. In fact, Eisner thought it was best that Ovitz and Disney work together to ensure a smooth departure.[230] Additionally, Eisner wrote a letter to Mr. Idei, Sony's Chairman, trumpeting Ovitz and notifying Mr. Idei that Disney had given permission for Ovitz to enter into negotiations for a possible move to Sony.[231] Apparently, however, only a limited number of directors knew that Ovitz was given permission to negotiate with Sony, including Litvack,[232] Watson,[233] Russell,[234] Gold,[235] and Roy Disney,[236] and that the board as a whole was never approached about the possible Sony "trade." Of these directors, only Litvack and Russell were ever asked for their opinions on the matter.

On November 1, Ovitz wrote a letter to Eisner notifying Eisner that things had failed to work out with Sony and that Ovitz had instead decided to recommit himself to Disney with "an even greater commitment of [his] own energies" than he had before and an "increased appreciation" of the Dis-

225. Tr. 1352:14–1353:20.

226. PTE 18.

227. Tr. 4351:23–4354:2. Eisner was hoping to obtain the licensing rights to *The Young and the Restless,* which would help Disney with its new Soap Opera Channel. Eisner also believed that if he did not ask for something in return for Ovitz, that Sony would think that Disney did not want Ovitz and then Sony may not have wanted him either.

228. PTE 18.

229. *Id.*

230. PTE 19 at WD00399–401.

231. *Id.* at WD00402. Eisner also forwarded this letter to Ovitz.

232. Tr. 6104:8–6107:6.

233. Tr. 7858:21–7859:22.

234. Tr. 2571:23–2572:14.

235. Tr. 3766:2–3767:6.

236. Tr. 4022:10–4023:8.

ney organization.[237] There are varying accounts of why Ovitz did not end up employed at Sony, but the important fact is that Ovitz remained at Disney.[238]

### 2. The September 30, 1996 Board Meeting

During the course of the Sony discussions the Disney board convened a meeting on September 30, 1996, while attending a Disney anniversary at the Walt Disney World Resort in Orlando, Florida. Ovitz was in attendance at the board meeting, and it is undisputed that neither Ovitz's future with Disney nor his conversations to date with Eisner and Litvack were discussed at the general board meeting.[239] Eisner, however, testified that he spoke with various directors either during an executive session held that same day at which Ovitz was not present, or in small groups during the weekend, to notify them that there were continuing problems with Ovitz's performance.[240] Additionally, other directors testified that Eisner apprised them of the developing situation with Ovitz either during or prior to September 1996.[241] Although Eisner never sat down at a full board meeting to discuss the persistent and growing Ovitz problem, it is clear that he made an effort to notify and talk with a large majority, if not all of the directors.

On the night of September 30, Eisner and Ovitz made their now-famous appearance on *The Larry King Live Show* in which Eisner refuted the then current Hollywood gossip that there was a growing rift between himself and Ovitz and emphatically stated that if given the chance, he would hire Ovitz again.[242] It is clear now that this entire interview was a shameless public relations move during which both Eisner and Ovitz did not candidly answer Larry King's questions with the goal of deflating the negative rumors surrounding their failed partnership.

On October 1, the day after the Larry King interview, Eisner sent a letter that he had been working on since the summer, to Russell and Watson detailing Eisner's mounting difficulties with Ovitz, including Ovitz's failure to adapt to Disney's corporate culture in even the slightest fashion, Eisner's lack of trust for Ovitz, and Ovitz's complete failure to alleviate Eisner's workload.[243] Apparently, an incident at Eisner's mother's funeral, which involved Ovitz getting into an argument on a New York City street over a parking space, spurred Eisner to finally send this letter. The letter stated that:

---

237. PTE 19 at WD00404.

238. *See* Tr. 1363:17–1365:2 (Ovitz) (stating that he did not continue negotiations with Sony because there were, in his view, severe conflicts within Sony's upper management); 4362:1–9 (Eisner) (stating that he was told that Ovitz did not get an offer at Sony because Ovitz was being unreasonable in his demands and that he was asking for "the sun and the moon" from Sony).

239. Tr. 6677:2–11; 7592:8–10.

240. Tr. 4349:13–4350:5; 4728:17–4729:12.

241. Tr. 3087:7–3088:16 (Russell); 3818:9–21 (Gold); 4021:7–4022:9 (Roy Disney); 5593:2–

5594:12, 5725:6–5726:2 (Mitchell); 5810:8–12 (Nunis); 6836:5–6837:19 (Wilson).

242. PTE 323, PTE 505.

243. PTE 79; *see also supra* text "Veracity and 'Agenting'" at 49. Although I have found that Ovitz was not a liar, Eisner's persistently-vocalized reservations about Ovitz's veracity are not inconsistent with that finding. I conclude that while Ovitz gave this Court no reason to believe that he lied, that is entirely possible that his actions while at Disney and his general character led Eisner to believe that Ovitz was not completely honest. Eisner, however, was unable to point to specific instances where Ovitz was untruthful.

If I should be hit by a truck, the company simply cannot make [Ovitz] CEO or leave him as president with a figurehead CEO. It would be catastrophic. I hate saying it, but his strength of personality together with his erratic behavior and pathological problems, and I hate saying that, is a mixture leading to disaster for this company.[244]

Eisner stated that his goal in writing the letter was to keep Ovitz from succeeding him at Disney should the opportunity arise. Because of that purpose, the letter contained a good deal of hyperbole to help Eisner better "unsell" Ovitz as his successor.[245] Neither Russell nor Watson divulged at any time the contents of the letter with other members of the board.[246]

Eisner was informed on November 1 that Ovitz's negotiations with Sony had failed to result in Ovitz leaving Disney. Once Eisner discovered that the Sony negotiations had failed to produce the desired result, Eisner decided that Ovitz must be gone by the end of the year.[247] To facilitate Ovitz's departure, Eisner asked Wilson to take a Thanksgiving trip on the yacht that Ovitz and Wilson jointly owned, the Illusion.[248] It was Eisner's hope that Wilson, a confidant of Ovitz's, could help Ovitz finally understand not only that Ovitz had to leave Disney, but that everyone, including Ovitz, would be better off if he left.

Still struggling to make Ovitz understand that he had to leave Disney, Eisner wrote a letter to Ovitz on November 11 (which was never sent), in which he again tried to put Ovitz on notice that he was no longer welcome at Disney.[249] Eisner characterized this letter as:

[A] shot at trying to conjure up every argument, every issue exaggerated to the point of extreme nature so that [Ovitz] could see how deadly serious [Eisner] was.... However, [Eisner] realized it was ... not accurate, way exaggerated, silly, hyperbole, insensitive, and it read like ... a Vanity Fair article.[250]

Eisner also stated that:

One of the reasons Litvack didn't want me to send the memo is there were so many things in the memo ... which just weren't true, but I was trying to create a case that [Ovitz] could not argue with.[251]

In this letter, Eisner told Ovitz that:

I think we should part ways professionally. I believe you should resign (this is not a legal suggestion but a cosmetic one), and we should put the best possible face on it. When we talked last Friday, I told you again that my biggest problem was that you played the angles too much. I told you 98% of the problem was that I did not know when you were telling the truth, about big things, about small things.... We are beyond the curing stage. We are now in salvation. I would like to remain friends, to end this so it looks like you decided it, and to be positive and supportive ... I hope we can work together now to accomplish what has to be done. I am

244. *Id.* at DD002623.

245. Tr. 4436:14–4439:6.

246. Tr. 3078:17–3079:15; 7881:10–7887:3.

247. Tr. 4368:9–4369:3.

248. Tr. 4369:4–4370:2; 6838:18–6839:11.

249. PTE 24.

250. Tr. 4372:5–19.

251. Tr. 5028:13–19.

ready to work as hard as necessary and as long.[252]

Eisner sent this document to Bass and Russell for their review.[253] Eisner also believed that he may have shown the letter to Litvack, but Litvack did not recall having seen this letter before trial.[254] For my purposes, Russell was the only director to receive this document and he did not share it or the matters it concerned with anyone else on the board.[255] Instead of sending this letter to Ovitz, Eisner met with Ovitz personally on November 13 and they discussed much of what was contained in the letter, especially Ovitz's alleged management and ethics problems.[256] Notes taken by Eisner following this meeting stated that the meeting was "2 hours and 15 minutes of [Eisner] telling [Ovitz] that it was not going to work."[257] Eisner believed that Ovitz just would not listen to what he was trying to tell him and instead, Ovitz insisted that he would stay at Disney, going so far as to state that he would chain himself to his desk.[258]

### 3. *Options for Ovitz's Termination*

Since the Sony option was discussed in early September, Eisner and Litvack had also been discussing whether Ovitz could be terminated, and more importantly, whether he could be terminated for cause.[259] Eisner hoped to obtain a termination for cause because he believed that although Ovitz "had not done the job that would warrant [the NFT] payment" Disney was obliged to honor the OEA.[260] Honoring the OEA meant that if Ovitz was terminated without cause, he would receive the NFT payment that the OEA called for, which consisted of the balance of Ovitz's salary, an imputed amount of bonuses, a $10 million termination fee and the immediate vesting of his three million stock options at the time. Litvack advised Eisner from the very beginning that he did not believe that there was cause to terminate Ovitz under the OEA.

As the end of November approached, Eisner again asked Litvack if Disney had cause to fire Ovitz and avoid the costly NFT payment.[261] Litvack proceeded to examine more carefully the issue of whether cause existed under the OEA. Litvack reviewed the OEA, refreshed himself on the meaning of gross negligence and malfeasance and reviewed all of the facts concerning Ovitz's performance of which he was aware.[262] Litvack freely admits that he did not do any legal research in answering the cause question;[263] nor did he order an outside investigation to be undertaken

**252.** PTE 24 at DD002454–002455.

**253.** Eisner 606:4–7.

**254.** Tr. 6143:3–20.

**255.** Tr. 3090:9–3091:8; 3095:20–3096:3.

**256.** Eisner 606:8–607:14; *see also* Tr. 5199:14–19; 2017:17–2018:15.

**257.** PTE 325 at DD002549.

**258.** Tr. 4370:3–19. The threat of chaining himself to his desk, although obviously metaphorical, demonstrates exactly how unwilling Ovitz was to even consider leaving Disney at that point.

**259.** Tr. 4379:23–4380:19; 6110:12–6111:3.

**260.** Tr. 4380:22–4381:15.

**261.** Tr. 6110:15–6111:3.

**262.** Tr. 6113:21–6114:19.

**263.** Tr. 6114:20–10 (Litvack) (stating that he did not do any case research because he "didn't believe that there were going to be any cases that were going to answer the question for [him]. [He] had been dealing with contracts and litigation all [his] life.... [He] felt he knew the facts as to what the man had done and not done.").

or an outside opinion to be authored.[264] Litvack did state that in December he consulted with Morton Pierce, a senior partner at Dewey Ballantine, and that Pierce agreed that there was no cause.[265] Pierce, however, was not admitted to the California Bar (California law governed the OEA), was not an expert in employment law,[266] and could not recall speaking with Litvack regarding Ovitz.[267] Furthermore, Pierce's bills to Disney do not clearly reflect that any such conversation took place regarding whether Ovitz could be terminated for cause.[268] After taking these steps, Litvack, for the second time, concluded that there was no cause to terminate Ovitz. In fact, despite Ovitz's poor performance and concerns about his honesty, Litvack believed that the question of whether Ovitz could be terminated for cause was not a close question and, in fact, Litvack described it as "a no-brainer."[269] Litvack, however, produced no written work product or notes to show to the board that would explain or defend his conclusion, and because he did not ask for

an outside opinion to be authored, there was no written work product at all. When Litvack notified Eisner that he did not believe cause existed, Eisner testified that he "checked with almost anybody that [he] could find that had a legal degree, and there was just no light in that possibility. It was a total dead end from day one."[270]

In a perfect, more responsible world, both Litvack and Eisner would have had sufficient documentation not only to back up their conclusion that Ovitz could not be terminated for cause, but they would have also had sufficient evidence of the research and legwork they did to arrive at that conclusion. Despite the paucity of evidence, it is clear to the Court that both Eisner and Litvack wanted to fire Ovitz for cause to avoid the costly NFT payment, and perhaps out of personal motivations. The Court is convinced, based upon these two factors, that Eisner and Litvack did in fact make a concerted effort to determine if Ovitz could be terminated for cause, and that despite these efforts, they

264. Tr. 6115:22–6116:14 (Litvack) (stating that he did not order an outside investigation because he believed he knew the facts and an outsider would have gone to him to get the facts, and also because he believed that the firing of Ovitz was a sensitive matter and he wanted to involve as few people as possible); 6130:5–24 (Litvack) (explaining that he did not order an outside written opinion because it would have been expensive, and he believed it was a "CYA tactic done by general counsels to cover themselves" and he didn't believe he needed that). Litvack consulted Val Cohen, co-head of the Disney litigation group, and possibly Santaniello, and to the extent he met with them, he stated that they both agreed with his conclusion that there was no cause, although there is no record of their having met or discussed the existence of cause. *See* Tr. 6119:22–6121:8. Litvack admits, however, that all the information Val Cohen knew about Ovitz, she would have learned from Litvack. *See* Tr. 6401:2–6405:4.

265. Tr. 6121:9–6126:8.

266. Tr. 6222:22–6225:13.

267. Tr. 6398:3–11.

268. PTE 391; PTE 392 (bill contains charge of $25,500 for consultation in the Ovitz matter which included advice regarding proxy disclosure and tax considerations relating to Ovitz's termination).

269. Tr. 6114:24–10. In light of the hostile relationship between Litvack and Ovitz, I believe if Litvack thought it were possible to avoid paying Ovitz the NFT payment, that out of pure ill-will, Litvack would have tried almost anything to avoid the payment. *See* Tr. 6115:9–21 ("[I]f there was a way not to pay him, I would have loved not to pay him. . . . I didn't like him, and he didn't like me. I didn't feel he had done the job.").

270. Tr. 4380:10–21.

were unable to manufacture the desired result.

In addition to determining that there was no cause to fire Ovitz as defined in the OEA, Litvack also testified that it would be inappropriate and unethical for Disney to try to bluff Ovitz into accepting an amount less than agreed to in the OEA in case of an NFT.[271] Litvack believed that it would be a bad idea to attempt to coerce Ovitz (by threatening a for-cause termination) into negotiating for a smaller NFT package than was provided for in the OEA because Disney, when pressed by Ovitz's attorneys, would have to admit that there in fact was no cause and possibly subject Disney to a wrongful termination suit.[272] Litvack also believed that a failed attempt to bluff Ovitz out of the NFT could be quite harmful to Disney's reputation because it would appear as if Disney was trying to get out of contractual obligations (which it would have been), and that would make it difficult for Disney to do business and be viewed as an honest business partner.[273]

271. Tr. 6128:6–11.

272. Tr. 6118:16–6119:13; 6129:2–6130:3.

273. *Id.* Litvack also believed that attempting to relocate Ovitz within Disney would not improve the situation as Ovitz just was not a good match for Disney, although he conceded that that was up to Eisner. *See* Tr. 6128:12–6129:1.

274. PTE 91.

275. *Id.* at WD01561A.

276. Tr. 3771:21–3772:16 (Because the proxy was not due for some time, Gold stated that the board chose to renominate Ovitz and then change the slate after he was fired instead of embarrassing Ovitz at the meeting.).

277. I recognize that certain portions of the deposition testimony concerning this execu-

### 4. The November 25, 1996 Board Meeting

The Disney board held its next meeting on November 25, and Ovitz was present. The minutes of this meeting contain no record that the board engaged in any discussion concerning Ovitz's termination, or that they were informed of the actions that Eisner and Litvack had taken to this point concerning Ovitz.[274] The only action recorded in the minutes concerning Ovitz is his unanimous renomination to a new three-year term to the board.[275] Gold testified, however, that by this time the board knew that Ovitz would be fired, but because Ovitz was present at the meeting it would have been akin to a "public hanging" to fail to re-nominate him.[276]

Although there was no mention of Ovitz's impending termination at the board meeting, it is apparent, despite the lack of a written record, that directly following the board meeting, there was some discussion concerning Ovitz at the executive session which was held at Disney Imagineering in a glass-walled room (according to those in attendance who remember this event).[277] One of the more striking images

tive session, whether it occurred, and what was said at it, are to some degree in conflict with the trial testimony. *See* Gold 357:20–361:24 (stating that he does not independently recall when the executive session occurred, but that there was an executive session during which Ovitz's termination was discussed); Litvack 573:7–574:9 (stating that he was unaware of an executive session, however if there was such a meeting, he would have been excluded); Russell 731:18–732:7 (stating that he does not recall an executive session after the November 1996 board meeting); Stern 163:14–164:2 (stating that he has no recollection of an executive session of the board after the November 1996 meeting). Although be later testified that after reviewing Gold's trial testimony that he vividly recalled the meeting, *see* Tr. 8155:13–8158:4, Eisner himself testified that this was not an *official* executive session, but instead he gathered the non-management directors in a room to discuss Ovitz. *See* Tr. 4425:7–4426:10. Despite

of this trial is that apparently Ovitz was directly outside the glass walls—looking in at this meeting—while his fate at Disney was being discussed. There are no minutes to show who attended the executive session, but I am reasonably certain that at least Eisner, Gold, Bowers, Watson and Stern were in attendance.[278] In the absence of further evidence, I must conclude that no other directors attended this session. It is also clear that Eisner notified the directors in attendance at the executive session that it was his intention to fire Ovitz by year's end and that he had asked Wilson to speak with Ovitz while they were onboard the Illusion during the upcoming Thanksgiving holiday.[279]

Beyond Ovitz's impending doom and Wilson's upcoming boat trip, there is some controversy as to whether any details of the NFT and the cause question were discussed at this meeting. Eisner testified that, in addition to the other items, he informed those in attendance of what the NFT would cost Disney.[280] Gold tells a somewhat more elaborate (and certainly more self-serving) version of the meeting in which Gold asks Eisner whether Ovitz's termination would be for cause, and Eisner assures Gold, in the presence of the other directors, that Litvack had advised Eisner that there were no grounds for a "for

cause" termination.[281] After the executive session adjourned, Gold testified that Litvack came into the room and Eisner told Gold to ask Litvack about cause, and that Litvack then told Gold that there was no cause to terminate Ovitz.[282] Stern, noting at trial that he had failed to recall anything at all concerning this meeting during his deposition, echoed Gold's version, stating that after the meeting, Litvack said that there was "no other way to go" besides an NFT.[283]

Outside of Gold and Stern, nobody else present at the executive session recalled Gold raising the issue of fault with Eisner or having witnessed Gold speak with Litvack. Litvack recalls speaking with Gold sometime before December 12, and he recalls in substance a similar conversation to what Gold and Stern recall, that is, Eisner telling Gold to ask Litvack about cause. Litvack, however, cannot place that conversation in time, believes it took place in the boardroom and believes that the only people present were Eisner, Gold and himself.[284] Because of these numerous discrepancies, I cannot conclude that Gold questioned Eisner during this meeting regarding cause, nor can I conclude that the conversation that took place between Gold and Litvack occurred after the executive

these conflicts, I am convinced that such a meeting took place. What was discussed at that meeting, however, is an entirely separate question that I will deal with shortly.

**278.** Mitchell was called after the meeting by Eisner and was told that there was some discussion of Ovitz's performance. Tr. 5758:21–5759:10. Mitchell, however, was not told anything concerning the NFT. *See* Tr. 5782:8–18.

**279.** Tr. 4551:17–4552:21 (Eisner); 3772:17–3773:18, 3785:3–9 ("You couldn't have left the November ... executive session without knowing where Mr. Eisner was going [as concerned Ovitz].") (Gold); 5950:20–5952:13

(Bowers); 7859:23–7862:5 (Watson); 8155:13–8158:4 (Stern).

**280.** Tr. 4425:7–4426:10.

**281.** Tr. 3773:15–3774:16.

**282.** Tr. 3774:17–3776:7; 3906:17–3908:4. Gold told a slightly different story at his deposition which had Litvack in the room during the entire executive session and did not have Gold asking Litvack questions about outside counsel. *See* Gold 348:12–351:15.

**283.** Tr. 8155:13–8158:4.

**284.** Tr. 6343:20–6346:5.

session in the presence of those who were in attendance.

### 5. *The Illusion Dispelled*

Shortly after the November 25 board meeting and executive session, the Ovitz and Wilson families left on the Illusion for a Thanksgiving trip to the British Virgin Islands. Ovitz embarked on this trip with the hope that if he could figure out a way to make it to Christmas, he could fix everything with Disney and make his problems go away.[285] Wilson, however, had other plans.[286] Ovitz recalled the conversations between him and Wilson quite well. Ovitz recalled that Wilson told him that "it wasn't going to work and that [Eisner] wanted [Ovitz] out of the company." [287] Ovitz said that after speaking with Wilson he began to realize how serious the situation with Disney had become and that he needed to talk to his attorneys and get some perspective on the situation.[288] Wilson was unable to recall the details of what he and Ovitz spoke about,[289] but Wilson does recall that Ovitz was quite "emotionally concerned" with his situation at Disney.[290]

At some point during the trip, Eisner contacted Wilson by phone and Wilson related the situation and the progress he had made with Ovitz.[291] Wilson was unable to remember the specifics of his conversation with Eisner, but his recollection was refreshed after viewing notes, dated December 1, taken by Eisner following the conversation.[292] Wilson recalled describing Ovitz as a "wounded animal … in a corner," and stated that by this he meant that Ovitz could become dangerous to the organization if the relationship with Disney continued.[293] Wilson also recalled stating that Ovitz was a "loyal friend and devastating enemy," [294] and advising that Eisner should be reasonable and magnanimous, both financially and publicly, so Ovitz could save face.[295]

On December 3, having returned from his Thanksgiving trip, Ovitz, armed with his newfound understanding that his time at Disney was rapidly coming to an end, met with Eisner to discuss the terms of his departure. Eisner memorialized this meeting in a note to Russell which read "I met with Michael Ovitz today who wants to bring our discussions to a conclusion this week, wants you and Bob Goldman to settle out his contract immediately and sign it by weeks end." [296] Essentially, this note asked Russell to take charge of managing the Ovitz departure. Ovitz asked that he not have to deal personally with Litvack during the termination process, although he had no qualms about Litvack being involved.[297] Ovitz also asked for several concessions from Disney, including keep-

---

**285.** Tr. 2050:1–10.

**286.** Wilson also testified that Eisner informed him that Ovitz would be entitled to a payment under the OEA if he was terminated without fault, and that Wilson knew what the approximate value of that payment was. *See* Tr. 7031:10–7032:4.

**287.** Tr. 2051:7–11.

**288.** *Id.*

**289.** Tr. 7016:16–22.

**290.** Tr. 7017:24–7018:5.

**291.** Tr. 7016:23–7017:9.

**292.** PTE 25.

**293.** Tr. 7026:22–7027:23; *see also* PTE 25.

**294.** Tr. 7028:2–7029:1.

**295.** Tr. 7030:6–7031:9.

**296.** PTE 326 DD002539.

**297.** *Id.* at DD002540; *see also* Tr. 2060:19–2061:9.

ing his seat on the board, obtaining a consulting/advising arrangement with Disney, the continued use of an office and staff (but not on the Disney lot), continued health insurance and home security, continued use of the company car and the repurchase of his plane.[298]

Although Eisner and Ovitz did not see eye to eye on Ovitz's requests, Eisner initially objected only to Ovitz's continued use of the company car, telling Russell, "I don't want to nit pick here, but we are paying him a fortune."[299] The memo to Russell does not reflect Eisner's objections to Ovitz's other requests. Eisner, however, testified that "by the time I got from number one to number five [of listing Ovitz's requests] I had already realized it was a bad idea, and the next day I called him and told him that ... it would be impossible."[300] Eisner also told Russell that:

> Any deal we make that is one cent more than the contract should include a non raid clause with teeth, a non compete in areas he advises us in, and a non disclose or bad mouth me or the company for five years at least. It would be great if you paid some of his money out over time which he would lose if he broke that deal.[301]

Shortly after this meeting, Ovitz spoke with Russell on the phone, and Russell described the conversation as "a very, very troubling and unusual conversation."[302] Russell stated that during their conversation, Ovitz made clear that he understood that the door to Disney was closed, but he was still "pleading his heart out ... [with] tears in his voice."[303] Over the next week, Disney, and more accurately, Eisner, rejected every request that Ovitz had made, informing him that all he would receive is what he had contracted for in the OEA and nothing more.[304] Other than the extra benefits which Ovitz requested and Disney summarily denied, there seems to have been no negotiation between anyone in Ovitz's camp and anyone at Disney concerning whether there would be a for cause termination or an NFT, and nobody seems to have even mentioned to Ovitz or his representatives the possibility of a for cause termination.[305]

### 6. Ovitz's Bonus and His Termination

On December 10, the Executive Performance Plan Committee ("EPPC") met to consider annual bonuses for Disney's most highly-compensated executive officers. The EPPC was chaired by Gold, its other members Lozano, Poitier and Rus-

**298.** PTE 326.

**299.** *Id.* at DD002539.

**300.** Tr. 4397:20–24.

**301.** PTE 326 at DD002540; *see also* PTE 379.

**302.** Tr. 2577:3–2578:1.

**303.** *Id.*

**304.** Tr. 1379:21–1380:5, 3228:9–3229:19 (denial of continuing seat on board); 1379:1–20, 2098:5–13, 3227:8–18 (denial of consulting agreement); 3224:7–21 (denial of use of office and staff); 2063:21–2064:10, 3225:10–13 (denial of opportunity to repurchase plane);

6178:15–6179:23 (denial of repurchase or continued use of car).

**305.** Tr. 1378:6–14 (Ovitz) (stating that Eisner never mentioned to him the possibility that he would be fired for cause); 4455:3–19 (Eisner) (stating that at no time did he mention to Ovitz the possibility that he could be fired for cause, and denying that any negotiations took place between the two parties); 2640:17–2641:21 (Russell) (stating that he had never mentioned anything concerning a for cause termination to Ovitz or anyone working for Ovitz); 6186:15–6187:4 (Litvack) (stating that to the best of his knowledge, neither he nor anyone else at Disney ever mentioned to Ovitz or one of his representatives that he could be fired for cause).

sell, attended, although Poitier and Lozano attended by phone.[306] Also in attendance were Eisner, Watson, Litvack, Santaniello, and Marsha Reed.[307] Russell informed all those in attendance of his conversations with Ovitz's representatives and that Ovitz was going to be terminated, but that he was not going to be terminated for cause.[308] At this meeting, Russell recommended that Ovitz, despite his poor performance and imminent termination, should receive a $7.5 million bonus for his services during the 1996 fiscal year because Disney had done so well during the fiscal year and because Disney had a large bonus pool.[309] The EPPC approved this recommendation and it appears that Russell may have even advised the EPPC (despite the *clear* language in the OEA stating that the *bonus was discretionary* ) that Disney was contractually obligated to pay Ovitz his bonus.[310] Despite the fact that all of those in attendance should have known better, nobody spoke up to correct the mistaken perception that Ovitz had to receive a bonus, let alone a $7.5 million bonus.

The following evening, Eisner met with Ovitz at Eisner's mother's apartment in New York City.[311] By the time this meeting occurred, it had already been decided that Ovitz was being terminated, without cause, and would be receiving his contractual NFT payment, and that he would not be receiving any of the additional items that he asked for.[312] The purpose of this meeting was to agree to a press release to announce the termination, let Ovitz know that he would not receive any additional items, and as Eisner described it, it served as "the final parting." [313] Eisner and Ovitz apparently came to some understanding that neither Ovitz nor Disney was to defame each other in the press, and that the separation was to be undertaken with dignity and respect for both sides.[314] Ovitz's termination was memorialized the following day in a letter signed by Litvack and dated December 12.[315] Litvack testified

306. PTE 51.

307. *Id.* Watson attended by phone.

308. Tr. 2581:23–2582:17; 3785:3–3786:11; 4429:7–4430:4; *see also* DTE 163.

309. PTE 51 at WD01229; *see also* 2582:18–2583:12.

310. Tr. 3926:11–15 (Gold) (stating that Russell stated that the bonus was mandatory); 7752:1–7754:22 (Lozano) (stating that although he could not recall Russell advising the EPPC that the bonus was mandatory, that he believed that they were contractually obligated to grant Ovitz a $7.5 million bonus); 6154:15–6156:16 (Litvack) (stating that Russell told the EPPC that the bonus was mandatory, and that Litvack did not say anything because he was not sure what Russell was referring to and he did not want to embarrass Russell). Planning to correct Russell's mistake when he spoke with him later on, Litvack nonetheless ordered that Ovitz's bonus be paid. *See* PTE 175; Tr. 6156:16–6157:10.

311. Tr. 4402:8–4403:8.

312. Eisner did give some testimony that by December 11 he still intended to give Ovitz some sort of consulting arrangement separate from and unrelated to the OEA. The overwhelming weight of the evidence, however, demonstrates that this was not in fact the case, and it certainly did not happen. *See* Tr. 4601:6–23.

313. Tr. 4592:18–4593:6.

314. Eisner 654:16–655:16; *see also* Tr. 4601:8–18.

315. PTE 13. The letter reads:

This will confirm the terms of our mutual agreement as follows:
1. The term of your employment under your existing Employment Agreement with Disney will end on January 31, 1997.
2. This letter will for all purposes of the Employment Agreement be given the

that Russell negotiated the terms in the letter, but Litvack signed this document on Eisner's instructions.[316] The board was not shown the December 12 letter,[317] nor did it meet to approve its terms.[318]

Also on December 12, Disney issued the press release announcing Ovitz's termination.[319] The press release stated that "Michael S. Ovitz, will leave the company by mutual agreement effective January 31, 1997. He will continue to serve as an advisor and consultant to the company and the Board of Directors."[320] Although I am puzzled by the use of the phrase "mutual agreement," I am nonetheless convinced, based upon Ovitz's constant self-denial and difficult behavior during the months leading up to his termination, and Eisner's commitment that he would handle the termination gracefully for Ovitz's benefit (and likely to prevent Ovitz from defaming him and Disney in the press),[321] that the termination was anything but a mutual agreement.[322] Additionally, although I am

troubled by the statement in the press release that Ovitz would continue to serve as an advisor and consultant to the board, because this was either a deliberate untruth or an incredibly irresponsible and sloppy error on Disney's part, it is ultimately immaterial to the issues to be resolved in this case. Therefore, I do not believe that the statement in the press release regarding Ovitz continuing as an advisor and consultant to the Disney board is reflective of any agreement or understanding that Disney and Ovitz had at the time.[323] The Court believes that both of these untrue statements were likely made as part of an effort by Disney to make Ovitz's departure seem as amicable as possible so that Ovitz's reputation would not be publicly tarnished any more than could be avoided. In any event, once Ovitz left Eisner's mother's apartment, he never again returned to Disney.[324]

That same day, Eisner at least attempted to contact each of the Board members

same effect as though there had been a "Non–Fault Termination," and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11(c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002.

316. Tr. 6157:11–6159:8.

317. Bowers 335:3–14; Gold 207:13–18; Roy Disney 189:20–190:10.

318. Tr. 3933:8–20 (Gold); 4102:23–4103:11 (Eisner); 5772:18–5773:4 (Mitchell); 5881:24–5882:23 (Nunis); 5990:21–5991:10 (Bowers); 7248:3–7249:6 (Poitier); 7615:19–7616:16 (Murphy); 7758:2–7759:22 (Lozano).

319. PTE 390.

320. *Id.*

321. PTE 19 at WD4000. *See also* Tr. 2088:1–5 (Ovitz) (stating "what we agreed on that

they tried to handle this with some dignity for me and some grace and were very generous in their press release, which was very nice for them to do.").

322. *See also* Tr. 2087:6–2088:5 (Ovitz) (stating that "I wouldn't leave by mutual agreement and I wasn't going to serve as an advisor and consultant. I wanted to [serve in those positions.]"); 2573:11–21 (Foster: "[Ovitz's] departure was not voluntary, is that correct?" Russell: "No way, no way."); 4525:12–16 (Schulman: "You were trying to work out getting Mr. Ovitz's consent; correct?" Eisner: "I was not trying to get his consent on being fired. I was trying to get his consent of leaving the company in a graceful way.").

323. Tr. 2087:6–2088:5. What makes it even clearer that Disney was simply trying to mislead the public is that no such representation was made in Ovitz's termination letter. PTE 13.

324. Tr. 1382:22–1383:1.

by phone before the issuance of the press release in order to notify them that Ovitz had been officially terminated.[325] None of the board members at that time, or at any other time before or during trial, ever objected to Ovitz's termination; in fact, most if not all thought it was the appropriate move for Eisner to make.[326] Also on December 12, copies of the press release along with a letter from Eisner were sent to each of the directors.[327] The letters contained no more information regarding the termination than was contained in the press release.

Thus, as of December 12, Ovitz was officially terminated without cause. Up to this point, however, the Disney board had never met in order to vote on, or even discuss, the termination at a full session, and few if any directors did an independent investigation of whether Ovitz could be terminated for cause. As a result, the Disney directors had been taken for a wild ride, and most of it was in the dark. Additionally neither the EPPC nor the compensation committee had a vote on the matter, and it seems as though they had yet to have a substantive discussion of whether Ovitz could be terminated for cause. Many directors believed that Eisner had the power to fire Ovitz on his own and that he did not need to convene a board meeting to do so.[328] Other directors believed that if a meeting was required to terminate Ovitz, that Litvack, serving as corporate counsel, would have advised them that was the case and he would have made sure

---

**325.** DTE 413 (Eisner's incoming and outgoing phone log from December 12 through December 14 listing calls placed to Nunis, Roy Disney, Russell, O'Donovan, Wilson, Murphy, Gold, Stern, Bowers, Poitier and Walker); *see also* Tr. 3802:6–2223 (Gold) (testifying that Eisner notified him by phone, and asked him to pass the news on to Roy Disney); 5810:19–5811:20 (Nunis) (testifying that Eisner notified him by phone); 5932:7–5833:3 (Bowers) (testifying that Eisner notified her by phone); 7556:1–7557:15 (T. Murphy) (testifying that Eisner notified him by phone); 7642:21–7643:9 (Lozano) (testifying that Eisner notified him by phone); 8159:19–8160:24 (Stern) (testifying that Eisner notified him by phone). Eisner also notified Bass and Warren Buffett. Tr. 4405:18–4406:14.

**326.** Tr. 3778:1–23 (Gold) (stating that as of the November 25 executive session, he concurred with Eisner's decision to terminate Ovitz despite what it would cost Disney); 4026:13–4028:5 (Roy Disney) (stating that he supported the decision to terminate Ovitz despite the cost involved because of the significant problems Ovitz was causing within Disney); 4405:18–4409:10 (Eisner) (stating that he received no objection from any board member after placing phone calls to notify them of Ovitz's termination or after they received copies of the press release and accompanying letter); 5810:19–5811:20 (Nunis)

(stating that as of the press release he supported Eisner's decision to terminate Ovitz because "turmoil at the top of the company" was dangerous for everyone); 5933:22–5935:15 (Bowers) (stating that she supported Eisner's decision to terminate Ovitz as of the press release because it was clear that Ovitz was not a team player); 6720:11–6720:23 (O'Donovan) (stating that he supported Eisner's decision to terminate Ovitz because it is important to have harmony at the top of a large organization); 7144:3–7146:13 (Poitier) (stating that he believed Ovitz had to be terminated according to the terms of the OEA because it was a "clear mismatch"); 7556:3–7557:7 (Murphy) (stating that he supported Eisner's decision to terminate Ovitz despite the cost because it was the best thing for Disney and its shareholders); 7642:21–7643:24 (Lozano) (stating that he supported Eisner's decision to terminate Ovitz despite the cost to Disney); 8158:5–8160:24 (Stern) (stating that he supported Eisner's decision to terminate Ovitz because it was a bad relationship, and the amount Disney would save would outweigh the cost of the termination).

**327.** PTE 13.

**328.** Tr. 2587:1–7 (Russell); 5733:3–5734:17 (Mitchell); 6721:8–21 (O'Donovan); 7067:21–7069:8 (Wilson); 7561:9–13 (Murphy); 8233:5–16 (Stern).

one was called.[329] Litvack believed that Eisner had the power to fire Ovitz on his own accord and, therefore, did not believe it was necessary to convene a meeting.[330] Litvack also stated that he did not call a meeting because not only did he believe that Eisner was empowered to fire Ovitz on his own, but Litvack believed that all the directors were up to speed and in agreement that Ovitz should be terminated.[331] Although there was no meeting called to vote on or even discuss Ovitz's termination, it is clear that most, if not all, directors trusted Eisner's and Litvack's conclusion that there was no cause and that Ovitz should still be terminated without cause even though this entailed making the costly NFT payment.[332]

During the week that Ovitz was terminated (December 11–16), articles began appearing in the press with quotes from Ovitz or his representatives describing why Ovitz left Disney and detailing to some extent the size of his severance package.[333] For example, a December 14 article in the Baltimore Sun reported that "Resigning Disney President Michael Ovitz said yesterday through a representative that Disney is giving him a $90 million severance package."[334] Other articles describing Ovitz's frustrations at Disney stated that Ovitz "wasn't game to struggle against a bad situation,"[335] and that "Ovitz was frustrated by his poorly defined role, Eisner's reluctance to share power and repeated clashes with other senior Disney executives . . . notably [Litvack] and [Bollenbach],"[336] and that "the reality was that Eisner did not let go . . . [and that] Eisner thwarted [Ovitz] by not giving him detailed

329. Tr. 2889:10–2892:3 (Russell); 6720:21–6721:7, 6785:1118–6786:15 (O'Donovan); 7227:2–7 (Poitier); 7561:14–17 (Murphy); 7466:11–7467:2 (Lozano).

330. Tr. 6149:4–6151:11.

331. Id.

332. Tr. 2574:5–2576:21 (Russell) (stating that he believed that Eisner and Litvack had done sufficient research and trusted their judgment that there was no cause to terminate Ovitz, that he was unaware of anything that would constitute cause to fire Ovitz, and that he was aware that Ovitz would receive the NFT payment); 3775:12–3778:18 (Gold) (stating that he was aware of the size of the NFT payment, that after asking Litvack about his conclusions concerning cause he believed that Litvack had done and was continuing to do sufficient research and Gold trusted his and Eisner's conclusions, and that Gold also had no knowledge of any act that would have constituted cause to fire Ovitz); 5597:18–5598:13 (Mitchell) (stating that he relied on and trusted Litvack's determination that there was no cause and Mitchell knew of nothing that would have constituted cause); 5813:2–24 (Nunis) (stating that he believed that if Eisner and Litvack could have avoided paying the NFT that they would have done so);

5933:4–5934:24 (Bowers) (agreeing with Eisner's decision, that Disney would honor the terms of the OEA and make a large payment to Ovitz including a large cash payment and acceleration of the options); 6781:18–6782:9 (O'Donovan) (stating that he was not aware of the value of Ovitz's payment and relied on Litvack entirely to make the cause determination); 7557:2–15 (Murphy) (stating that he believed that if there was a way that Eisner could have avoided paying Ovitz he would have and he therefore trusted Eisner's judgment on the issue of cause); 7867:2–7868:2 (Watson) (stating that he did not believe that Ovitz was grossly negligent or malfeasant and that therefore he could not be fired for cause); 8160:2–8161:16 (Stern) (stating that he believed that Ovitz never lied to him, and that Stern trusted Eisner's judgment because he had a reputation for being "a tough buck," and if Eisner could have avoided paying Ovitz he would have).

333. DTE 243.

334. DTE 243 at 13–14; see also id. at DD002077, DD002068.

335. Id. at DD002075.

336. Id. at DD002077.

responsibilities or the power to manage the various Disney divisions."[337] The articles also stated that Ovitz's departure was mutual,[338] and some went so far as to state that Ovitz's departure was his own idea.[339] Additionally, it was reported that Ovitz had hired a public relations consultant named Steven Rivers to put a positive spin on the termination for Ovitz.[340] Ovitz, however, testified that he did not employ Rivers or any other PR firm at this time.[341] Eisner believed that he had been generous in his treatment of Ovitz, as well as his agreement to make the termination seem mutual, and felt that these articles were:

> an incredible betrayal not of a contract, not of any kind of written agreement, but that I had bent over backwards, and not because he was my friend. I would do it with anybody that was leaving under these circumstances, and he just, you know, threw it right in the company's face. And I was reading every single day about what idiots we were, the Disney Company, and how he had done this enormous feat.[342]

On December 16, Eisner reacted to these stories by sending an e-mail to John Dreyer, Disney's communications chief, which among other things stated that Ovitz was a "psychopath" and "totally incompetent."[343] Eisner described the letter as his effort at "venting" and that "although [he] didn't know what the words meant, [he] was just so angry."[344]

Following the official termination, the EPPC met on December 20 with the sole purpose of rescinding Ovitz's $7.5 million bonus. Litvack stated that after the December 10 EPPC meeting, he had questioned Russell as to whether the bonus was mandatory, and that Russell had sent Litvack a memo (which had been drafted almost a year earlier as an introduction to the OEA) on December 18, and in that document it became apparent that the bonus was not in fact mandatory.[345] Russell also had a discussion with Gold on December 18 during which he told Gold that his recommendation that Ovitz be paid a bonus was stupid and that he was worried that members of the EPPC were under the mistaken belief that the bonus was contractual.[346] Gold testified that within a week of the December 10 meeting, Litvack and Russell came to him "sheepishly, and said 'we've made a mistake.'"[347] On December 20 a special telephonic meeting of the EPPC was convened with the purpose of rescinding Ovitz's $7.5 million bonus, which the EPPC had voted in favor of just ten days earlier.[348] Gold, Lozano, Russell, Watson, Eisner and Litvack attended the meeting.[349]

Russell's self-prepared agenda for the meeting outlines what was discussed before revoking Ovitz's bonus, including that

337. *Id.* at DD002068.

338. *Id.* at DD002075.

339. *Id.* at DD002084.

340. Tr. 4432:20–4433:1 (Eisner) (testifying that, when he confronted Ovitz about these articles, Ovitz admitted to hiring Rivers); *see also* DTE 243 at DD002076, DD002084, DTE 243 at 12, 14.

341. Tr. 2090:17–2091:6.

342. Tr. 4433:2–4433:14.

343. PTE 20.

344. Tr. 4433:15–21.

345. PTE 180; *see also* Tr. 6159:20–6161:5.

346. Tr. 2589:12–2591:1; *see also* PTE 384 (Russell's notes of his meeting with Gold).

347. Tr. 3799:15–3800:7.

348. PTE 53.

349. *Id.*

it would be "illogical and impossible to justify any bonus one day and fire him the next, [and that] Committee members [could not] be asked to try to justify it based on good performance."[350] The EPPC then revoked Ovitz's bonus. After the revocation, Gold questioned Litvack if he had not also made a mistake as to whether Ovitz could be terminated for cause and Litvack told Gold that he was sure that he had not. Gold also contends that Litvack said his view was supported by outside counsel.[351] Litvack denies ever having made this representation.

After Ovitz's bonus was rescinded, Eisner, in a December 27 letter, accelerated Ovitz's departure date from January 31, 1997, to December 27, 1996, and Ovitz's tenure as both an executive and director of Disney ended on that date.[352] Similar to the December 12 letter, this letter states that Ovitz's termination "will for all purposes of the Employment Agreement be treated as a 'Non–Fault Termination.'" There was no mention in this letter of Ovitz serving as a consultant to the board, however.[353] The letter, unlike the December 12 letter, contained specific details of Ovitz's payout and stated Ovitz would immediately receive roughly $38 million in cash and that the first tranche of three million options would vest immediately.[354] Litvack is the signatory on this letter and Ovitz cosigned. Litvack, however, testi-

fied that he signed the letter agreement because no one else was available to do so during the holidays and that he had no role in drafting it.[355]

As previously mentioned, Disney also chose to withhold $1,000,000 of Ovitz's NFT payment "pending final settlement of [Ovitz's] accounts."[356] Ovitz has stated that his agreement to the holdback was a condition to "Disney honoring its contractual obligations."[357] Eisner, however, testified that it was common for executives at Disney to be behind on their expenses up to six months, so it made sense to holdback $1 million in case of lingering expenses.[358] Besides Eisner, Litvack, and perhaps Russell, no defendant even saw the December 27 letter before it was signed.[359] Additionally, neither the full board nor any committee thereof met to discuss the acceleration of Ovitz's departure or the $1 million holdback.[360] Shortly after Disney paid Ovitz what he was owed under the OEA for an NFT (minus the $1 million holdback), plaintiffs filed the current action.

The full board next met on January 27, 1997. By this time, the board was aware of the negative publicity that the Ovitz termination and NFT payment had received. There was an extensive discussion of Ovitz's termination at this meeting and the pending lawsuit. Litvack, addressing the full board for the first time concerning

350. PTE 93; see also Tr. 2591:15–2592:2; 3797:14–3799:14.

351. Tr. 3796:1–18; 6167:20–6168:14.

352. PTE 14.

353. Id.

354. Id.

355. Tr. 6170:14–19; 6586:18–6587:5.

356. Id. At the time that Eisner ordered the holdback, he did not know that Price Water-

house would be called in to do a full audit of Ovitz's expenses. Tr. 5147:15–5150:11.

357. Ovitz Post Trial Br. at 13.

358. Tr. 4400:21–4402:4.

359. See, e.g., Bowers 336:20–24; Lozano 213:19–214:2; Mitchell 40:13–23; T. Murphy 106:14–21; Nunis 80:3–5; O'Donovan 119:23–120:4; Poitier 176:24–177:18; Stern 192:9–23; Watson 442:16–19; Wilson 125:25–126:8; Roy Disney 190:11–24.

360. Tr. 3943:19–3944:22.

the cause issue, notified the board that in his opinion there had been no gross negligence or malfeasance and, thus, Ovitz could not be terminated for cause.[361] Litvack stood by his decision at trial, stating he had learned nothing since 1996 that made him reconsider his original advice to the board that Disney could not fire Ovitz for cause.[362]

### D. Expert Witnesses

Six expert witnesses testified over the course of the trial.[363] In general, their reports and testimony, while meeting the minimum standards for admissibility, were not of as much help to the Court as they could have been because of the polarized nature of their opinions, especially their interpretations of the factual questions that are of central importance in this trial. I shall discuss each expert *seriatim*. To the extent that my conclusions about an expert are decidedly negative, that characterization is based upon an objective evaluation of the witness and the strength and

relevance of the evidence presented both in the report and at trial.

### 1. Professor Deborah DeMott

Plaintiffs offered Professor DeMott, the David F. Cavers Professor of Law at Duke Law School, as an expert on "the custom and practice with regard to corporate governance in Delaware public companies in the time period relevant to this case."[364] Professor DeMott was subject to an earlier motion *in limine*, whereby defendants sought to exclude her testimony. That motion was granted on the grounds that her report and proposed testimony did not comply with D.R.E. 702 and improperly opined on the application of Delaware law to the facts of this case.[365] Professor DeMott rewrote her report,[366] and her testimony was received at trial over defendants' objections.[367]

Professor DeMott opined on the "custom and practice of corporate governance in publicly traded Delaware corporations as of the times relevant to the transactions in

**361.** Tr. 2599:10–2600:9 (Russell) (stating that Litvack had explained about the lawsuit and that he stated that "we had acted properly and that there would not have been a basis to claim that there was good cause under the employment agreement ... with respect to the discharge of Michael Ovitz."); 4444:8–4446:12 (Eisner) (stating that the board was fully informed of all the details of Ovitz's termination and that Litvack explained the cause question "to the point that everybody was getting tired of me saying, "Okay, Sandy, say it once again. Who did you talk to? Are you sure? Did we do the right thing?"); 5936:13–5939:15 (Bowers) (stating that Litvack advised the board that there was no gross negligence or malfeasance to terminate Ovitz and that they had to pay him and that she also recalls Litvack stating that he had received outside counsel at this point); 6181:11–6183:11 (Litvack) (stating that he set out the whole Ovitz situation for the board and that he told the board that he did not believe there was gross negligence or malfeasance and hence no way to terminate Ovitz for cause) Litvack also stated that he did not

recall saying that he had the advice of outside counsel, but that if he was asked he would have responded that he did. *Id.; see also* PTE 799.

**362.** Tr. 6693:1–12.

**363.** A seventh expert, Alan Johnson, prepared a report on behalf of the defendants and was deposed, but he did not testify at trial. *See* Tr. 771:24–772:16. His amended report dated August 6, 2004, is part of the trial record. DTE 181. Professor Murphy spent a significant amount of time at trial disputing certain elements of Johnson's report. Tr. 833:21–857:19.

**364.** Tr. 23:20–24.

**365.** *See In re The Walt Disney Co. Derivative Litig.*, 2004 WL 550750 (Del.Ch. Mar.9, 2004).

**366.** PTE 462.

**367.** Tr. 24:1–38:6.

this case," and also on "whether the conduct of the board of directors of [the Company] complied with or departed from those customs and those practices." [368] Despite plaintiffs' and Professor DeMott's efforts to couch her opinion in terms of custom and practice of Delaware corporations, it was clear to all that her report and testimony were still directed to the core issues in this case—whether the defendants breached their fiduciary duties as they exist under Delaware law. [369]

In addition to opining on the core issues in this case, [370] another key area of Professor DeMott's report (and the corresponding testimony) that is of no value to the Court is her interpretation of the Company's certificate of incorporation, bylaws, and board committee charters. [371] Interpretation of the Company's internal governing documents is a matter exclusively for the Court. [372] Thus, there is very little, if any, of Professor DeMott's report that is

of benefit to the Court, especially because the relevant question is not whether the defendants complied with the custom and practice of other Delaware corporations during the relevant time frame, but whether they complied with their fiduciary duties. [373]

### 2. *Professor John Donohue*

Professor Donohue, the William H. Neukom Professor of Law at Stanford Law School, came to the witness stand on behalf of plaintiffs three different times during the course of the trial. His report and testimony were directed to the issue of whether Ovitz could (and should) have been terminated for cause as opposed to the NFT he received. The fatal flaw in Donohue's opinion is that it is based upon his factual determinations—determinations with which I, after weighing all of the evidence, do not agree. [374] For example, in

---

**368.** Tr. 40:9–18.

**369.** For example, instead of using the term "custom and practice" in her report, Professor DeMott states that good corporate governance "requires," "includes" and "envisions" certain actions. Tr. 98:24–101:10; *see also* Tr. 161:22–166:3 (plaintiffs' counsel objects to a question on cross-examination on the grounds that defense counsel was "just inserting the phrase 'custom and practice,'" and that these questions were "not going to what is the custom and practice in the particular time frame with respect to public Delaware companies, but what are the legal requirements [imposed upon fiduciaries of Delaware corporations]").

**370.** *See* PTE 462 at ¶ 14 ("Neither Disney's Board nor its Compensation Committee gave careful consideration to the implications of the terms of Disney's employment agreement with Mr. [Ovitz]."); *see also id.* at ¶ 17 ("The record leaves no doubt that both the decision to terminate Mr. Ovitz's employment and the decision to characterize the termination as a non-fault termination were made by Mr. Eisner without consideration by Disney's Board.").

**371.** PTE 462 at ¶¶ 9, 12, 17; Tr. 172:6–175:5.

**372.** *See Itek Corp. v. Chicago Aerial Indus., Inc.,* 274 A.2d 141, 143 (Del.1971).

**373.** Professor DeMott's testimony was useful, however, in the sense that it drew in stark relief the contrast between ideal corporate governance practices and the unwholesome boardroom culture at Disney—that is, her testimony clarified how ornamental, passive directors contribute to sycophantic tendencies among directors and how imperial CEOs can exploit this condition for their own benefit, especially in the executive compensation and severance area. *See* Tr. 43:4–46:15 (individualized one-on-one discussions between management and directors can lead to directors who are "unequally or unevenly informed with regard to significant matters" and "have the effect of vitiating, sapping the board's ability as an institution to function together collectively and collegially and deliberatively"); 83:12–84:6.

**374.** *See* Tr. 636:16–637:6; 702:4–7.

the summary of his conclusions, Donohue states that Ovitz committed gross negligence or malfeasance because of his dishonesty, and because of eight other categories of bad acts.[375] As demonstrated above, in the lengthy and detailed recitation of the facts, I conclude that those determinations are simply not supported by a fair and neutral evaluation of the record.

Donohue's opinion outlined an array of legal standards that might cover Ovitz's termination.[376] In his zeal to crucify Ovitz, Donohue concluded that Ovitz's conduct would meet any of the multiplicity of standards he discusses for gross negligence or malfeasance, and his report contains very little guidance in terms of which standard might be the most appropriate or most likely to be applied by a California court.[377] As a result, Donohue's report and testimony are of little value to the Court in evaluating defendants' conduct as it relates to Ovitz's termination.

Donohue was permitted to file a supplemental report based upon his review of certain documents, which were produced by defendants shortly before trial.[378] The supplemental report made no substantive changes to Donohue's opinions and conclusions.[379]

### 3. Professor Kevin Murphy

Professor Murphy (to whom I will refer as "Professor Murphy" in order to avoid any potential confusion with defendant Thomas Murphy), the E. Morgan Stanley Chair in Business Administration at the Marshall School of Business at the University of Southern California, presented expert testimony for plaintiffs on the issue of damages together with an economic and reasonableness evaluation of Ovitz's compensation package.[380] Professor Murphy concluded that Ovitz's compensation package was unreasonably excessive and orders of magnitude larger than the compensation awarded to executives with arguably equivalent responsibilities.[381] In determining the reasonableness of Ovitz's compensation, Professor Murphy chose not to consider Ovitz's past income at CAA and the effect that income would have on the remuneration he would expect from any future employment.[382] As would be expected, Professor Murphy concluded that the most reasonable and appropriate assumptions are those that would maximize the value of the OEA and corresponding cost of the NFT.[383] Perhaps Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions for mitigation or non-compete restrictions,[384] but that criticism is not supported by the

---

**375.** PTE 404 at 4.

**376.** *Id.* at 7–34.

**377.** *See id.* at 4.

**378.** PTE 826.

**379.** *Id.*

**380.** *See* PTE 426 (Professor Murphy report).

**381.** *See, e.g.,* Tr. 748:22–749:13.

**382.** Tr. 868:17–870:16; 1061:5–19; *see also* Tr. 1010:21–1020:18; 1036:12–1037:9; 1043:1–21.

**383.** *See* Tr. 901:6–919:14; 925:2–939:4; 980:4–989:7; 1072:11–1077:13; 1081:19–1085:17; PTE 426 at 24–31 (Professor Murphy's discussion of the cost to the Company of Ovitz's severance where he concludes that the Black–Scholes value (as opposed to intrinsic or realized cost) of Ovitz's options (by far the highest of the three) is the appropriate way to measure that cost).

**384.** Tr. 803:3–805:5.

language of the OEA.[385]

Professor Murphy's report did not include an event study, but at trial Professor Murphy gave a very brief and unpersuasive critique of Dunbar's event study, which as discussed below, concluded that the Company's market capitalization increased by more than $1 billion as a result of the announcement of Ovitz's hiring. The record does not reflect that Professor Murphy's qualifications as an expert extend to performing and interpreting event studies, and I therefore reject Professor Murphy's critique of Dunbar's conclusion with respect to the market's reaction to the announcement of Ovitz's hiring.[386] The remainder of his report, however, is of use to the Court in determining the economic consequences facing the defendants when the decisions at issue in this case were made.

### 4. *Larry R. Feldman*

Ovitz's expert with respect to whether he could have been terminated for cause was Larry Feldman. Feldman is a renowned litigator in southern California and is currently employed at Kaye Scholer LLP.[387] Feldman opined that the Company had no grounds upon which to terminate Ovitz for cause, and that had the Company done so, that Ovitz would have been able to pursue meritorious claims for breach of contract, fraud and defamation, with damages far in excess of the value of the NFT.[388]

Upon comparing Feldman's report to the factual determinations I have made, I conclude that the evidence presented at trial is generally consistent with Feldman's view of the relevant facts. Feldman's legal analysis, however, is more troublesome. For example, I am not persuaded in the least that the legal standard used by Feldman in his report to define gross negligence or malfeasance—criminal misconduct or its equivalent—is the correct standard.[389] Additionally, his opinion with respect to potential claims for defamation and fraud in the inducement is thinly supported and fails to adequately address potentially meritorious defenses that the Company could have asserted to such causes of action.[390] In sum, therefore, Feldman's report and testimony are of some value to the Court, but not substantial value.

**385.** *See* PTE 7 ¶ 9 at WD00209–10.

**386.** Notwithstanding the statements in the text above, Professor Murphy does make a very good point that the press release announcing Ovitz's hiring (PTE 3) does not disclose any economic terms of Ovitz's employment with the Company, and therefore, as a matter of common sense, the market cannot be said to have "approved" the economic terms of the OEA. *See* 859:7–860:3. One might intuit, however, that the $1 billion increase in the Company's market capitalization as a result of Ovitz's hiring would reflect the assumptions of the market as to the potential cost of Ovitz's employment contract, even if the market was unaware of the actual cost. Dunbar testified to this effect, outlining the public reports of Ovitz's compensation before the text of the OEA was filed publicly in December 1995 and concluding that the lack

of statistically significant market reaction at that time was due to the market's correct assumptions of the size of the compensation package on August 14, 1995. Tr. 7296:8–7297:20; 7414:19–7416:3; DTE 428 at 3–9.

**387.** *See* DTE 408 at 1–2.

**388.** DTE 408 at 47.

**389.** DTE 408 at 10–16. *But see* PTE 404 at 17–18 (Donohue's opinion that gross negligence is not exclusively a criminal standard); DTE 430 at 8–11 (Fox concurring with Donohue); *cf.* Tr. 8333:24–8334:10 (Feldman) (stating at trial that gross negligence does not require actual criminal misconduct).

**390.** *See* DTE 408 at 36–44; Tr. 8403:19–8411:3; 8455:21–8467:3; 8552:18–8577:21.

### 5. *John C. Fox*

John Fox, a partner of Fenwick & West LLP, testified on behalf of all defendants but Ovitz as an expert with respect to whether Ovitz could have been terminated for cause. Fox's report and testimony were very thorough, well reasoned and informed by Fox's extensive practical experience as an employment law litigator and advisor.[391]

The overwhelming majority of Fox's factual determinations are consonant with the conclusions I have reached above based upon the evidence presented at trial. His legal conclusions based upon those facts, therefore, are of far greater weight and persuasive value than the conclusions reached by Donohue. Similar to Feldman, Fox gives short shrift in his report to analyzing Ovitz's potential claims for fraud in the inducement and defamation.[392] Unlike Feldman, however, Fox was able to clearly articulate at trial the reasoning behind his conclusion with respect to the viability of these tort claims, bolstering the value of his report in those areas.[393] Fox also testified in great detail regarding the definition of gross negligence and malfeasance.[394] He also opined that, regardless of how gross negligence and malfeasance might be defined in a hypothetical *Ovitz v. The Walt Disney Company* suit had Ovitz been terminated for cause, after reviewing the evidence, Ovitz's conduct (or misconduct) did not even come close to that high standard.[395] In summary, Fox's report is of significant value to the Court, and I will weigh his conclusions accordingly in making my determinations regarding the ultimate issues in this case.

### 6. *Frederick C. Dunbar*

The remaining expert was Frederick Dunbar, Senior Vice President of National Economic Research Associates, Inc., who testified on behalf of the defendants as to the market reaction to the hiring of Ovitz and also critiqued Professor Murphy's report as it related to the valuation of Ovitz's options and the present value calculation of the cash portion of the NFT payment.[396]

---

**391.** *See* DTE 430 (Fox report); DTE 248 (Fox's supplemental report).

**392.** DTE 430 at 27–28; *see* DTE 430 at 28; DTE 408 at 36–43.

**393.** *See* Tr. 8838:1–19; 8866:3–17; 8905:20–8908:1; 8948:20–8951:13; 8956:6–8960:9; 9207:14–9213:23; 9222:23–9231:19; 9244:21–9246:8.

**394.** Tr. 8739:15–8748:4; 8999:20–9039:22; 9084:5–20.

**395.** Tr. 8758:1–8837:3; 8844:10–8860:6; 8922:3–8925:18; 8947:5–8951:13; 8955:10–8961:24; 9025:22–9026:15; 9039:23–9040:12; 9048:3–9195:7.

**396.** *See* DTE 428 (Dunbar report). I have omitted any discussion regarding Professor Murphy's opinion regarding the appropriate discount rate (together with Dunbar's response thereto) because there is no evidence in the record that would indicate that any of the defendants in this action exercised any discretion whatsoever in determining the discount rate applied to the cash payment received by Ovitz as a result of the NFT. Without that evidence connecting a defendant to that decision, I fail to see the current relevance of why other discount rates might have been appropriate. Whichever Disney employees made the decision as to which discount rate to use, were they before the Court, would receive the protections of the business judgment rule. There is no evidence in the record that would impugn in any way the presumptions of care, loyalty, or good faith used by those employees in the business judgment of determining the appropriate discount rate. For that reason, an analysis of why a particular discount rate might have been more appropriate than the one selected is not germane to the issues to be decided herein. *See* Santaniello 149:16–154:14 (stating that he was unaware of how the discount rate was determined); PTE 130 (memo from the Company's Controller's office to Santaniello enclosing present value calculations at 6.5% and 6.75%); PTE 131 (demonstrating that the

Dunbar's conclusion with respect to the market's overwhelmingly positive reaction to Ovitz's hiring is not unassailable, but is nonetheless well-supported by the evidence and based upon accepted methods of analysis.[397] With respect to his opinion that a reduced or discounted option expiration date is appropriate when performing a Black–Scholes valuation of the options, Dunbar's testimony at trial was thorough and convincing.[398] Accordingly, Dunbar's Black–Scholes calculations are more valuable and persuasive than those performed by Professor Murphy and will be useful in evaluating the defendants' actions.

## II. LEGAL STANDARDS

The outcome of this case is determined by whether the defendants complied with their fiduciary duties in connection with the hiring and termination of Michael Ovitz. At the outset, the Court emphasizes that the best practices of corporate governance include compliance with fiduciary duties.[399] Compliance with fiduciary duties, however, is not always enough to meet or to satisfy what is expected by the best practices of corporate governance.

The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty.[400] Of late, much discussion among the bench, bar, and academics alike, has surrounded a so-called third fiduciary duty, that of good faith. Of primary importance in this case are the fiduciary duty of due care and the duty of a director to act in good faith. Other than to the extent that the duty of loyalty is implicated by a lack of good faith, the only remaining issues to be decided herein with respect to the duty of loyalty are those relating to Ovitz's actions in connection with his own termination.[401] These considerations will be addressed *seriatim*, although issues of good faith are (to a certain degree) inseparably and necessarily

---

6.5% discount rate was actually used in paying Ovitz).

**397.** DTE 428 at 3–9; Tr. 7287:6–7300:3; 7365:6–7448:16.

**398.** Tr. 7306:11–7333:16; 7448:17–7506:6. In contrast, Professor Murphy's explanation for using the latest possible termination date when valuing the options upon termination, based upon the fact that the exercisability of those options was extended, (in exchange for dropping the $50 million guarantee), and based upon an array of possible hedges, is not nearly as persuasive. *See* Tr. 823:18–830:20; 964:19–972:20.

**399.** All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and

can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.

*Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

**400.** The Delaware Supreme Court has been clear that outside the recognized fiduciary duties of care and loyalty (and perhaps good faith), there are not other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called *"Revlon"* duties and the duty of candor or disclosure. *See Malpiede v. Townson*, 780 A.2d 1075, 1083, 1086 (Del.2001); *Paramount Communications Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del.1994). ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' ") (citation omitted)).

**401.** *See In re The Walt Disney Co. Derivative Litig. ("Disney III")*, 2004 WL 2050138, at *7 (Del.Ch. Sept.10, 2004); *Brehm*, 746 A.2d at 257–58.

intertwined with the duties of care and loyalty, as well as a principal reason the distinctness of these duties make a difference—namely § 102(b)(7) of the Delaware General Corporation Law.[402]

## A. The Business Judgment Rule

A comprehensive review of the history of the business judgment rule is not necessary here, but a brief discussion of its boundaries and proper use is appropriate. Delaware law is clear that the business and affairs of a corporation are managed by or under the direction of its board of directors.[403] The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation.[404] Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." [405]

The business judgment rule is not actu-

---

**402.** Perhaps these categories of care and loyalty, so rigidly defined and categorized in Delaware for many years, are really just different ways of analyzing the same issue. Professor Sean Griffith said it best when he recently wrote:

> At first glance, the duties of care and loyalty appear quite distinctive. . . .
>
> A bit of digging beneath these surface differences, however, reveals the richly interconnected roots of the two doctrinal paradigms. Start with the duty of care: directors must conduct themselves as ordinarily prudent persons managing their own affairs. So far so good, but a moment's reflection reveals that an ordinarily prudent person becomes an ordinarily prudent director only once we assume an element of loyalty. How do ordinarily prudent directors conduct their affairs? A decision is taken with due care, when from an array of alternatives, the directors employ a procedure to pick the one that best advances *the interests of the corporation.* Now pause for a moment to consider what a funny way this is of conceiving what an ordinarily prudent person would do *in the conduct of her own affairs.* We might typically assume that an ordinarily prudent person, in evaluating a set of alternatives, picks the one that provides the most benefit and least cost to *herself.* A director's decision-making process, however, can be evaluated only by changing the referent from herself to the corporation. The question of prudence, in other words, is framed with a tacit element of loyalty.
>
> . . . .
> . . . [Shareholders and courts] are worried about the directors' loyalty because we are concerned that their disloyalty will result in a poor bargain for the corporation. We are concerned, in other words, that conflicted directors will strike bargains for the corporation that an ordinarily prudent person would not strike for herself. This can be seen most clearly if the non-arms-length transactions that raise duty of loyalty concerns are imagined as arms-length transactions with third parties. Would an ordinarily prudent person lease a corporate asset to a third party on exceedingly generous terms? Would an ordinarily prudent person lavish compensation on a third party and permit the third party to divert investment opportunities that would otherwise come her way? These are duty of loyalty concerns framed as duty of care questions. The phrasing is natural because, at its core, the duty of loyalty is just a bet that some situations are likely to lead to careless or imprudent transactions for the corporation, which is to say that the duty of care is a motivating concern for the duty of loyalty. Here again the duties overlap.

Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence*, 55 Duke L.J. (forthcoming 2005) (manuscript of May 25, 2005 at 39–42 available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=728431) (emphasis in original, citations omitted).

**403.** 8 *Del. C.* § 141(a).

**404.** *See Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del.1981).

**405.** *Cede & Co. v. Technicolor, Inc.* ("*Cede III*"), 634 A.2d 345, 360 (Del.1993) (citing *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1988)).

ally a substantive rule of law,[406] but instead it is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." [407] This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors.[408] In the absence of this evidence, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." [409] When

a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste.[410]

This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction.[411] In that event, the burden shifts to the director defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and its shareholders.[412]

406. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del.1995) (citing *Cede III*, 634 A.2d at 360); *see Emerald Partners v. Berlin*, 787 A.2d 85, 90–91 (Del.2001); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del.1995).

407. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Smith v. Van Gorkom*, the Delaware Supreme Court clarified that "the presumption that the directors acted in good faith [is] irrelevant in determining the threshold issue of whether the directors as a Board exercised an informed business judgment." 488 A.2d 858, 889 (Del.1985). In *In re Holly Farms Corp. S'holders Litig.*, the Court of Chancery denied the protections of the business judgment rule to a board of directors' agreement to a lock up because it was "the product of a fundamentally flawed process and cannot be in the interests of the stockholders." 1988 WL 143010, at *6 (Del.Ch. Dec.30, 1988).

408. *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988); *Cede III*, 634 A.2d at 360. In *Gagliardi*, Chancellor Allen described the policy rationale for the business judgment rule in the paragraph quoted below. Although this statement, made in 1996, may at first appear to be undercut by the increased incentive compensation of the dot-com era, the rationale still applies because of the relatively small percentages of stock held by officers and directors of public companies.

Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a

very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky—you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention", "waste", etc. could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimalist proceduralist standards of attention, they can face liability as a result of a business loss.

*Gagliardi v. TriFoods Int'l Inc.*, 683 A.2d 1049, 1052 (Del.Ch.1996).

409. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971); *see also Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985).

410. *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780 (Del.Ch.1988).

411. *Emerald Partners*, 787 A.2d at 91.

412. *Id.* In certain circumstances, the burden can shift back to the plaintiffs in the event of

In *Van Gorkom,* the Delaware Supreme Court analyzed the Trans Union board of directors *as a whole* in determining whether the protections of the business judgment rule applied.[413] More recent cases understand that liability determinations must be on a director-by-director basis. In *Emerging Communications,* Justice Jacobs wrote (while sitting as a Vice Chancellor) that the "liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director."[414] There is a not significant degree of tension between these two positions, notwithstanding the procedural differences between the two cases.

Even if the directors have exercised their business judgment, the protections of the business judgment rule will not apply if the directors have made an "unintelligent or unadvised judgment."[415] Furthermore, in instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply.[416] Under those circumstances, the appropriate standard for determining liability is widely believed to be gross negligence,[417] but a single Delaware case has held that ordinary negligence would be the appropriate standard.[418]

## B. Waste

Corporate waste is very rarely found in Delaware courts because the applicable test imposes such an onerous burden upon a plaintiff—proving "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude

---

413. *Van Gorkom,* 488 A.2d at 889.

414. *In re Emerging Communications Inc. S'holders Litig.,* 2004 WL 1305745, at *38 (Del.Ch. Jun.4, 2004).

415. *Mitchell v. Highland–Western Glass,* 167 A. 831, 833 (Del.Ch.1933); *Van Gorkom,* 488 A.2d at 872.

416. *Aronson,* 473 A.2d at 813. This is not to say that all director inaction is not subject to the business judgment rule. As the *Aronson* Court noted, *"a conscious decision to refrain from acting* may nonetheless be a valid exercise of business judgment." *Id.* (emphasis added).

417. *See Seminaris v. Landa,* 662 A.2d 1350 (Del.Ch.1995); *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268 (Del.Ch.1995).

418. *Rabkin v. Philip A. Hunt Chem. Corp.,* 1987 WL 28436, at *1–3 (Del.Ch. Dec.17, 1987). *See Graham v. Allis–Chalmers Mfg. Co.,* 188 A.2d 125, 130 (Del.1963). I confess to being mystified why plaintiffs did not cite *Rabkin* and its lower standard of liability when they did cite *Aronson* for the proposition that the business judgment rule does not apply to director inaction, as well as a bankruptcy decision that heavily relied upon *Rabkin. See Pereira v. Cogan,* 294 B.R. 449 (S.D.N.Y.2003), *vacated and remanded sub nom. Pereira v. Farace,* 413 F.3d 330 (2d Cir.2005). A similar mystery confronted then-Vice Chancellor Berger in *Rabkin,* where she wrote:

> Both parties agree that liability must be predicated upon a finding of gross negligence. As a result, the Court did not have the benefit of what it assumed would be plaintiffs' arguments in support of the Court's original ruling [that ordinary negligence was the appropriate standard] and the Court is left in the unenviable position of deciding against both parties.

1987 WL 28436, at *2. It also bears noting that no Delaware decision (until this one) has cited *Rabkin,* decided roughly eighteen years ago, and it would appear that *Seminaris, In re Baxter Int'l,* and *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996), have since eclipsed *Rabkin* by implicitly accepting that gross negligence is the appropriate standard even in cases of alleged director inaction and lack of oversight.

that the corporation has received adequate consideration."[419] In other words, waste is a rare, "unconscionable case[ ] where directors irrationally squander or give away corporate assets."[420]

The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith.[421] It is not necessarily true, however, that every act of bad faith by a director constitutes waste. For example, if a director acts in bad faith (for whatever reason), but the transaction is one in which a businessperson of ordinary, sound judgment concludes that the corporation received adequate consideration, the transaction would not constitute waste.[422]

## C. The Fiduciary Duty of Due Care

The fiduciary duty of due care requires that directors of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances,"[423] and "consider all material information reasonably available" in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent.[424] Chancellor Allen described the two contexts in which liability for a breach of the duty of care can arise:

> First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss.[425]

Chancellor Allen then explained with respect to board decisions:

> ... [These] cases will typically be subject to review under the director-protective business judgment rule, assuming the decision made was the product of *a process* that was *either* deliberately considered in good faith or was otherwise rational. What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's

---

**419.** *Brehm,* 746 A.2d at 263; *In re The Walt Disney Co. Derivative Litig.* (*"Disney I"*), 731 A.2d 342, 362 (Del.Ch.1998) (quoting *Glazer v. Zapata Corp.,* 658 A.2d 176, 183 (Del.Ch. 1993)).

**420.** *Brehm,* 746 A.2d at 263.

**421.** *See White v. Panic,* 783 A.2d 543, 553–55 (Del.2001) (citing *J.P. Stevens,* 542 A.2d at 780–81).

**422.** Nevertheless, if the director acted in bad faith, it would be extraordinarily difficult for the defendant directors to prove that the transaction was entirely fair to the corporation because it would be difficult to demonstrate fair process. *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983).

**423.** *Graham,* 188 A.2d at 130.

**424.** *Brehm,* 746 A.2d at 259; *Official Comm. Of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, et al.* (*"IHS"*), 2004 WL 1949290, at *9 n. 37 (Del.Ch. Aug.24, 2004); *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *12 (Del.Ch. Jan.10, 2003). In *Cede III,* the Supreme Court affirmed and adopted Chancellor Allen's "presumed findings" that the directors of Technicolor "were grossly negligent in failing to reach an informed decision when they approved the agreement of merger, and ... thereby breached their duty of care." 634 A.2d at 366. By way of example, a board of directors need not read *"in haec verba* every contract or legal document that it approves, but if it is to successfully absolve itself from charges of [violations of the duty of care], there must be some credible evidence that the directors knew what they were doing, and ensured that their purported action was given effect." *Van Gorkom,* 488 A.2d 858, 883 n. 25 (Del.1985).

**425.** *Caremark,* 698 A.2d at 967 (emphasis in original).

duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.

Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment,* he or she should be deemed to satisfy fully the duty of attention.[426]

With respect to liability for director inaction, Chancellor Allen wrote that in order for the inaction to be so great as to constitute a breach of the director's duty of care, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight."[427] The Chancellor rationalized this extremely high standard of liability for violations of the duty of care through inaction by concluding that:

> [A] demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors.[428]

In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a " 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' "[429] Because duty of care violations are actionable only if the directors acted with gross negligence,[430] and because in most instances money damages are unavailable to a plaintiff who could theoretically prove a duty of care violation,[431] duty of care violations are rarely found.

## D. The Fiduciary Duty of Loyalty

The fiduciary duty of loyalty was described in the seminal case of *Guth v. Loft, Inc.,* in these strict and unyielding terms:

426. *Id.* at 967–68 (internal citations and footnotes omitted, emphasis in original).

427. *Id.* at 971.

428. *Id.* (emphasis in original).

429. *Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *12 (Del.Ch. Apr.5, 1990) (quoting *Allaun v. Consol. Oil Co.,* 147 A. 257, 261 (Del.Ch.1929), and citing *Gimbel v. Signal Cos., Inc.,* 316 A.2d 599, 615 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.1974)). For example, on a motion to dismiss, in order for a plaintiff to successfully plead that the directors acted with gross negligence (as opposed to regular negligence), the plaintiff should articulate "facts that suggest a *wide* disparity between the process the directors used … and that which would have been rational." *Guttman v. Huang,* 823 A.2d 492, 507 n. 39 (Del.Ch. 2003) (emphasis in original).

430. *Brehm,* 746 A.2d at 259.

431. *See* 8 *Del. C.* § 102(b)(7).

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.[432]

More recently, the Delaware Supreme Court stated that there is no safe-harbor for divided loyalties in Delaware,[433] and that the duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take[ ] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[434] The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders.[435]

In the specific context at issue here with respect to a classic duty of loyalty claim, Ovitz, as a fiduciary of Disney, was required to act in an "adversarial and arms-length manner" when negotiating his termination and not abuse or manipulate the corporate process by which that termination was granted.[436] He was obligated to act in good faith and "not advantage himself at the expense of the Disney shareholders."[437]

### E. Section 102(b)(7)

Following the Delaware Supreme Court's landmark decision in *Van Gorkom*,[438] the Delaware General Assembly acted swiftly to enact 8 *Del. C.* § 102(b)(7).[439] Section 102(b)(7) states that a corporation may include in its certificate of incorporation:

(7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omis-

---

**432.** 5 A.2d 503, 510 (Del.1939).

**433.** *Weinberger*, 457 A.2d at 710.

**434.** *Cede III*, 634 A.2d at 361 (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984)).

**435.** *Id.* at 362 (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del.1993)).

**436.** *In re The Walt Disney Co. Derivative Litig.* (*"Disney II"*), 825 A.2d 275, 290 (Del.Ch. 2003); *Disney III*, 2004 WL 2050138, at *7.

**437.** *Disney II*, 825 A.2d at 290; *see IHS*, 2004 WL 1949290, at *16.

**438.** 488 A.2d 858.

**439.** 65 Del Laws, c. 289 (1986).

sion occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also be deemed to refer (x) to a member of the governing body of a corporation which is not authorized to issue capital stock, and (y) to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

The purpose of Section 102(b)(7) was explained by the Delaware Supreme Court in this manner:

> The purpose of Section 102(b)(7) was to *permit shareholders*—who are entitled to rely upon directors to discharge their fiduciary duties at all times—to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct.[440]

Recently, Vice Chancellor Strine wrote that, "[o]ne of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as

they do so in good faith."[441] Or in other words, § 102(b)(7) is most useful "when, despite the directors' good intentions, [the challenged transaction] did not generate financial success and ... the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out" could improperly influence a *post hoc* judicial evaluation of the directors' actions.[442]

The vast majority of Delaware corporations have a provision in their certificate of incorporation that permits exculpation to the extent provided for by § 102(b)(7). This provision prohibits recovery of monetary damages from directors for a successful shareholder claim, either direct or derivative, that is exclusively based upon establishing a violation of the duty of due care.[443] The existence of an exculpation provision authorized by § 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, because a court may still grant injunctive relief for violations of that duty.[444]

An exculpation provision such as that authorized by § 102(b)(7) is in the nature of an affirmative defense.[445] As a result, it is the burden of the director defendants to demonstrate that they are entitled to the protections of the relevant charter provi-

**440.** *Emerald Partners*, 787 A.2d at 90 (emphasis in original); *see Malpiede*, 780 A.2d at 1095.

**441.** *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 777 (Del.Ch.2004).

**442.** *Id.*

**443.** *Emerald Partners*, 787 A.2d at 91.

**444.** *Malpiede*, 780 A.2d at 1095; E. Norman Veasey, et al., *Delaware Supports Directors With a Three–Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 403 (1987) ("[S]ection 102(b)(7) does not eliminate the duty of care that is properly imposed upon directors. Directors continue to be charged under Delaware law with a duty of care in the decisionmaking process and in their oversight responsibilities. The duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals."). Cf. *Strassburger v. Earley*, 752 A.2d 557, 581 (Del.Ch.2000) (holding that rescissory damages, although an equitable remedy, is not appropriate for breaches solely of the duty of care).

**445.** *Emerald Partners*, 787 A.2d at 91–92.

sion.[446]

## F. Acting in Good Faith

Decisions from the Delaware Supreme Court and the Court of Chancery are far from clear with respect to whether there is a separate fiduciary duty of good faith.[447] Good faith has been said to require an "honesty of purpose," and a genuine care for the fiduciary's constituents,[448] but, at least in the corporate fiduciary context, it is probably easier to define bad faith rather than good faith.[449] This may be so because Delaware law presumes that directors act in good faith when making business judgments.[450] Bad faith has been defined as authorizing a transaction "for some purpose *other than* a genuine attempt to advance corporate welfare or [when the transaction] is *known to constitute* a violation of applicable positive law."[451] In other words, an action taken with the intent to harm the corporation is a disloyal act in bad faith. A similar defi-

**446.** *See id.; Emerging Communications,* 2004 WL 1305745, at *42.

**447.** It does no service to our law's clarity to continue to separate the duty of loyalty from its essence; nor does the recognition that good faith is essential to loyalty demean or subordinate that essential requirement. There might be situations when a director acts in subjective good faith and is yet not loyal (*e.g.,* if the director is interested in a transaction subject to the entire fairness standard and cannot prove financial fairness), but there is no case in which a director can act in subjective bad faith towards the corporation and act loyally.... For example, one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.

*Guttman,* 823 A.2d at 506 n. 34. *See In re Gaylord Container Corp. S'holders Litig.,* 753 A.2d 462, 475 n. 41 (Del.Ch.2000); *In re ML/EQ Real Estate P'ship Litig.,* 1999 WL 1271885, at *4 n. 20 (Del.Ch. Dec.21, 1999); *Barkan v. Amsted Indus. Inc.,* 567 A.2d 1279, 1286 (Del.1989); *Blasius Indus. Inc. v. Atlas Corp.,* 564 A.2d 651, 663 (Del.1988) (holding that because the acts taken by the directors thwarted the shareholder franchise, even if the directors acted in good faith, those actions "constituted an unintended violation of the duty of loyalty that the board owed to the shareholders."); *cf. IHS,* 2004 WL 1949290, at *9 (analyzing good faith claims under the rubrics of care and loyalty, as appropriate, instead of as a separate duty).

**448.** E. Norman Veasey, *Reflections on Key Issues of the Professional Responsibilities of Corporate Lawyers in the Twenty–First Century,* 12 Wash. U.J.L. & Pol'y 1, 9 (2003).

**449.** Despite the existence of significant jurisprudence with respect to good faith in the contractual context of the covenant of good faith and fair dealing, *see, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199 (Del.1993), Delaware decisions have shown a reluctance to importing these contractual standards into the corporate fiduciary realm.

**450.** *See Allaun,* 147 A. 257; *Van Gorkom,* 488 A.2d at 873.

**451.** *Gagliardi,* 683 A.2d at 1051 n. 2 (citing *Miller v. AT & T,* 507 F.2d 759 (3d Cir.1974), emphasis in original). Chancellor Allen then explained that "[t]here can be no personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction." *Id.* In *Cinerama, Inc. v. Technicolor, Inc.,* 1991 WL 111134, at *15 (Del.Ch. June 24, 1991), Chancellor Allen to a certain extent equated good faith with loyalty when he stated that there was "persuasive evidence" of bad faith on the part of one of the Technicolor directors (Sullivan) because he had met and cooperated with the acquiror before the acquiror had met with the CEO. Sullivan also received a $150,000 "finder's fee" for his assistance from the post-merger Technicolor. *Id.* at *7. This portion of the decision was not appealed because Cinerama abandoned its claims that the directors acted in bad faith. *Cede III,* 634 A.2d at 359. *See also* Veasey, *infra* n. 457 at 448 (noting that intentional violations of law implicate good faith by stating that "the utter failure to follow the minimum expectations of Sarbanes–Oxley, or the NYSE or NASDAQ Rules ... might ... raise a good faith issue").

nition was used seven years earlier, when Chancellor Allen wrote that bad faith (or lack of good faith) is when a director acts in a manner "unrelated to a pursuit of the corporation's best interests." [452] It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation. [453]

Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, ... shame or pride." [454] Sloth could certainly be an appropriate addition to that incomplete list if it constitutes a systematic or sustained shirking of duty. [455] Ignorance, in and of itself, probably does not belong on the list,

but ignorance attributable to any of the moral failings previously listed could constitute bad faith. It is unclear, based upon existing jurisprudence, whether motive is a necessary element for a successful claim that a director has acted in bad faith, [456] and, if so, whether that motive must be shown explicitly or whether it can be inferred from the directors' conduct. [457]

Shrouded in the fog of this hazy jurisprudence, the defendants' motion to dismiss this action was denied because I concluded that the complaint, together with all reasonable inferences drawn from the well-plead allegations contained therein, could be held to state a non-exculpated breach of fiduciary duty claim, insofar as it alleged that Disney's directors *"consciously and intentionally disregarded their responsi-*

**452.** *In re RJR Nabisco, Inc. S'holder Litig.,* 1989 WL 7036, at *15 (Del.Ch. Jan.31, 1989); *cf. Strassburger,* 752 A.2d at 581 (holding that certain directors breached their duty of loyalty by "indifference to their duty to protect the interests of the corporation and its minority shareholders," because their primary loyalty was instead given to the interests of their employer).

**453.** *See Guttman* 823 A.2d at 506 n. 34 ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious actions not in the corporation's best interest does not make it faithful, as opposed to faithless."); *Nagy v. Bistricer,* 770 A.2d 43, 48 n. 2 (Del.Ch.2000) (The duty of good faith, "[i]f it is useful at all as an independent concept, [good faith's] utility may rest in its constant reminder ... that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.") *Emerging Communications,* 2004 WL 1305745, at *38 (holding that certain defendants violated their duty of "loyalty and/or good faith" because of the uncertainty in defining those terms).

**454.** *Guttman,* 823 A.2d at 506 n. 34; *cf. Malpiede,* 780 A.2d at 1085 n. 29 (holding that

plaintiffs did not adequately allege a breach of the "duty of loyalty and good faith" merely by pleading conclusory statements that the target's board rejected an offer based upon "(1) the interested director's desire to consummate [the deal proposed by the other bidder], (2) a desire to benefit [the majority shareholders] with a quick deal, (3) 'dislike' of [the spurned bidder], or (4) a personal desire to complete the sale process.").

**455.** *See* Hillary A. Sale, *Delaware's Good Faith,* 89 CORNELL L.REV. 456, 488–91 (2004) (advocating application of federal scienter standards from the Rule 10b–5 context to an analysis of whether directors have satisfied their duty of acting in good faith when the allegations stem from directors' deliberate indifference).

**456.** *Compare Van Gorkom,* 488 A.2d at 873, *with Zirn v. VLI Corp.,* 681 A.2d 1050, 1061–62 (Del.1996) (discussing good faith motives with respect to proxy disclosures) *and Johnson v. Shapiro,* 2002 WL 31438477 (Del.Ch. Oct.18, 2002) (same).

**457.** *See* E. Norman Veasey, *State–Federal Tension in Corporate Governance and the Professional Responsibilities of Advisors,* 28 J. CORP. L. 441, 447 (2003).

*bilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." [458]

Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty,* a *conscious disregard for one's responsibilities,* is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith.[459] Deliberate indifference and inaction *in the face of a duty to act* is, in my mind, conduct that is clearly disloyal to the corporation.[460] It is the epitome of faithless conduct.

To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation. The presumption of the business judgment rule creates a presumption that a director acted in good faith. In order to overcome that presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence. To create a definitive and categorical definition of the universe of acts that would constitute bad faith would be difficult, if not impossible. And it would misconceive how, in my judgment, the concept of good faith operates in our common law of corporations. Fundamentally, the duties traditionally analyzed as belonging to corporate fiduciaries, loyalty and care, are but constituent elements of the overarching concepts of allegiance, devotion and faithfulness that must guide the conduct of every fiduciary. The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation,[461] where the fiduciary acts with the intent to violate applicable positive law,[462] or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[463]

**458.** *Disney II,* 825 A.2d at 289 (emphasis in original); *see Gagliardi,* 683 A.2d at 1051 ("[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.").

**459.** Indeed, § 102(b)(7) on its face seems to equate bad faith with intentional misconduct. *See* 8 *Del. C.* § 102(b)(7)(ii).

**460.** This is, in my opinion, what the Supreme Court was trying to communicate in *Van Gorkom* when it wrote:

In the specific context of a proposed merger of domestic corporations, *a director has a duty under 8* Del. C. *§ 251(b),* along with his fellow directors, to act in an informed manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. *Certainly in the merger context, a director may not abdicate that duty* by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of 8 *Del. C.* § 251(b) may be submitted to the shareholders under § 251(c).

*It is against those standards that the conduct of the directors of Trans Union must be tested,* as a matter of law and as a matter of fact, regarding their exercise of an informed business judgment in voting to approve the Pritzker proposal.

488 A.2d at 873 (citations and footnotes omitted; emphases added). In other words, in *Van Gorkom,* the directors were under a statutory duty to act. That duty, by law, could not be abdicated to the shareholders, much less to the officers of the corporation.

**461.** *Gagliardi,* 683 A.2d at 1051 n. 2.

**462.** *Id.*

**463.** *Disney II,* 825 A.2d at 289–90; *see Allaun,* 147 A. at 261 (further judicial scrutiny is warranted if the transaction is a result of

There may be other examples of bad faith yet to be proven or alleged,[464] but these three are the most salient. As evidenced by previous rulings in this case both from this Court and the Delaware Supreme Court, issues of the Disney directors' good faith (or lack thereof) are central to the outcome of this action. With this background, I now turn to applying the appropriate standards to defendants' conduct.

## III. ANALYSIS

Stripped of the presumptions in their favor that have carried them to trial,[465] plaintiffs must now rely on the evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste. More specifically, in the area of director action, plaintiffs must prove by a preponderance of the evidence that the presumption of the business judgment rule does not apply either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an "unintelligent or unadvised judgment,"[466] by failing to inform themselves of all material information reasonably available to them before making a business decision.[467]

directors' "reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders."); *Gimbel*, 316 A.2d at 604 (motion for a preliminary injunction denied, *inter alia*, because there was "[n]othing in the record [that] would justify a finding ... that the directors acted ... out of improper motive or *intentional disregard of shareholder interests."*) (emphasis added); *see also Caremark*, 698 A.2d at 971 (where the fiduciaries' failure to act was allegedly "sustained or systematic"). The first two of these examples seem to sound in the fiduciary duty of loyalty, whereas the last appears to be an extension, or rather, an example of, severe violations of the fiduciary duty of care. In the end, so long as the role of good faith is understood, it makes no difference whether the words "fiduciary duty of" are placed in front of "good faith," because acts not in good faith (regardless of whether they might fall under the loyalty or care aspects of good faith) are in any event non-exculpable because they are disloyal to the corporation. *See* 8 *Del. C.* § 102(b)(7).

464. Another example of how the concept of good faith may operate in a situation where ensuring director compliance with the fiduciary duties of care and loyalty (as we have traditionally defined those duties) may be insufficient to protect shareholders' interests, is found in 8 *Del. C.* § 144(a). Under § 144(a), a transaction between a corporation and its directors or officers will be deemed valid if approved by a majority of the independent directors, assuming three criteria are met: 1) the approving directors were aware of the conflict inherent in the transaction; 2) the approving directors were aware of all facts material to the transaction; and 3) the approving directors acted in good faith. In other words, the inside transaction is valid where the independent and disinterested (loyal) directors understood that the transaction would benefit a colleague (factor 1), but they considered the transaction in light of the material facts (factor 2—due care) mindful of their duty to act in the interests of the corporation, unswayed by loyalty to the interests of their colleagues or cronies (factor 3—good faith). On the other hand, where the evidence shows that a majority of the independent directors were aware of the conflict and all material facts, in satisfaction of factors 1 and 2 (as well as the duties of loyalty and care), but acted to reward a colleague rather than for the benefit of the shareholders, the Court will find that the directors failed to act in good faith and, thus, that the transaction is voidable. In such a case, the duties of care and loyalty, as traditionally defined, might be insufficient to protect the equitable interests of the shareholders, and the matter would turn on the good faith of the directors.

465. *See Disney II*, 825 A.2d at 279; *Disney III*, 2004 WL 2050138, at *3.

466. *Mitchell*, 167 A. at 833; *Van Gorkom*, 488 A.2d at 872.

467. *Brehm*, 746 A.2d at 259; *Van Gorkom*, 488 A.2d at 872; *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del.1971).

If plaintiffs cannot rebut the presumption of the business judgment rule, the defendants will prevail. If plaintiffs succeed in rebutting the presumption of the business judgment rule, the burden then shifts to the defendants to prove by a preponderance of the evidence that the challenged transactions were entirely fair to the corporation.[468]

As it relates to director inaction, plaintiffs will prevail upon proving by a preponderance of the evidence that the defendants breached their fiduciary duties by not acting. In order to invoke the protections of the provision in the Company's certificate of incorporation authorized by 8 *Del. C.* § 102(b)(7), the defendants must prove by a preponderance of the evidence that they are entitled to the protections of that provision.[469]

### A. Ovitz Did Not Breach His Duty of Loyalty

■ As previously mentioned, the only issue remaining in this case with respect to the traditional duty of loyalty (aside from whether there is an overlap between loyalty and good faith) is whether Ovitz breached his fiduciary duty of loyalty in the course of his termination.[470] Before trial, Ovitz moved for summary judgment on this claim, a motion I denied on the ground that genuine issues of material fact existed which prevented entry of summary judgment in favor of Ovitz at that time.[471] More specifically, I recognized:

... *if* Ovitz received a[n] NFT, [then] he had a contractual right to receive the payout he did receive. But Ovitz did not have a contractual right to receive a[n] NFT.... Instead, Ovitz's receipt of a[n] NFT was conditioned upon a one-time determination (to be made by [the Company]) that was not guaranteed by his contract, and Ovitz appears to have actively engaged in negotiations and decisionmaking that affected [the Company]'s determination to grant the NFT.

Ovitz negotiated his exit from [the Company] with Eisner, Russell, and others. He made a conscious decision not to resign and to seek the benefits that his contract made available to him only under certain prescribed circumstances. Ovitz allegedly colluded with those on the other side of the bargaining table ... in bringing about the circumstances that would entitle him to his NFT benefits. In so doing, he allegedly manipulated corporate processes and thereby violated his fiduciary duties to [the Company].[472]

Now, upon consideration of the evidence presented at trial, and based upon the findings of fact made above, it is clear that plaintiffs have failed to demonstrate by a preponderance of the evidence that Ovitz breached his duty of loyalty.

Ovitz did not breach his fiduciary duty of loyalty by receiving the NFT payment because he played no part in the deci-

---

**468.** *Cinerama*, 663 A.2d at 1162; *Emerald Partners*, 787 A.2d at 91.

**469.** *Emerald Partners*, 787 A.2d at 95.

**470.** The Court notes that plaintiffs' statement of issues of law and fact to be litigated contained in the Pre–Trial Stipulation and Order repeatedly uses the phrase "fiduciary duties of due care, good faith, and/or loyalty" regardless of the challenged conduct. To the extent plaintiffs are still pursuing pure duty of loyalty claims other than this claim related to Ovitz's actions in receiving his NFT, as to those claims, plaintiffs have failed to demonstrate by a preponderance of the evidence that the defendants breached their fiduciary duty of loyalty.

**471.** *Disney III*, 2004 WL 2050138, at *6–8.

**472.** *Id.* at *7.

sions:[473] (1) to be terminated and (2) that the termination would not be for cause under the OEA.[474] Ovitz did possess fiduciary duties as a director and officer while these decisions were made, but by not improperly interjecting himself into the corporation's decisionmaking process nor manipulating that process, he did not breach the fiduciary duties he possessed in that unique circumstance. Furthermore, Ovitz did not "engage" in a transaction with the corporation—rather, the corporation imposed an unwanted transaction upon him.[475]

Once Ovitz was terminated without cause (as a result of decisions made entirely without input or influence from Ovitz), he was contractually entitled, without any negotiation or action on his part, to receive the benefits provided by the OEA for a termination without cause, benefits for which he negotiated at arms-length *before* becoming a fiduciary.[476] No reasonably prudent fiduciary in Ovitz's position would have unilaterally determined to call a board meeting to force the corporation's chief executive officer to reconsider his termination and the terms thereof,[477] with that reconsideration for the benefit of shareholders and potentially to Ovitz's detriment.[478]

Furthermore, having just been terminated, no reasonably prudent fiduciary in Ovitz's shoes would have insisted on a board meeting to discuss and ratify his termination after being terminated by the corporation's *chief executive officer* (with guidance and assistance from the Company's general counsel). Just as Delaware law does not require directors-to-be to comply with their fiduciary duties,[479] former directors owe no fiduciary duties, and after December 27, 1996, Ovitz could not breach a duty he no longer had.

Having found that Ovitz did not play a part in the decision to terminate himself, and that ordinary officers and directors of reasonable prudence in the same position would not have acted with more care, I conclude that Ovitz did not breach his fiduciary duty of loyalty in connection with his termination.

## B. Defendants Did Not Commit Waste

Plaintiffs pursued a claim for waste at trial and argued in their briefs that they have proven this claim.[480] As stated

---

473. I ignore the subtlety that at the moment Ovitz received the monetary payout for the NFT he was no longer a fiduciary, his directorship and status as an officer having ended in no event later than December 27, 1996. *See* PTE 14.

474. *See supra* text "Ovitz's Bonus and His Termination" at 80.

475. For this reason, a discussion of the application of 8 *Del. C.* § 144 is not necessary. Such discussion was appropriate, however, at the summary judgment stage when I inferred (to plaintiffs' benefit) that Ovitz involved himself in the Company's decision ("manipulated corporate processes") to grant him an NFT. *See Disney III*, 2004 WL 2050138, at *7.

476. *See Disney III*, 2004 WL 2050138, at *3–6.

477. Ovitz, as President, did have the authority to call a special board meeting by himself. *See* PTE 498 at Article III, Section 5.

478. Indeed, if Ovitz had called a special meeting of the board in order to force Eisner to reconsider the issues regarding his termination, that act would, in my mind, raise greater issues relating to a potential breach of Ovitz's duty of loyalty than not calling a meeting.

479. *Disney III*, 2004 WL 2050138, at *3–4.

480. Ovitz had moved for summary judgment on the waste claim, but neither party addressed it in the summary judgment briefing or at oral argument, and the motion for summary judgment was therefore denied. *Disney III*, 2004 WL 2050138, at *6.

above, the standard for waste is a very high one that is difficult to meet.[481] Plaintiffs refer to Professor Murphy's opinion that the OEA improperly incentivized Ovitz to leave the Company and receive an NFT, rather than complete the term of the OEA, to support their argument for waste.[482] Of course, Professor Murphy's opinion relies on the assumptions that either Ovitz would be able to procure for himself an NFT, or that Eisner had agreed to terminate him even before Ovitz was hired.

The record does not support these assertions in any conceivable way. Apart from his job performance, Ovitz was never in a position to determine if he would be terminated, and if so, whether it would be with or without cause. As it relates to job performance, I find it patently unreasonable to assume that Ovitz intended to perform just poorly enough to be fired quickly, but not so poorly that he could be terminated for cause. First, based upon my personal observations of Ovitz, he possesses such an ego, and enjoyed such a towering reputation before his employment at the Company, that he is not the type of person that would intentionally perform poorly. Ovitz did not build Hollywood's premier talent agency by performing poorly. Second, nothing in the trial record indicates to me that Ovitz intended to bring anything less than his best efforts to the Company. Additionally, I have found and concluded above that Eisner believed Ovitz would be an excellent addition to the company throughout 1995,[483] a

far cry from plaintiffs' accusations of deciding to hire him for the purpose of firing him shortly thereafter with a spectacular severance payoff.

More importantly, however, I conclude that given his performance, Ovitz could not have been fired for cause under the OEA. Any early termination of his employment, therefore, had to be in the form of an NFT. In reaching this conclusion, I rely on the expert reports of both Feldman and Fox, whose factual assumptions are generally consonant with my factual findings above. Nevertheless, by applying the myriad of definitions for gross negligence and malfeasance discussed by Donohue, Feldman and Fox, I also independently conclude, based upon the facts as I have found them, that Ovitz did not commit gross negligence or malfeasance while serving as the Company's President.

As a result, terminating Ovitz and paying the NFT did not constitute waste because he could not be terminated for cause and because many of the defendants gave credible testimony that the Company would be better off without Ovitz,[484] meaning that it would be impossible for me to conclude that the termination and receipt of NFT benefits resulted in "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration,"[485] or a situation where the defendants have "irrationally squander[ed] or give[n] away corporate assets."[486] In other words, defendants did not commit waste.

481. *See supra* notes 419–420 and accompanying text.

482. PTE 426 at 22–23.

483. *See supra* text "Ovitz's Early Performance" at 711.

484. *See supra* note 326.

485. *Brehm,* 746 A.2d at 263; *Disney I,* 731 A.2d at 362 (quoting *Glazer,* 658 A.2d at 183.)

486. *Brehm,* 746 A.2d at 263.

C. *The Old Board's Decision to Hire Ov-itz and the Compensation Commit-tee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith*

The members of the "Old Board" (Eisner, Bollenbach, Litvack, Russell, Roy Disney, Gold, Nunis, Poitier, Stern, Walker, Watson, Wilson, Bowers, Lozano and Mitchell) were required to comply with their fiduciary duties on behalf of the Company's shareholders while taking the actions that brought Ovitz to the Company. For the future, many lessons of what not to do can be learned from defendants' conduct here. Nevertheless, I conclude that the only reasonable application of the law to the facts as I have found them, is that the defendants did not act in bad faith, and were at most ordinarily negligent, in connection with the hiring of Ovitz and the approval of the OEA. In accordance with the business judgment rule (because, as it turns out, business judgment *was* exercised), ordinary negligence is insufficient to constitute a violation of the fiduciary duty of care. I shall elaborate upon this conclusion as to each defendant.

1. *Eisner*

■ Eisner was clearly the person most heavily involved in bringing Ovitz to the Company and negotiating the OEA. He was a long-time friend of Ovitz and the instigator and mastermind behind the machinations that resulted in Ovitz's hiring and the concomitant approval of the OEA. In that aspect, Eisner is the most culpable of the defendants. He was pulling the strings; he knew what was going on. On the other hand, at least as the duty of care is typically defined in the context of a business judgment (such as a decision to select and hire a corporate president), of all the defendants, he was certainly the most informed of all reasonably available material information, making him the least culpable in that regard.

This dichotomy places the Court in a somewhat awkward position. By virtue of his Machiavellian (and imperial) nature as CEO, and his control over Ovitz's hiring in particular, Eisner to a large extent is responsible for the failings in process that infected and handicapped the board's decisionmaking abilities.[487] Eisner stacked his (and I intentionally write "his" as opposed to "the Company's") board of directors with friends and other acquaintances who, though not necessarily beholden to him in a legal sense, were certainly more willing to accede to his wishes and support him unconditionally than truly independent di-

---

487. It is precisely in this context—an imperial CEO or controlling shareholder with a supine or passive board—that the concept of good faith may prove highly meaningful. The fiduciary duties of care and loyalty, as traditionally defined, may not be aggressive enough to protect shareholder interests when the board is well advised, is not legally beholden to the management or a controlling shareholder and when the board does not suffer from other disabling conflicts of interest, such as a patently self-dealing transaction. Good faith may serve to fill this gap and ensure that the persons entrusted *by shareholders* to govern Delaware corporations do so with an honesty of purpose and with an understanding of whose interests they are there to protect. In a thoughtful article, Professor Lyman Johnson has written about the richer historical and literary understanding of loyalty and care, beyond their more narrow "non-betrayal" and "process" uses in contemporary jurisprudence. Professor Johnson's description of a more expansive duty of loyalty to encompass affirmative attention and devotion may, in my opinion, fit comfortably within the concept of good faith (or vice versa) as a constituent element of the overarching concept of faithfulness. *See* Lyman P.Q. Johnson, *After Enron: Remembering Loyalty Discourse in Corporate Law*, 28 DEL. J. CORP. LAW 27 (2003).

rectors.[488] On the other hand, I do not believe that the evidence, considered fairly, demonstrates that Eisner actively took steps to defeat or short-circuit a decision-making process that would otherwise have occurred.

Eisner had demonstrated a desire to bring Ovitz to the Company before mid-1995. His efforts to actually hire Ovitz became more intense in the summer of 1995, culminating in the signing of the OLA on August 14 of that year, together with the press release issued that same day. Eisner obtained no consent or authorization from the board before agreeing to hire Ovitz, before agreeing to the substantive terms of the OLA, or before issuing the press release.[489] Indeed, outside of his small circle of confidantes, it appears that Eisner made no effort to inform the board of his discussions with Ovitz until after they were essentially completed and an agreement in principle had been reached.

As a general rule, a CEO has no obligation to continuously inform the board of his actions as CEO, or to receive prior authorization for those actions.[490] Nevertheless, a reasonably prudent CEO (that is

488. Some of this deference may be due, at least in part, to Eisner's success at the Company's helm in the eleven years preceding these events. Tr. 4131:20–4133:1. Nevertheless, the board's collective kowtowing in regard to Ovitz's hiring is also due to Eisner's desire to surround himself with yes men. *See* 3845:20–3847:3 (Gold) (testifying that he believes that Bowers, Poitier, Stern, Watson and Mitchell are not competent as board members). As examples of Eisner's success at surrounding himself with non-employee directors who would have sycophantic tendencies: Russell was Eisner's personal attorney, Tr. 2650:10–2651:7; Mitchell was hand-selected by Eisner to serve on the board, Tr. 5627:18–5628:2, and now serves as chairman, a position which provides Mitchell with substantial remuneration worth about $500,000 annually, Tr. 5629:9–24; Reveta Bowers is an administrator of a private school in West Hollywood, California, Tr. 5901:11–5903:9, that was attended by three of Eisner's children, Tr. 5944:24–5945:8, and to which Eisner and entities related to the Company have made substantial contributions, Tr. 5945:9–5947:16; O'Donovan was president of Georgetown University from 1989 to 2001, Tr. 6710:7–6711:15, (Eisner served on Georgetown University's board of directors from 1985 to 1991, Tr. 6712:16–24) where Eisner's son attended college until 1992, Tr. 6712:16–6713:3, and to which Eisner made a $1 million donation in 1996 at O'Donovan's request, Tr. 6713:4–16.

489. Nevertheless, I do not doubt that Eisner was entirely convinced that the board would support him in this decision.

490. In a corporation of the Company's size and scope, the only logical way for the corporation to operate is that the everyday governance should be "under the direction" of the board of directors rather than "by" the board. More than twenty years ago, this Court wrote (and it is even more true today):

A fundamental precept of Delaware corporation law is that it is the board of directors, and neither shareholders nor managers, that has ultimate responsibility for the management of the enterprise. Of course, given the large, complex organizations though which modern multi-function business corporations often operate, the law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance. Thus Section 141(a) of DGCL expressly permits a board of directors to delegate managerial duties to officers of the corporation, except to the extent that the corporation's certificate of incorporation or bylaws may limit or prohibit such a delegation. *Chapin v. Benwood Foundation*, 402 A.2d 1205, 1211 (Del.Ch.1979) (quoting *Abercrombie v. Davies*, 123 A.2d 893, 899 (Del.Ch. 1956)), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del.1980).

to say, a reasonably prudent CEO with a board willing to think for itself and assert itself against the CEO when necessary) would not have acted in as unilateral a manner as did Eisner when essentially committing the corporation to hire a second-in-command, appoint that person to the board, and provide him with one of the largest and richest employment contracts ever enjoyed by a non-CEO. I write, "essentially committing," because although I conclude that legally, Ovitz's hiring was not a "done deal" as of the August 14 OLA,[491] it was clear to Eisner, Ovitz, and the directors who were informed, that as a practical matter, it certainly was a "done deal."[492]

After August 14, the record seems to indicate that Eisner's role in Ovitz's hiring lessened, as Russell continued the substantive negotiations with Ovitz while Santaniello worked on drafting the OEA. Eisner did not attend the portion of the compensation committee meeting on September 26 where Ovitz's hiring and the key terms of the OEA were discussed and voted upon,[493] but he did lead the discussion in the full board meeting that same day with respect to Ovitz's election as President of the Company.[494] Eisner's involvement in the final stages of drafting and executing the OEA were minimal.

Because considerations of improper motive are no longer present in this case,[495] the decision to hire Ovitz and enter into the OEA is one of business judgment, to which the presumptions of the business judgment rule apply. In order to prevail, therefore, plaintiffs must demonstrate by a preponderance of the evidence that Eisner was either grossly negligent or acted in bad faith in connection with Ovitz's hiring and the approval of the OEA.

As I mentioned earlier, Eisner was very much aware of what was going on as the situation developed. In the limited instances where he was not the primary source of information relating to Ovitz, Russell kept Eisner informed of negotiations with Ovitz. Eisner knew Ovitz; he was familiar with the career Ovitz had built at CAA and he knew that the Company was in need of a senior executive, especially in light of the upcoming CapCities/ABC merger. In light of this knowledge, I cannot find that plaintiffs have demonstrated by a preponderance of the evidence that Eisner failed to inform himself of all material information reasonably available or that he acted in a grossly negligent manner.

Notwithstanding the foregoing, Eisner's actions in connection with Ovitz's hiring should not serve as a model for fellow executives and fiduciaries to follow. His

---

**491.** The OLA's opening paragraph stated, "This will confirm our arrangement under which you will become employed by [the Company]. *Subject to the formal approval of the Company's Board of Directors and its Compensation Committee,* we have agreed that...." PTE 60 at DD002932 (emphasis added). The footnote in the summary judgment opinion in this case, *Disney III,* 2004 WL 2050138, at *6 n. 54, that Ovitz was likely legally bound by the OLA as of October 1, 1995, is not contradicted by my conclusion here that the Company was not legally bound until at least September 26, 1995.

**492.** Tr. 2807:13–23; 3572:3–23; 3708:7–17; 6827:8–19; 7693:24–7694:6; 8198:5–21.

**493.** PTE 39 at WD01170.

**494.** PTE 29 at WD01196.

**495.** *See Brehm,* 746 A.2d at 257–58 & n. 42 (holding "that the Complaint fails to create a reasonable doubt that Eisner was disinterested in the [OEA]," and concluding that further inquiry into the independence of the other directors would be unnecessary, and that plaintiffs would not be permitted to relitigate this claim after amending the complaint).

lapses were many. He failed to keep the board as informed as he should have. He stretched the outer boundaries of his authority as CEO by acting without specific board direction or involvement. He prematurely issued a press release that placed significant pressure on the board to accept Ovitz and approve his compensation package in accordance with the press release. To my mind, these actions fall far short of what shareholders expect and demand from those entrusted with a fiduciary position. Eisner's failure to better involve the board in the process of Ovitz's hiring, usurping that role for himself, although not in violation of law,[496] does not comport with how fiduciaries of Delaware corporations are expected to act.

Despite all of the legitimate criticisms that may be leveled at Eisner, especially at having enthroned himself as the omnipotent and infallible monarch of his personal Magic Kingdom, I nonetheless conclude, after carefully considering and weighing all the evidence, that Eisner's actions were taken in good faith. That is, Eisner's actions were taken with the subjective belief that those actions were in the best interests of the Company—he believed that his taking charge and acting swiftly and decisively to hire Ovitz would serve the best interests of the Company notwithstanding the high cost of Ovitz's hiring and notwithstanding that two experienced executives who had arguably been passed over for the position (Litvack and Bollenbach) were not completely supportive.[497] Those actions do not represent a knowing violation of law or evidence a conscious and intentional disregard of duty. In conclusion, Eisner acted in good faith and did not breach his fiduciary duty of care because he was not grossly negligent.

## 2. *Russell*

■ Apart from Eisner, Russell, who was familiar with the Company's compensation policies and practices from his service as chairman of the Company's compensation committee, was the next most heavily involved director in hiring Ovitz, as he was the main negotiator on behalf of the Company.[498] Russell was also closely involved with Watson and Crystal in shaping and extensively analyzing Ovitz's proposed compensation.[499] Russell spoke to Poitier on two occasions in mid-August 1995 to discuss the terms of Ovitz's compensation, and he knew that Watson would speak with Lozano.[500] Additionally, on September 26, 1995, Russell led the discussion at the compensation committee meeting regarding the proposed terms for the OEA, and then reported on that meeting during the full board meeting shortly thereafter.[501]

The compensation committee's charter indicates that the committee has the power to "establish the salaries" of the Company's CEO and COO/President, together with benefits and incentive compensation, including stock options, for those same

---

**496.** Eisner's authority to take these actions was not restricted in any way by statute, the Company's certificate of incorporation, by-laws, or a board resolution.

**497.** Eisner's stellar track record as the Company's Chairman and CEO over the preceding eleven years (from 1984 to 1995) bolsters his belief that his decisions generally benefit the Company and its shareholders.

**498.** Tr. 2314:20–2384:13; 2391:9–2516:8.

**499.** Tr. 2425:14–2435:4; 2441:10–2445:16; 2453:5–2476:14; 2485:22–2502:17.

**500.** Tr. 2445:12–2451:19; 2453:5–18.

**501.** PTE 39 at WD01170; PTE 29 at WD01197; Tr. 2517:7–2536:23.

individuals.[502] In addition to this power, the committee's charter charges it with the duty to "approve employment contracts, or contracts at will," for "all corporate officers who are members of the Board of Directors regardless of salary."[503]

Plaintiffs have argued that Russell exceeded the scope of his authority as chairman of the compensation committee by negotiating with Ovitz on behalf of the Company.[504] Although it is true that nothing in the compensation committee's charter specifically grants authority to the committee to negotiate (as opposed to simply approve) employment contracts, there is no language in the charter that would indicate that the committee does not have this power. Indeed, the contrary appears to be the case. The charter distinguishes between "establish[ing]" salaries for the CEO and COO/President and "approv[ing]" salaries for those individuals, together with many others.[505]

In negotiating with Ovitz, Russell became privy to a great deal of information with respect to Ovitz. Ovitz's representatives relayed some of that information to Russell. General information about Ovitz also was common knowledge to those in the entertainment industry. Russell did not independently and objectively verify the representations made by Ovitz's negotiators that his income from CAA was $20 to $25 million annually because Russell, based upon his pre-existing knowledge, believed that representation to be accurate.[506] Nonetheless, I conclude that Russell negotiated with Ovitz at arms' length.

Would the better course of action have been for Russell to have objectively verified Ovitz's income from CAA? Undoubtedly, yes. Would it have been better if Russell had more rigorously investigated Ovitz's background in order to uncover his past troubles with the Department of Labor?[507] Yes. Would the better course of action have been for someone other than

---

**502.** PTE 187 (charter as of May 1, 1993); PTE 465 (essentially duplicative of PTE 187); PTE 47 (charter as of Jan. 19, 1996).

**503.** PTE 187; PTE 47.

**504.** *See* Tr. 2676:11–2678:19. Although it would have been ideal if the other members of the compensation committee were more substantively involved in those negotiations, it would certainly be unwieldy as a practical matter to require the entire committee, together and as a whole, to negotiate on the Company's behalf.

**505.** PTE 187; PTE 47. The very definition of "establish" contemplates some form of negotiation or molding where "approve" does not. Black's defines establish as including the following definitions:

... To make or form; ... To found, to create, to regulate....

....

To bring into being; to build; to constitute; to create; to erect; to form; to found; to found and regulate, to institute, to locate,

to make; to model; to organize; to originate; to prepare; to set up.

BLACK'S LAW DICTIONARY 642–43 (Rev. 4th ed.1968). Approve is defined as "[t]o be satisfied with; to confirm, ratify, sanction, or consent to some act or thing done by another; to sanction officially; to ratify; to confirm...." *Id.* at 132. These definitions lead me to believe that it would be perfectly reasonable for Russell and others to believe that it was appropriate for the compensation committee to negotiate with Ovitz the terms of his employment. Nevertheless, Russell did testify that it was not normally the compensation committee's role to negotiate. Tr. 2906:6–2907:10.

**506.** Tr. 2352:3–2363:13; 2402:6–21; 2755:2–2757:10.

**507.** *See* PTE 151 at DD000460. This article reports that the news of Ovitz's problems with the Department of Labor, although reported publicly, was swept under the rug by the press, essentially making that information less reasonably available to Russell. *See also* PTE 8 at DD002131.

Eisner's personal attorney to represent the Company in the negotiations with Ovitz? Again, yes. Have plaintiffs shown by a preponderance of the evidence that Russell's actions on behalf of the Company were *grossly* negligent (in that he failed to inform himself of all material information *reasonably* available in making decisions) or that he acted in bad faith? No. I conclude that Russell for the most part knew what he needed to know, did for the most part what he was required to do, and that he was doing the best he thought he could to advance the interests of the Company by facilitating a transaction that would provide a legitimate potential successor to Eisner and provide the Company with one of the entertainment industry's most influential individuals.

### 3. *Watson*

■ Watson's main role in Ovitz's hiring and his election as President of the Company was helping Russell evaluate the financial ramifications of the OEA.[508] Watson is a past Chairman of the Company's board, and served in that position when Eisner and Wells were hired in 1984.[509] Watson was familiar with Crystal, having worked with him on Eisner's and Wells' contracts in 1984 and again in 1989.[510]

Watson conducted extensive analyses of Ovitz's proposed compensation package, sharing those analyses with Crystal and Russell at their meeting on August 10, and in their later discussions stemming from that meeting.[511] He was also involved in determining how to replace the proposed option guarantee with the extended exer-

cisability of Ovitz's options (together with other features).[512] He also spoke with Lozano (although the date is unclear) sometime before the September 26, 1995 compensation committee meeting in order to inform him somewhat of his and Russell's analyses and discussions.[513] Watson attended the September 26, 1995 compensation committee meeting and voted in favor of the resolution approving the terms of the OEA.[514]

Watson was familiar with making executive compensation decisions at the Company. Nothing in his conduct leads me to believe that he took an "ostrich-like" approach to considering and approving the OEA. Nothing in his conduct leads me to believe that Watson consciously and intentionally disregarded his duties to the Company. Nothing in his conduct leads me to believe that Watson had anything in mind other than the best interests of the Company when evaluating and consenting to Ovitz's compensation package. Finally, nothing in his conduct leads me to believe that Watson failed to inform himself of all material information reasonably available before making these decisions. In short, I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Watson either breached his fiduciary duty of care or acted in anything other than good faith in connection with the hiring of Ovitz and the approval of the economic terms of the OEA.

### 4. *Poitier and Lozano*

■ Poitier and Lozano were the remaining members of the compensation

---

**508.** Tr. 7822:1–7823:7. Russell phoned Watson on several occasions beginning on August 2, 1995. *See* DTE 120 at WD07493–95.

**509.** Tr. 7803:8–7813:6.

**510.** Tr. 7825:18–7827:8.

**511.** Tr. 7827:17–7829:15.

**512.** Tr. 7836:5–7846:2.

**513.** Tr. 7833:11–7834:2; 8082:12–8088:9.

**514.** PTE 39 at WD01170.

committee that considered the economic terms of the OEA. It is not disputed that they were far less involved in the genesis of the OEA than were Russell, and to a lesser extent, Watson. The question in dispute is whether their level of involvement in the OEA was so low as to constitute gross negligence and, therefore, a breach of their fiduciary duty of care, or whether their actions evidence a lack of good faith. As will be shown, I conclude that neither of these men acted in a grossly negligent manner or in bad faith.

Poitier is a man celebrated for his work both within and outside the entertainment industry.[515] Poitier was elected to the Company's board of directors in 1994, and attended his first board meeting during January of 1995.[516] Lozano was the publisher of the nation's largest Spanish language daily newspaper, is the former chairman of the board of that entity, and also served as the United States' ambassador to El Salvador.[517] Lozano had a long tenure on the Company's board of directors, serving from the early 1980s until 2001.[518] Lozano also has experience on the compensation committees of other corporations.[519]

There is no question that Poitier and Lozano's involvement in the process of Ovitz's hiring came very late in the game. As found above, Poitier received a call from Russell on August 13 (and another the next day), during which they discussed the terms of the proposed OLA.[520] Lozano spoke with Watson regarding this same subject. It appears that neither Poitier nor Lozano had any further involvement with the hiring process, apart from these phone calls, until the September 26, 1995 compensation committee meeting.

At that meeting, both Poitier and Lozano received the term sheet that explained the key terms of Ovitz's contract, and they were present for and participated in the discussion that occurred. Both then voted to approve the terms of the OEA, and both credibly testified that they believed they possessed sufficient information at that time to make an informed decision.[521] Plaintiffs largely point to two perceived inadequacies in this meeting (and in Poitier and Lozano's business judgment)[522]—

---

**515.** *See* Tr. 7101:19–7116:20; 7118:8–7119:8; 7122:1–7123:5.

**516.** Tr. 7123:6–7124:15.

**517.** *See* Tr. 7623:5–7624:14.

**518.** Tr. 7624:15–7625:3; 7628:3–7.

**519.** Tr. 7628:11–15.

**520.** *See* Tr. 2445:22–2447:13.

**521.** Tr. 7136:23–7137:3; 7634:18–23; 7636:2–10.

**522.** Because I have rejected plaintiffs' argument that Ovitz's hiring was legally a "done deal" as of August 14, 1995 because the OLA was expressly subject to the approval of the board and compensation committee, the amount of contact that Poitier and Lozano did or did not have with Russell and Watson

before September 26, 1995, is immaterial. *But see Van Gorkom*, 488 A.2d at 884 (concluding that Trans Union's press release of October 9, *together with* the amendments to the merger agreement executed October 10, "had the clear effect of locking Trans Union's Board into the Pritzker Agreement"). Poitier and Lozano made a decision on September 26, 1995 when they voted to approve the terms of his contract. As a result, their level of knowledge or involvement before that date is only relevant insofar as it informs the Court as to their accumulated knowledge on September 26, 1995, when the business judgment was made. For this reason, it is also irrelevant that Poitier and Lozano did not attend the meeting between Russell, Watson and Crystal on August 10; nor is their failure to attend the meeting (or even be invited) evidence that Russell or Watson were shirking their duties by working by themselves without the other two members of the committee. Certainly the more ideal scenario would have

first, that insufficient time was spent reviewing the terms of Ovitz's contract and, second, that Poitier and Lozano were not provided with sufficient documentation, including Crystal's correspondence, Watson's calculations, and a draft of the OEA.[523] These arguments understandably hearken back to *Van Gorkom*, where the Supreme Court condemned the Trans Union board for agreeing to a material transaction after a board meeting of about two hours and without so much as a term sheet of the transaction as contemplated.[524] Although the parallels between *Van Gorkom* and this case at first appear striking, a more careful consideration will reveal several important distinctions between the two.

First and foremost, the nature of the transaction in *Van Gorkom* is fundamentally different, and orders of magnitude more important, than the transaction at issue here. In *Van Gorkom*, the Trans Union board was called into a special meeting on less than a day's notice, without notice of the reason for the meeting, to consider a merger agreement that would result in the sale of the entire company.[525]

As footnoted above,[526] Delaware law, *as a matter of statute*, requires directors to take certain actions in connection with a merger of the corporation, as was being contemplated by Trans Union.[527] No statute required the Company's board to take action in connection with Ovitz's hiring. The Company's governing documents provide that the officers of the corporation will be selected by the board of directors,[528] and the charter of the compensation committee states that the committee is responsible for establishing and approving the salary of the Company's President.[529] That is exactly what happened.[530] The board meeting was not called on short notice, and the directors were well aware that Ovitz's hiring would be discussed at the meeting as a result of the August 14 press release more than a month before.[531] Furthermore, analyzing the transactions in terms of monetary value, and even accepting plaintiffs' experts' bloated valuations for comparison purposes, it is beyond question that the $734 million sale [532] of Trans Union was material and significantly larger than the financial ramifications to

been for Poitier and Lozano to have been both better qualified and more involved, but again, defendants' conduct is not measured against the best practices of corporate governance.

523. The upcoming discussion would apply with equal force to Russell and Watson, and the conclusions made herein are implicit in the conclusions reached above with regard to their actions.

524. 488 A.2d at 868–69 (the board meeting lasted "about two hours," the board's decision was solely based upon oral statements and presentations, and copies of the proposed merger agreement were not available). Those oral representations and presentations were materially misleading and not consistent with the executed merger agreement. *Id.* at 870, 875, 879–80.

525. *Id.* at 867.

526. *See supra* note 460.

527. *See* 8 *Del. C.* § 251(b).

528. DTE 184 at Article Tenth; PTE 1 at Article Tenth; DTE 185 at Article Tenth.

529. PTE 187; PTE 47.

530. PTE 39 at WD01170; PTE 29 at WD01196.

531. The directors were also aware generally that, for some time, the Company had been looking for an executive to replace Wells.

532. 13,357,758 shares outstanding, multiplied by $55 per share. 488 A.2d at 864, 869. The reader should bear in mind that the $734 million figure is a nominal one almost twenty-five years old—expressed in 1995 dollars, that number would be higher.

the Company of Ovitz's hiring.[533]

Second, the Trans Union board met for about two hours to discuss and deliberate on this monumental transaction in the life of Trans Union. A precise amount of time for the length of the compensation committee meeting, and more specifically, the length of the discussion regarding the OEA, is difficult to establish. The minutes of the compensation committee's meeting and the full board's meeting indicate that the compensation committee meeting convened at 9:00 a.m., and that the full board's meeting convened at 10:00 a.m., leaving no more than an hour for the compensation committee to meet.[534] Lozano, although he had little recollection of the meeting, believed that the compensation committee meeting ran long—until 10:30 a.m.[535] As I found above, the meeting lasted about an hour. Russell testified that the discussion of the OEA took about 25–30 minutes,[536] significantly more time than the brief discussion reflected in the minutes would seem to indicate.[537] Lozano believed that the committee spent "perhaps four times as much time on Mr. Ovitz's contract than we did on Mr. Russell's compensation." [538]

I am persuaded by Russell and Lozano's recollection that the OEA was discussed for a not insignificant length of time.[539] Is that length of time markedly less than the attention given by the Trans Union board

**533.** Eisner's decision to enter into the OLA with Ovitz, and the compensation committee's later decision to approve the economic terms of the OEA on September 26, 1995, have to be understood in context. In fiscal 1996, the Company had almost $19 billion in revenues, and more than $3 billion in operating income. PTE 442 at WD02085. Roth, below both Eisner and Ovitz in the chain of command, had authority to budget the development and marketing of feature films, apparently without prior authorization from Eisner, Ovitz or the board. *See supra* note 149. According to a contemporary memorandum written by Eisner, an average live-action feature film cost $33 million to develop and another $19 million to market and distribute, for a total cost of $52 million per film. PTE 558 at WD08652. Disney had budgeted thirty such live-action feature films for fiscal 1996, though Eisner expected that number to decline by one-third in the coming years. *Id.;* PTE 587 at WD10772. Eisner also believed that Roth was responsible for losses of $60 million attributable only to three films, and that his expenditures were $90 million "more than what was prudent." PTE 67 at DD002980; *see* PTE 587 at WD10767 (two box office failures alone resulted in a $45 million negative variance to profit forecasts). The big-budget summer blockbuster, *The Rock,* was expected to cost $122.9 million ($67 million in development, and another $55.9 million in distribution and marketing), and *Ransom,* to be released just two weeks after *The Rock,* was expected to cost $126

million ($68.6 million in production, and $57.4 in distribution and marketing). *Id.* at WD10772. Between these two motion pictures alone, Roth had the authority to spend almost $250 million, with an expected profit of ten percent. *Id.* If Roth had this much authority, the proposition that Eisner, the Company's chief executive officer, entered into the OLA without prior board authorization, or that the compensation committee approved Ovitz's contract based upon a term sheet and upon less than an hour of discussion, seems eminently reasonable given the OEA's (relatively small) economic size.

**534.** PTE 29 at WD01194; PTE 39 at WD01167; Tr. 7188:17–7211:3.

**535.** Tr. 7641:16–7642:2; 7714:12–24.

**536.** Tr. 2857:10–2863:18.

**537.** Tr. 2535:10–2536:23; 2838:8–2851:2; 2854:16–2857:4.

**538.** Tr. 7638:13–22.

**539.** It would have been extremely helpful to the Court if the minutes had indicated in any fashion that the discussion relating to the OEA was longer and more substantial than the discussion relating to the myriad of other issues brought before the compensation committee that morning.

to the merger agreement they were statutorily charged with approving or rejecting? Yes. Is that difference probative on the issue of whether the compensation committee adequately discussed the OEA? Not in the least. When the Trans Union board met for those two hours, it was the very first time any of those directors had discussed a sale of the company.[540] Here, all the members of the committee were aware in advance that Ovitz's hiring would be discussed, and the members of the committee had also previously had more than minimal informal discussions amongst themselves as to the *bona fides* of the OEA before the meeting ever occurred. Furthermore, as mentioned above, the nature and scope of the transactions are fundamentally different.

Third, the Trans Union board had absolutely no documentation before it when it considered the merger agreement.[541] The board was completely reliant on the misleading and uninformed presentations given by Trans Union's officers (Van Gorkom and Romans).[542] In contrast, the compensation committee was provided with a term sheet of the key terms of the OEA and a presentation was made by Russell (assisted by Watson), who had personal knowledge of the relevant information by virtue of his negotiations with Ovitz and discussions with Crystal. Additionally, the testimony and documentary evidence support this conclusion.[543] It is true that the compensation committee did not review and discuss the then-existing draft of the full text of the OEA. This, however, is not required.[544] Nor is it necessary for an expert to make a formal presentation at the committee meeting in order for the board to rely on that expert's analysis, although that certainly would have been the better course of action.[545] Furthermore, the Company's compensation committee reasonably and wisely left the task of negotiating and drafting the actual text of the OEA in the hands of the Company's counsel.[546]

Fourth, Trans Union's senior management completely opposed the merger.[547] In contrast, the Company's senior management generally saw Ovitz's hiring as a boon for the Company, notwithstanding Litvack and Bollenbach's initial personal feelings.[548] In sum, although Poitier and Lozano did very little in connection with Ovitz's hiring and the compensation committee's approval of the OEA, they did not

540. *See* 488 A.2d at 875.

541. *Id.*

542. *Id.* at 874–78.

543. *But see id.* at 878–80 (defendants' testimony that the availability of a "market test" had been discussed was negated by their inability to produce and identify the original merger agreement and that the minutes of the meeting contained no reference to a discussion of Trans Union's right to a market test; defendants' testimony that they relied on counsel was negated by the failure of that counsel to testify, even though his firm participated in the defense).

544. *See id.* at 883 n. 25.

545. In *Van Gorkom,* the Trans Union board did not invite the company's investment banker, Salomon Brothers, to attend the board meeting, and Van Gorkom instead had Trans Union's chief financial officer state that the $55 per share figure was "'in the range of a fair price'" but also that "his studies did not indicate either a fair price for the stock or a valuation of the Company [and] that he did not see his role as directly addressing the fairness issue." *Id.* at 867–68.

546. *See* Tr. 2530:16–2531:14; 7847:9–7848:15.

547. *Van Gorkom,* 488 A.2d at 867–68.

548. *See* Tr. 5276:3–5277:12 (Bollenbach); 5802:14–5804:12 (Nunis); 6040:20–6041:21 (Litvack); 6051:4–6052:9 (Litvack).

breach their fiduciary duties. I conclude that they were informed by Russell and Watson of all *material* information reasonably available, even though they were not privy to every conversation or document exchanged amongst Russell, Watson, Crystal and Ovitz's representatives.

Much has been made throughout the various procedural iterations of this case about Crystal's involvement (or lack thereof) in the compensation committee's deliberations and decisionmaking.[549] Although there are many criticisms that could and have been made (including by Crystal himself) regarding Crystal's failure to calculate *ex ante* the cost of a potential NFT, nothing in the record leads me to conclude that any member of the compensation committee had actual knowledge that would lead them to believe (as to Poitier and Lozano, their understanding of Crystal's advice was based on information relayed by Russell and Watson) that Crystal's analysis was inaccurate or incomplete. Without that knowledge, I conclude that the compensation committee acted in good faith and relied on Crystal in good faith, and that the fault for errors or omissions in Crystal's analysis must be laid at his feet, and not upon the compensation committee.

The compensation committee reasonably believed that the analysis of the terms of the OEA was within Crystal's professional or expert competence, and together with Russell and Watson's professional competence in those same areas, the committee relied on the information, opinions, reports and statements made by Crystal, even if Crystal did not relay the information, opinions, reports and statements in person to the committee as a whole. Crystal's analysis was not so deficient that the compensation committee would have reason to question it.[550] Furthermore, Crystal appears to have been selected with reasonable care, especially in light of his previous engagements with the Company in connection with past executive compensation contracts that were structurally, at least, similar to the OEA. For all these reasons, the compensation committee also is entitled to the protections of 8 *Del. C.* § 141(e) in relying upon Crystal.

Viewed objectively, the compensation committee was asked to make a decision knowing that:[551] 1) Ovitz was a third party with whom Russell negotiated at arms' length;[552] 2) regardless of whether Ovitz truly was "the most powerful man in Hollywood," he was a highly-regarded industry figure;[553] 3) Ovitz was widely believed to possess skills and experience that would

---

549. *See Brehm,* 746 A.2d at 259–62.

550. Although Crystal testified that he viewed his role as nothing more than a "high-priced calculator," nothing in the record suggests the compensation committee placed such a restriction on Crystal's work or analysis of the OEA. *See* Tr. 3581:12–3582:11; PTE 214 at DD001388. In the parts of the record just cited, Crystal laments that the compensation committee did not follow his recommendations. I believe it is important to understand that the compensation committee relied in good faith on Crystal's report and analysis even though they chose not to follow Crystal's recommendations to the letter. The role of experts under § 141(e) is to assist the board's decisionmaking—not supplant it. An interpretation of § 141(e) that would require boards to follow the advice of experts (substantially? completely? in part?) before being able to claim reliance on those experts would be in conflict with the mandate in § 141(a) that the corporation is to be managed "by or under the direction of a board of directors."

551. These factors were also known to the board generally when they elected Ovitz to the Company's presidency.

552. Tr. 7638:23–7639:20.

553. Tr. 7127:4–20.

be very valuable to the Company, especially in light of the CapCities/ABC acquisition, Wells' death, and Eisner's medical problems;[554] 4) in order to accept the Company's presidency, Ovitz was leaving and giving up his very successful business,[555] which would lead a reasonable person to believe that he would likely be highly successful in similar pursuits elsewhere in the industry;[556] 5) the CEO and others in senior management were supporting the hiring;[557] and 6) the potential compensation was not economically material to the Company.[558]

Poitier and Lozano did not intentionally disregard a duty to act, nor did they bury their heads in the sand knowing a decision had to be made. They acted in a manner that they believed was in the best interests of the corporation. Delaware law does not require (nor does it prohibit) directors to

take as active a role as Russell and Watson took in connection with Ovitz's hiring. There is no question that in comparison to those two, the actions of Poitier and Lozano may appear casual or uninformed, but I conclude that they did not breach their fiduciary duties and that they acted in good faith in connection with Ovitz's hiring.[559]

### 5. The Remaining Members of the Old Board [560]

■ In accordance with the compensation committee's charter, it was that committee's responsibility to establish and approve Ovitz's compensation arrangements.[561] In accordance with the OLA and the Company's certificate of incorporation,[562] it was the full board's responsibility to elect (or reject) Ovitz as President of the Company.[563] Plaintiffs'

**554.** Tr. 7628:19–7630:23.

**555.** Tr. 7639:21–7640:3.

**556.** Tr. 7127:21–7129:18.

**557.** *See supra* note 548.

**558.** *See* Tr. 6828:15–6829:23.

**559.** Furthermore, the compensation committee did not commit a later breach of fiduciary duty nor act in bad faith (or fail to act in good faith) when the final version of the OEA was executed without their approval. The resolution passed on September 26, 1995 clearly contemplated that some details had yet to be decided, *see* PTE 39 at WD01170, and as I concluded on Ovitz's motion for summary judgment, no material changes to the OEA were made during Ovitz's tenure as President. *See Disney III*, 2004 WL 2050138, at *4–6; *cf. Van Gorkom*, 488 A.2d at 883–84 (Van Gorkom executed the amendment to the merger agreement in a manner both inconsistent with the authorization given him by the board and detrimental to Trans Union's interests).

**560.** The remaining members of the Old Board are: Bollenbach, Litvack, Roy Disney, Nunis, Stern, Walker, O'Donovan, Murphy, Gold, Bowers, Wilson and Mitchell. Even though

Bollenbach, Litvack and seemingly Roy Disney were officers of the Company, in electing Ovitz to be President, they were acting in a function that was exclusively directoral according to the Company's certificate of incorporation and, as such, their status as officers is irrelevant. *See* DTE 69 at Article IV, Section 1 (bylaws as of April 26, 1993); PTE 497 at Article IV, Section 1 (bylaws as of April 25, 1994); PTE 2 at Article IV, Section 1 (bylaws as of September 20, 1995); PTE 46 at WD00415 (exhibit to resolution electing officers of the Company on January 22, 1996); PTE 498 at Article IV, Section 1 (bylaws as of April 22, 1996).

**561.** *See supra* note 529.

**562.** *See* PTE 33; *supra* note 528.

**563.** Plaintiffs argue that the nominating committee (Gold, Bowers, Wilson and Mitchell) shirked their duties related to that committee in connection with the OEA approval. The nominating committee's duties and powers include the duty to "[d]evelop and review background information about candidates for director and make recommendations with respect thereto to the Board." PTE 563 at WD08721 (charter as of January 1996, but the

argument that the full board had a duty and responsibility to independently analyze and approve the OEA is simply not supported by the record. As a result, the directors' actions must be analyzed in the context of whether they properly exercised their business judgment and acted in accordance with their fiduciary duties when they elected Ovitz to the Company's presidency.

The record gives adequate support to my conclusion that the directors, before voting, were informed of who Ovitz was, the reporting structure that Ovitz had agreed to and the key terms of the OEA. Again, plaintiffs have failed to meet their burden to demonstrate that the directors acted in a grossly negligent manner or that they failed to inform themselves of all material information reasonably available when making a decision. They did not intentionally shirk or ignore their duty, but acted in good faith, believing they were acting in the best interests of the Company.

Are there many aspects of Ovitz's hiring that reflect the absence of ideal corporate governance? Certainly, and I hope that this case will serve to inform stockholders, directors and officers of how the Company's fiduciaries underperformed. As I stated earlier, however, the standards used to measure the conduct of fiduciaries under Delaware law are not the same standards used in determining good corporate governance. For all the foregoing reasons, I conclude that none of the defendants breached their fiduciary duties or acted in anything other than good faith in connection with Ovitz's hiring, the approval of the OEA, or his election to the Company's presidency.

### D. Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith

The New Board[564] was likewise charged with complying with their fiduciary duties

---

charter of that date expressly states that it is "based upon the existing Charter of The Walt Disney Company's Nominating Committee"). See DTE 182 at 13 (containing similar language); PTE 47 at WD01212–13 (board minutes approving the charter found in PTE 563 although the charter is not part of PTE 47). This argument is irrelevant for three reasons. First, the August 14 press release indicates that Ovitz would be nominated to the Company's board, but the OLA does not bind the Company to nominate Ovitz or guarantee him a seat on the board. See PTE 3; PTE 33; see also PTE 7 at ¶ 2 (OEA requires the Company to nominate Ovitz), ¶ 12(a) (Ovitz allowed to terminate the OEA if not retained as President and a director). Second, Ovitz was not actually nominated to the board on September 26, 1995 (nor were the directors under a duty to do so) and, therefore, any failure on the committee's part to meet or for the members of that committee to inform themselves of Ovitz's credentials for being nominated as a director before that date is irrelevant. See PTE 29; PTE 39. Third, even if I were to give

credence to this argument, and even if it were to prevail, the damages relating to this breach would be zero. Any harm the Company suffered as a result of the OEA stems from Ovitz as an employee/officer. As an insider, Ovitz received no compensation for attending board meetings. Plaintiffs have pointed to nothing relating to Ovitz's status as a director that would allow them to recover based on his actions qua director. For these reasons, the nominating committee's actions (or inaction) are not relevant to the instant inquiry. See Pre–Trial Stipulation and Order at 7–8 (Plaintiffs' Statement of Issues of Law and Fact to be Litigated is limited to "OEA Approval Violations" and "Ovitz's Receipt of a Full NFT Payout" and is silent as to Ovitz as a director or the nominating committee's role in his becoming a director).

564. The New Board consisted of Eisner, Ovitz, Roy Disney, Gold, Litvack, Nunis, Poitier, Russell, Stern, Walker, Watson, Wilson, Bowers, Lozano, Mitchell, O'Donovan and Murphy.

in connection with any actions taken, or required to be taken, in connection with Ovitz's termination. The key question here becomes whether the board was under a duty to act in connection with Ovitz's termination, because if the directors were under no duty to act, then they could not have acted in bad faith by not acting, nor would they have failed to inform themselves of all material information reasonably available before making a decision, because no decision was required to be made. Furthermore, the actions taken by the Company's officers (namely Eisner and Litvack) in connection with Ovitz's termination must be viewed through the lens of whether the board was under a duty to act. If the board was under no such duty, then the officers are justified in acting alone. If the board was under a duty to act and the officers improperly usurped that authority, the analysis would obviously be different.

### 1. *The New Board Was Not Under a Duty to Act*

██ Determining whether the New Board was required to discuss and approve Ovitz's termination requires careful consideration of the Company's governing instruments. The parties largely agree on the relevant language from the Company's certificate of incorporation and bylaws, but as would be expected, they disagree as to the meaning of that language.[565] Article Tenth of the Company's certificate of incorporation states:

> The officers of the Corporation shall be chosen in such a manner, shall hold their offices for such terms and shall carry out such duties as are determined solely by the Board of Directors, subject to the

right of the Board of Directors to remove any officer or officers at any time with or without cause.[566]

The Company's bylaws state at Article IV:

> *Section 1. General.* The officers of the Corporation shall be chosen by the Board of Directors and shall be a Chairman of the Board of Directors (who must be a director), a President, a Secretary and a Treasurer.
>
> . . . .
>
> *Section 2. Election.* The Board of Directors at its first meeting held after each Annual Meeting of stockholders shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time solely by the Board of Directors, which determination may be by resolution of the Board of Directors or in any bylaw provision duly adopted or approved by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier resignation or removal. Any officer elected by the Board of Directors may be removed at any time by the Board of Directors with or without cause. Any vacancy occurring in any office of the Corporation may be filled only by the Board of Directors.
>
> *Section 3. Chairman of the Board of Directors.* The Chairman of the Board of Directors shall be the Chief Executive Officer of the Corporation, shall preside at all meetings of the Board of Directors and of stockholders and shall, subject to the provisions of the Bylaws and the

---

**565.** The parties are also in agreement as to the particular versions of the certificate of incorporation (DTE 185) and bylaws (PTE 498) that were in effect at the time of Ovitz's termination.

**566.** DTE 185 at Article Tenth; *see* 8 *Del. C.* § 142.

control of the Board of Directors, have general and active management, direction, and supervision over the business of the Corporation and over its officers.... He shall perform all duties incident to the office of chief executive and such other duties as from time to time may be assigned to him by the Board of Directors. He shall have the right to delegate any of his powers to any other officer or employee.

*Section 4. President.* The President shall report and be responsible to the Chairman of the Board. The President shall have such powers and perform such duties as from time to time may be assigned or delegated to him by the Board of Directors or are incident to the office [of] President.[567]

Other relevant language comes from the board resolution that elected Ovitz as President, which states: "RESOLVED, that Michael S. Ovitz be, and hereby is, elected President of the Corporation, effective October 1, 1995, to serve in such capacity at the pleasure of this Board of Directors."[568]

Having considered these documents, I come to the following conclusions: 1) the board of directors has the sole power to elect the officers of the Company; 2) the board of directors has the sole power to determine the "duties" of the officers of the Company (either through board resolutions or bylaws); 3) the Chairman/CEO has "general and active management, direction, and supervision over the business of the Corporation and over its officers,"[569] and that such management, direction and supervision is subject to the control of the board of directors; 4) the Chairman/CEO has the power to manage, direct and supervise the lesser officers and employees of the Company; 5) the board has the *right*, but not the *duty* to remove the officers of the Company with or without cause, and that right is non-exclusive; and 6) because that right is non-exclusive, and because the Chairman/CEO is affirmatively charged with the management, direction and supervision of the officers of the Company, together with the powers and duties incident to the office of chief executive, the Chairman/CEO, subject to the control of the board of directors,[570] also possesses the

---

567. PTE 498 at WD07100–01.

568. PTE 29 at WD01196.

569. PTE 498 at WD07101.

570. Care should be taken to not read too much into the phrase, "subject to the control of the board of directors," as this "restriction" is simply a reflection of basic agency principles, and not a limitation on the powers and authority that would otherwise be incident to the office of chief executive. A chief executive officer has authority to govern the corporation subject to the control of the board of directors—that is, the chief executive officer may act as a general agent for the benefit of the corporation and in the manner in which the chief executive officer believes the board of directors desires him to act, but may not act in a manner contrary to the express desires of the board of directors. *See* RESTATEMENT (SECOND) OF AGENCY §§ 33, 39, 73

(1958). More generally, the rule has been stated thusly:

Implied authority (including 'incidental' and 'inferred' authority) of the agent to act is a natural consequence of the express authority granted. It is implied from what is actually manifested to the agent by the principal. It is obvious that implied authority cannot, by its very nature, be inconsistent with express authority because any expression of actual authority must control.

WILLIAM A. GREGORY, THE LAW OF AGENCY AND PARTNERSHIP § 15 (3d ed.2001). For example, as it would apply to this case, the chief executive officer possesses the authority to remove inferior employees (including officers) so long as the board of directors does not expressly limit or negate the chief executive officer's implied or inherent authority to do so. No member of the New Board expressed, either contemporaneously or at trial, any objection to Ovitz's termination. Tr. 2586:3–14 (Rus-

*right* to remove the inferior officers and employees of the corporation.[571]

The New Board unanimously believed that Eisner, as Chairman and CEO, possessed the power to terminate Ovitz without board approval or intervention.[572] Nonetheless, the board was informed of and supported Eisner's decision.[573] The board's simultaneous power to terminate Ovitz, reserved to the board by the certificate of incorporation, did not divest Eisner of the authority to do so, or vice-versa.[574] Eisner used that authority, and terminated Ovitz—a decision, coupled with the deci-

sell); 3778:1–23 (Gold); 4026:2–7 (Roy Disney); 4096:14–18 (Roy Disney); 5785:17–5786:9 (Mitchell); 5810:19–5812:12 (Nunis); 5934:4–5935:15 (Bowers); 6128:12–6129:1 (Litvack); 6720:11–20 (O'Donovan); 6843:23–6844:22 (Wilson); 7144:3–7146:8 (Poitier); 7556:3–7557:15 (T. Murphy); 7642:21–7643:24 (Lozano); 7857:17–7858:20 (Watson); 8158:5–8159:9 (Stern); 8160:15–24 (Stern).

**571.** These conclusions conform to the Company's custom and practice. *See* Tr. 6150:6–16 (Litvack) (testifying that "loads" of Company officers were terminated during his tenure as general counsel and that the board never once took action in connection with their terminations). The chief executive officer's non-exclusive (because it is shared with the board) right to employ and terminate inferior officers and employees extends to employees who are also directors. *See* 2 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS §§ 499 (perm ed. rev. vol.1998). The power to terminate inferior officers may be delegated by the board to an officer/agent even though the decision may require "the highest degree of judgment and discretion." *Id.* § 495. Fletcher's treatise also contains language that would indicate that, *under certain circumstances*, the removal of officers must occur by the directors:

The removal [of directors, other officers and agents] must *ordinarily* be by the body or officer authorized to elect or appoint.... Absent express authority, the [presiding officer] of a corporation has no power to remove an officer appointed by the board of directors *where the power of removal is in the board*, but a managing agent of a corporation may be removed from that position, when the term of employment has expired, by the [presiding officer] of the company by whom that agent was appointed.

*Id.* at § 357 (emphases added and citations omitted). Nevertheless, this same section also indicates that provisions in any particular corporation's governing documents would supercede this general rule: "If the statutes, charter or bylaws place the power of removal in the directors *or other officers*, as is usually the case as to offices that are not directorships, they are the ones to exercise it." *Id.* (emphasis added and citations omitted). The most applicable statement in any of the leading Delaware treatises with respect to the removal of officers comes from Folk's treatise, where conceding a lack of positive law on the issue, it is stated that "[p]resumably, the removal of officers is governed by the same provisions that regulate their election." RODMAN WARD, JR. ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 142.4 (4th ed.2004). My conclusion here does not contravene the general rule (to the extent it is a recognized rule of Delaware law), but is simply an application of the more specific requirements, guidelines and governance contained in the Company's governing documents.

**572.** Tr. 2890:3–2891:15 (Russell); 5598:18–22 (Mitchell); 5813:2–17 (Nunis); 6149:4–6151:11 (Litvack); 6339:22–6343:19 (Litvack); 6720:21–6721:21 (O'Donovan); 6785:15–6793:22 (O'Donovan); 7067:21–7069:8 (Wilson); 7226:7–7227:7 (Poitier); 7560:21–7561:17 (T. Murphy); 7646:11–7647:2 (Lozano). *See id.* at 6126:9–13 (Litvack) (testifying that Pierce did not advise him that a board meeting would be necessary to terminate Ovitz); 8233:5–11 (Stern) (stating that he relied on Litvack to determine the appropriate procedures for Ovitz's termination).

**573.** *See supra* note 570.

**574.** The delegation of authority by a board to an officer "does not mean that the board has completely abdicated its authority; moreover, the duties and powers of an officer or general manager do not deprive the directors of all stated authority and responsibilities." FLETCHER, § 495, *supra* note 571.

sion to honor the OEA, that resulted in the Company's obligation to pay the NFT.[575] Because Eisner unilaterally terminated Ovitz, as was his right,[576] the New Board was not required to act in connection with Ovitz's termination.

Therefore, the fact that no formal board action was taken with respect to Ovitz's termination is of no import. This is true regardless of the fact that Ovitz received a large cash payment and the vesting of three million options in connection with his termination.[577] The board had delegated to the compensation committee *ex ante* the responsibility to establish and approve compensation for Eisner, Ovitz and other applicable Company executives and high-paid employees.[578] The approval of Ovitz's compensation arrangements by the compensation committee on September 26, 1995 included approval for the termination provisions of the OEA, obviating any need to meet and approve the payment of the NFT upon Ovitz's termination.[579] Because the board was under no duty to act, they did not violate their fiduciary duty of care,

and they also individually acted in good faith.[580] For these reasons, the members of the New Board (other than Eisner and Litvack, who will be discussed individually below) did not breach their fiduciary duties and did not act in bad faith in connection with Ovitz's termination and his receipt of the NFT benefits included in the OEA.

### 2. Litvack

■ Litvack, as an officer of the corporation and as its general counsel, consulted with, and gave advice to, Eisner, on two questions relevant to Ovitz's termination. They are, first, whether Ovitz could or should have been terminated for cause and, second, whether a board meeting was required to ratify or effectuate Ovitz's termination or the payment of his NFT benefits. For the reasons I have already stated, Litvack properly concluded that the Company did not have good cause under the OEA to terminate Ovitz.[581] He also properly concluded that no board action was necessary in connection with the termination.[582] Litvack was familiar with the

---

**575.** *See* Tr. 4524:11–4526:24; 4584:3–9; 4919:8–4926:17.

**576.** That is, Eisner possessed that right unless and until he received contrary instructions from the board, which he did not. *See supra* note 570.

**577.** Notwithstanding earlier statements by this Court (*Disney III*, 2004 WL 2050138, at *7 n. 64) and the Delaware Supreme Court (*Brehm*, 746 A.2d at 259), I conclude that the NFT was not economically material to the Company. *See supra* notes 533, 558. Those previous judicial statements regarding materiality cannot properly be considered "law of the case" because those statements were made in the context of motions where plaintiffs were afforded all reasonable inferences in support of their arguments and without any factual basis. Now, upon a full factual record, and in my discretion as fact-finder (materiality is a question of fact), I conclude that the NFT payout, even at the inflated valuation calculated by Professor Murphy, was not material to the Company.

**578.** *See* PTE 187.

**579.** *See* PTE 39 at WD01186–87A.

**580.** The New Board could not have acted collectively in good faith because there was no meeting. Nonetheless, after weighing all the evidence in the case, I am not persuaded that the members of the New Board acted in bad faith in connection with Ovitz's termination. Had, for example, they been aware that the Company did have grounds upon which to terminate Ovitz for cause, and still not acted, the calculus would be much different, but based upon this record, I conclude that their non-action was in good faith.

**581.** *See supra* text "Defendants Did Not Commit Waste" at 131.

**582.** *See supra* text "The New Board Was Not Under a Duty to Act" at 162.

relevant factual information and legal standards regarding these decisions.[583] Litvack made a determination in good faith that a formal opinion from outside counsel would not be helpful and that involving more people in the termination process increased the potential for news of the impending termination to leak out.[584]

I do not intend to imply by these conclusions that Litvack was an infallible source of legal knowledge. Nevertheless, Litvack's less astute moments as a legal counsel do not impugn his good faith or preparedness in reaching his conclusions with respect to whether Ovitz could have been terminated for cause and whether board action was necessary to effectuate Ovitz's termination, as I have independently analyzed the record and conclude that Litvack's decisions as to those questions were correct. First, Litvack's silence at the December 10, 1996 EPPC meeting, when Russell informed the committee that Ovitz's bonus was contractually required, was unquestionably curious, and some might even call it irresponsible.[585] His excuse that he did not want to embarrass Russell in front of the committee is, in a word, pathetic. Litvack should have exercised better judgment than to allow Russell to convince the committee that a $7.5 million bonus was contractually required. Luckily

for Litvack, no harm was done because in the end Ovitz's bonus was rescinded.

Second, Litvack's (and Santaniello's) conclusion regarding the potential conflict between the OEA and the terms of the 1990 Plan is certainly questionable, but reasonable in light of the circumstances and not the product of an uninformed decision or bad faith.[586] The language in the 1990 Plan is sufficiently ambiguous—as to whether action by the compensation committee is required in all terminations (both with and without cause) of employees who possess options—to, in my opinion, absolve Litvack and Santaniello for their advice, and the compensation committee for not acting with respect to Ovitz's termination.[587]

In conclusion, Litvack gave the proper advice and came to the proper conclusions when it was necessary. He was adequately informed in his decisions, and he acted in good faith for what he believed were the best interests of the Company.

### 3. *Eisner*

 Having concluded that Eisner alone possessed the authority to terminate Ovitz and grant him the NFT, I turn to whether Eisner acted in accordance with his fiduciary duties and in good faith when he terminated Ovitz.[588] As will be shown hereafter, I conclude that Eisner did not

583. Tr. 6112:17–6115:21; 6117:5–6121:8; 6131:6–6151:11.

584. Tr. 6115:22–6116:14; 6130:4–6131:5; 6413:20–6417:1.

585. Tr. 6153:18–6156:9.

586. *See* Tr. 6126:14–6127:17; 6149:15–6150:5; 6658:5–6675:3. *Compare* PTE 7 at ¶ 5(e) *with* PTE 41 at WD00125, WD00134.

587. Again, my conclusion as to the propriety of the defendants' conduct in regard to Ovitz is informed by their custom and practice in other circumstances. Nothing in the record leads me to believe that the compensation

committee ever made a determination as to whether a particular termination was with or without cause under any of the Company's stock option plans that would put them on notice that action would be necessary as part of Ovitz's termination. *See* PTE 39; PTE 41; PTE 153.

588. The parties essentially treat both officers and directors as comparable fiduciaries, that is, subject to the same fiduciary duties and standards of substantive review. Thus, for purposes of this case, theories of liability against corporate directors apply equally to corporate officers, making further distinctions unnecessary. For a discussion of the duties

breach his fiduciary duties and did act in good faith in connection with Ovitz's termination and concomitant receipt of the NFT.

When Eisner hired Ovitz in 1995, he did so with an eye to preparing the Company for the challenges that lay ahead, especially in light of the CapCities/ABC acquisition and the need for a legitimate potential successor to Eisner. To everyone's regret, including Ovitz,[589] things did not work out as blissfully as anticipated. Eisner was unable to work well with Ovitz, and Eisner refused to let Ovitz work without close and constant supervision. Faced with that situation, Eisner essentially had three options: 1) keep Ovitz as President and continue trying to make things work; 2) keep Ovitz at Disney, but in a role other than President; or 3) terminate Ovitz.

In deciding which route to take, Eisner, consistent with his discretion as CEO, considered keeping Ovitz as the Company's President an unacceptable solution. Shunting Ovitz to a different role within the Company would have almost certainly entitled Ovitz to the NFT, or at the very least, a costly lawsuit to determine whether Ovitz was so entitled.[590] Eisner would have also rightly questioned whether there was another position within the Company where Ovitz could be of use. Eisner was then left with the only alternative he considered feasible—termination. Faced with the knowledge that termination was the best alternative and knowing that Ovitz

had not performed to the high expectations placed upon him when he was hired, Eisner inquired of Litvack on several occasions as to whether a for-cause termination was possible such that the NFT payment could be avoided, and then relied in good faith on the opinion of the Company's general counsel.[591] Eisner also considered the novel alternative of whether a "trade" of Ovitz to Sony would solve the problem by both getting rid of Ovitz and simultaneously relieving the Company of the financial obligations of the OEA. In the end, however, he bit the bullet and decided that the best decision would be to terminate Ovitz and pay the NFT.

After reflection on the more than ample record in this case, I conclude that Eisner's actions in connection with the termination are, for the most part, consistent with what is expected of a faithful fiduciary. Eisner unexpectedly found himself confronted with a situation that did not have an easy solution. He weighed the alternatives, received advice from counsel and then exercised his business judgment in the manner he thought best for the corporation. Eisner knew all the material information reasonably available when making the decision, he did not neglect an affirmative duty to act (or fail to cause the board to act) and he acted in what he believed were the best interests of the Company, taking into account the cost to the Company of the decision and the potential alternatives. Eisner was not per-

and liabilities of non-director corporate officers and how they may differ from those of directors, *see* Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule,* 60 Bus. Law. 439 (2005); Lawrence A. Hamermesh and A. Gilchrist Sparks, III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson,* 60 Bus. Law 865 (2005).

**589.** *See* PTE 341; Tr. 1757:15–1758:21.

**590.** *See* PTE 7 at ¶¶ 10, 11(c), 12(b).

**591.** Tr. 4379:23–4381:15; 4419:11–4422:2; 4476:11–4483:7. There being no indication in the record that Eisner was aware that Litvack did not consult with outside counsel in regard to Ovitz's termination, Eisner is entitled to rely on Litvack's assertion that he consulted with outside counsel even though, as explained above, I am not convinced that Litvack did indeed speak with Pierce regarding the cause issue.

sonally interested in the transaction in any way that would make him incapable of exercising business judgment, and I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Eisner breached his fiduciary duties or acted in bad faith in connection with Ovitz's termination and receipt of the NFT.

## IV. CONCLUSION

Based on the findings of fact and conclusions of law made herein, judgment is hereby entered in favor of the defendants on all counts.

IT IS SO ORDERED.

